UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

DIANA WILLIAMS,

                                  Plaintiff,

             -against-

THE CITY OF NEW YORK,

                                  Defendant.

------------------------------------------------------------------------ x

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT**

12 CV 6805 (VEC)

        Defendant City of New York hereby submits its statement of undisputed facts in support of its motion for partial summary judgment pursuant to Local Rule 56.1:

        1.       The events giving rise to this lawsuit occurred on September 11-12, 2011. (See Amended Complaint)

        2.       As of September 11, 2011, plaintiff and her husband, Christopher Williams, owned residential real estate located at 265 Hillbrook Drive, Staten Island, New York. (Amended Complaint, ¶ 7; Ex. A to Declaration of Mark D. Zuckerman, hereinafter "Zuckerman Decl.," C. Williams dep., p. 25, ll. 12-17, p. 26, ll. 14-20)

        3.       On September 11, 2011, Christopher Williams was living in the basement of 265 Hillbrook Drive, and the Williams' two tenants, Lorena White and Nicole Sabella, were renting rooms upstairs. The three of them also shared common areas within the premises. (Zuckerman Decl., Ex. A, C. Williams dep., p. 34, l. 25-p. 35, l. 22; p. 46, ll. 22-25; p. 48, ll. 1-3)

        4.       Lorena White and Nicole Sabella were friends at the time that they had rented the foregoing space from the Williams'. (Zuckerman Decl., Ex A, C. Williams dep., p. 38, ll. 14-19)

5. Thereafter, the Williams' began to have problems with Lorena White due to her non-payment of rent. (Ex. A, C. Williams, p. 38, l. 20, p. 40. l. 3)

6. Christopher Williams had also been told by Lorena White's ex-husband that Lorena White was a "very violent person" and "crazy person." Christopher Williams also thought that she was "crazy" from his interactions with her and thought she had gotten very "angry," "aggressive" and "intimidating" with him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, ll. 4-17; p. 44, ll. 12-17; p. 45, l. 24-p. 46, l. 15)

7. As a result, the Williams' lawyer sent Lorena White a letter "advising her to move out within 30 days." (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, ll. 18-19)

8. Upon receiving the letter, according to Christopher Williams, Lorena White "threatened" him, was "angry" and called the police to complain about him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, l. 19-p. 42, l. 9; p. 49, ll. 12-20; p. 54, l. 7-p. 57, l. 16)

9. The 30th and final day for Lorena White to move out was September 11, 2011, and Christopher Williams decided to call the police to assist in that process as he knew in advance that Nicole Sabella and Lorena White were planning to move out that day. (Zuckerman Decl., Ex. A, C. Williams dep., p. 42, ll. 10-12; p. 49, ll. 12-20; p. 59, l. 22-p. 60, l. 9; p. 62, ll. 17-23; Zuckerman Decl., Ex. B., Sabella dep., p. 43, l. 19-p. 44, l. 1)

10. As September 10, 2011, plaintiff was residing principally in Maryland, where the Williams' two children were attending to school. (Zuckerman Decl., Ex. A, C. Williams dep., p. 27, ll. 11-p, 28, l. 12; Zuckerman Decl., Ex. C, D. Williams dep., p. 78, l. 19-p. 79, l. 3)

11. Plaintiff is deaf. (See Amended Complaint; Zuckerman Decl., Ex. D, D. Williams 50-h, p. 7, ll. 12-13)

12. Plaintiff drove to Staten Island in the evening of September 10, 2011 ito be present when Lorena White and Nicole Sabella moved out (Nicole Sabella decided to move out when Lorena White was asked by the Williams' to move out in order to continue to live with her), as was requested of Lorena White for non-payment of rent. (Zuckerman Decl., Ex. A, C. Williams dep. 50, ll. 7-24; p. 59, ll. 15-17; p. 59, l. 22-p. 60, l. 9; Zuckerman Decl., Ex. B, Sabella dep., p. 40, ll. 8-23)

13. The Williams' felt that Diana Williams had to be present for the "move-out" to ensure that "everything went smoothly." (Zuckerman Decl., Ex. A, C. Williams dep., p. 60, ll. 19-21)

14. Christopher and Diana Williams had agreed with each other in advance that they would call the police to ensure that the "move-out" "went smoothly" and so the police could "monitor" it. (Zuckerman Decl., Ex. A, C. Williams dep., l. 59-p. 60, l. 21; p. 61, ll. 3-7)

15. The Williams' were expecting problems, which is why they wanted the police present for the "move-out." (Zuckerman Decl., Ex. A, C. Williams dep., p. 63, ll. 4-8)

16. Pursuant to their plan to call the police to "monitor" the "move-out," the Williams' placed a phone call to the police around 10 a.m. on the morning of September 11, 2011, from the Williams' basement where Christopher Williams had been residing and Diana Williams had spent the night. (Zuckerman Decl., Ex. A, C. Williams dep., p. 61, l. 25-p. 62, l. 8; p. 63, ll. 12-25)

17. In their phone call to the police, the Williams' explained to the 911 operator that Lorena White "was very angry" and that they were "afraid that anything could happen." (Zuckerman Decl., Ex. A, C. Williams dep., p. 64, ll. 11-20; Zuckerman Decl, Ex. C, D. Williams dep., p. 80, ll. 3-14)

18. Plaintiff then went upstairs to talk to Nicole Sabella about some "missing items that were in the kitchen." (Zuckerman Decl., Ex. A, C. Williams dep., p. 65, ll. 12-24;. Zuckerman Decl, Ex. D, D. Williams 50-h, p. 12, ll. 2-13; Zuckerman Decl., Ex. B, Sabella dep. p. 49, ll. 15-23))

19. Plaintiff had brought the family dog with her from Maryland to 265 Hillbrook Drive when she traveled to New York in the evening of September 10, 2011. (Zuckerman Decl., Ex. A, C. Williams dep., p. 48, ll. 19-20; 59, ll. 15-17)

20. Pursuant to the Williams' agreement with their tenants, the dog was not supposed to go into Lorena White's bedroom. (Zuckerman Decl., Ex. A, C. Williams dep., p. 48, l. 24-p. 49, l. 5)

21. After plaintiff went upstairs to discuss the "missing items" from the kitchen (the "cutting board") with the Williams' tenants, Christopher Williams heard the dog barking, seemingly because plaintiff's brother David Rivera, was at the front door. (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 1-7; 69, ll. 1-10)

22. As Christopher Williams and David Rivera were talking, the dog ran upstairs to find plaintiff and David Rivera couldn't catch the dog. (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 8-12)

23. The dog went into Lorena White's room, plaintiff went to retrieve it, and there was a confrontation between Lorena White and plaintiff, as Lorena White was in her room. (Zuckerman Decl., Ex. A, C. Williams dep., p. 68, ll. 4-6; p. 70, l. 1-7; p. 75, l. 21-p. 76, l. 5; Zuckerman Decl., Ex. D, D. Williams 50-h, p. 10, l. 10-p. 11, l. 2; Zuckerman Decl., Ex. B, Sabella dep., p. 49, l. 24-p. 50, l. 2; Zuckerman Decl., Ex. C, D. Williams dep., p. 97, ll. 2-4)

24. During the confrontation, according to Diana Williams, Lorena White threatened to hurt her. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 17, l. 25-p. 18, l. 2)

25. During the confrontation, plaintiff admits that she "push[ed] [Lorena] away to stop her," as plaintiff was holding her dog in her hand. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 4-9) Plaintiff was pushing Lorena White away with an "open palm toward her." (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 15-23) Plaintiff admits to "mov[ing] her back with [her] hand" and that it was "possible" that she touched her. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 32, ll. 20-22, Zuckerman Decl., Ex. C, D. Williams dep. p. 99, ll. 21-22)

26. During the confrontation, plaintiff contends that Lorena White "came right in [her] face…" (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 4-9)

27. During the confrontation, plaintiff "got a scratch on her chin" from Lorena White. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 10-14, Zuckerman Decl., Ex. E; Zuckerman Decl., Ex. G, Romano dep. 4/4/14 p. 64, l. 18-22)

28. Plaintiff's brother, David Rivera, had to "get in the middle of them" to keep Lorena White and plaintiff apart. (Zuckerman Decl., Ex. B, Sabella dep., p. 50, ll. 3-7; p. 51, l. 9-p. 52, l. 21; p. 70, ll. 2-5; Zuckerman Decl., Ex. C, D. Williams dep., p. 98, l. 24-p. 99, l. 8)

29. Christopher Williams then saw plaintiff coming downstairs with the dog and "when [he] looked at her [he] knew something wasn't right. (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 15-20)

30. At or about the same time, Christopher Williams could see David Rivera calming Lorena White down, and noticed that Lorena White "was very upset." (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 21-24)

31. That's when Christopher Williams "knew something was going to happen…..I knew I was going to have to call the police." (again)(Zuckerman Decl.,, Ex. A, C. Williams dep., p. 71, ll. 12-14)

32. Plaintiff, who had gone outside after the altercation with Lorena White, then told Christopher Williams that she was mad at him for letting the dog go upstairs as they talked outside. (Zuckerman Decl., Ex. A, C. Williams dep., p. 67, ll. 23-25)

33. The Williams then waited 10-15 minutes for the police to respond to their initial call, but they didn't arrive. (Zuckerman Decl., Ex. A, C. Williams dep., p. 76, ll. 19-22)

34. Christopher Williams and David Rivera tried to call the police again, but could not within 265 Hillbrook Drive, because the Williams' internet had been disconnected while Nicole Sabella was packing, to which Christopher Williams was "so angry" with her. (Zuckerman Decl., Ex. A, C. Williams dep., p. 76, l. 23-p. 77, l. 16)

35. Lorena White's boyfriend, first name "Alendi," then arrived and tried to let himself in the residence, to which Christopher Williams objected because the police hadn't arrived. (Zuckerman Decl., Ex. A, C. Williams dep., p. 77, ll. 17-22; Zuckerman Decl., Ex. B, Sabella dep., p. 47, ll. 14-24)

36. Lorena White's boyfriend was "hearing." (not deaf) (Zuckerman Decl., Ex. A, C. Williams dep., p. 80, ll. 13-22)

37. Christopher Williams confronted Lorena White's boyfriend at the entrance to the residence, and the boyfriend pushed him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 77, ll. 17-24)

38. Lorena White's boyfriend then started to curse at him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 1-2)

39. Then Lorena White's boyfriend "made his hand into a clear gun shape—made a gun with his hand, pointed at [Christopher Williams] and said, I'm going to shoot you." (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 14-18)

40. In his own words, Christopher Williams testified at deposition that he and Lorena White's boyfriend "were fighting." (Zuckerman Decl., Ex. A, C. Williams dep., p. 98, ll. 14-15)

41. Christopher Williams and David Rivera then "ran" to David Rivera's residence, which was close by, to call the police again, and stayed there for 5 minutes. (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 21-23; p. 80, ll. 3-7; p. 82, ll. 4-9)

42. When the "police picked up," Christopher Williams told the police that "a man is chasing [him] and saying that he has a gun," and "that there is a gun." (Zuckerman Decl., Ex. A, C. Williams dep., p. 79, ll. 2-4)

43. The NYPD's SPRINT report evidencing the call to the 911 operator indicates that there was a male Hispanic with dark skin who had a gun. (Zuckerman Decl., Ex. I, SPRINT report)

44. The responding officers remember the job also "[coming] over as a dispute between landlord and tenant." (Zuckerman Decl., Ex. J, Costanzo dep., p. 28, ll. 21-24)

45. The police told Christopher Williams that they would "send an officer right over." (Zuckerman Decl., Ex. A, C. Williams dep., p. 79, ll. 4-5)

46. Police Officer Christopher Romano and his partner, P.O. Gillio Costanzo, arrived at the scene 5 minutes later. (Zuckerman Decl., Ex. A, C. Williams dep., p. 83, ll. 11-14, Zuckerman Decl., Ex. G, Romano dep. 4/4/14, p. 33, ll. 4-6; Zuckerman Decl., Ex. J, Costanzo dep. p. 12, ll. 13-15)

47. The officers talked to Lorena White, Nicole Sabella and Lorena White's boyfriend after they arrived on the scene for "fifteen to twenty minutes." (Zuckerman Decl., Ex. A, C. Williams dep., p. 83, l. 24-p. 84, l. 3; p. 84, ll. 21-24, p. 87, ll. 18-21; Zuckerman Decl., Ex. B, Sabella dep., p. 61, ll. 7-21; Zuckerman Decl., Ex. C, D. Williams dep., p. 82, ll. 16-19)

48. The officers also searched Lorena White's boyfriend's car for the gun. (Zuckerman Decl., Ex. A, C. Williams dep., p. 93, ll. 16-22)

49. Upon arriving at the scene, Officer Romano and Officer Costanzo were told that two women had gotten into a physical altercation and P.O. Romano's investigation confirmed same. They were told about the physical altercation by one of the women participants. They also observed physical injuries, including a "lip" injury to Lorena White and a scratch on Diana Williams' chin. No gun was found. (Zuckerman Decl., Ex. G, Romano 4/4/14 dep., p. 34, l. 21-p. 37, l. 19; p. 40, ll. 17-23; p. 43, ll. 5-20; p. 47, l. 25-p. 48, l. 5, Zuckerman Decl., Ex. H, Romano 10/9/14 dep., p. 101, ll. 16-23; Zuckerman Decl., Ex. J, Costanzo dep., p. 30, l. 17-20; p. 37, l. 25-p. 38, l. 6; p. 41, ll. 15-18; Zuckerman Decl., Exs. E and F)

50. Lorena White is able to speak English and P.O. Costanzo could communicate with her with the help of her boyfriend. (Zuckerman Decl., Ex. A, C. Williams dep., p. 58, ll. 3-25; Zuckerman Decl., Ex, J, Costanzo dep. p. 28, l. 25-p. 29, l. 18)

51. According to Christopher Williams, the situation was very "hectic" and "chaotic" when the police arrived. (Zuckerman Decl., Ex. A, C. Williams dep., p. 84, ll. 21-25; p. 85, ll. 6-8)

52. Plaintiff was ultimately arrested for assaulting her tenant, Lorena White. (Assault in the 3rd Degree) (Amended Complaint, ¶ 7; Zuckerman Decl., Ex. C, D. Williams dep., p. 88, ll. 14-17; Zuckerman Decl., Ex. G, Romano 4/4/14 dep. p. 34, l. 17-p. 35, l. 10; p. 55, l. 15-25).

53. Lorena White was also ultimately arrested for assaulting plaintiff. (Zuckerman Decl., Ex. A, C. Williams dep., p. 97, ll. 3-8; Zuckerman Decl, Ex. C, D. Williams dep. p. 104, ll. 10-15; Zuckerman Decl., Ex. G, Romano 4/4/14 dep., p. 34, l. 17-p. 35, l. 10)

54. Upon her arrest, plaintiff was transported to the NYPD's 122nd Precinct for processing, which was a 3-5 minute ride from 265 Hillbrook Drive. (See Amended Complaint, ¶ 11; Zuckerman Decl., Ex. A, C. Williams dep., p. 96, ll. 23-25; Zuckerman Decl., Ex. C, D. Williams dep., p. 112, ll. 17-19)

55. While in custody, and upon her arrival at Staten Island Central Booking, which is at the same location as the NYPD's 120th Precinct, following transport from the 122nd Precinct, plaintiff requested to go to the hospital. (Zuckerman Decl., Ex. C, D. Williams dep., p. 120, l. 10-,p. 121, l. 6; see Amended Complaint, ¶ 14)

56. In accordance with her request, plaintiff was transported to the Richmond University Medical Center by EMTs in an ambulance. (See Amended Complaint, ¶ 14; Zuckerman Decl., Ex. C, D. Williams dep., p. 127, ll. 7-21)

57. According to its records, the Richmond University Medical Center provided plaintiff an American Sign Language Interpreter when she was treated at that Hospital. (the first time) (Zuckerman Decl., Exhibit K, Maximos dep. p. 32, ll. 19-24; See Amended Complaint, ¶ 15)

58. Following her discharge from the Richmond University Medical Center (the first time), plaintiff was transported back to Staten Island Central Booking by P.O. Justin Meehan and P.O. Christopher Maki. (See Amended Complaint, ¶ 16; see Zuckerman Decl., Ex. C, D. Williams dep., p. 133, ll. 16-18; Zuckerman Decl., Ex. L, Meehan dep. p. 129. l 20-p. 130, l. 4; 134, ll. 9-18)

59. Upon arriving back at Staten Island Central Booking, plaintiff again requested to be hospitalized. (See Amended Complaint, ¶ 17; Zuckerman Decl., Ex. C, D. Williams dep., p. 137, ll. 3-11)

60. In accordance with her request, plaintiff was again transported to the Richmond University Medical Center by EMTs in ambulance. (Zuckerman Decl., Ex. C, D. Williams dep., p. 143, ll. 2-12; 144, 4-13)

61. While she was treated at the Richmond University Medical Center (the second time), plaintiff contends that she was not provided an American Sign Language Interpreter, though the Hospital during its Rule 30(b)(6) deposition in this matter, could not determine from its records whether one was provided or not. (see Zuckerman Decl., Ex. K, Maximos dep. p. 104, ll. 14-22; see Amended Complaint, ¶ 17)

62. Plaintiff has not sued the Richmond University Hospital for its alleged failure to provide and American Sign Language Interpreter during plaintiff's second visit to the Hospital. (See Amended Complaint)

63. On September 12, 2011, plaintiff was released from custody without charges being formally brought at or about 1:00 or 2:00 p.m. as the Staten Island District Attorney chose not to proceed if both women agreed not to pursue charges. (Amended Complaint, ¶ 21; Zuckerman Decl., Ex. D, D. Williams 50-h, p. 24, ll. 12-22; Zuckerman Decl., Ex. G, Romano dep. 4/4/14 p. 58, l. 22-p. 59, l. 7; p. 69, l. 24-p. 71, l. 16)

64. Lorena White and Nicole Sabella ultimately moved out of 265 Hillbrook Drive on or about September 11, 2011. (Zuckerman Decl., Ex. A, C. Williams dep., p. 52, ll. 10-13)

Dated: New York, New York
January 16, 2015

ZACHARY W. CARTER
Corporation Counsel of the
 City of New York
Attorney for Defendant City
100 Church Street, Room 3-133b
New York, New York 10007
(212) 356-3519

By:     /s/
MARK D. ZUCKERMAN
Senior Counsel