**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| | |
|---|---|
| DIANA WILLIAMS, | CIV. NO. 12-CV-06805(VEC) |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW OPPOSING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| THE CITY OF NEW YORK, | |
| Defendant. | |

-----------------------------------------------------------------

EISENBERG & BAUM, LLP
24 Union Square East
Fourth Floor
New York, NY 10003
(212) 353-8700

ATTORNEYS FOR PLAINTIFF

**TABLE OF CONTENTS:**

**TABLE OF AUTHORITIES:**.................................................................................................. iii

**PRELIMINARY STATEMENT** ....................................................................................... 1

**SUMMARY JUDGMENT STANDARD** ........................................................................ 3

**ARGUMENT** ...................................................................................................................... 3

   I.   The City Is Liable for Discrimination at the Scene of an Arrest ........................................ 3

      a.  Title II Applies to Everything the City Does................................................... 4

      b.  Exigent Circumstances Did Not Exist ............................................................. 8

      c.  The NYCHRL Warrants Independent Consideration.....................................11

   II.   Plaintiff Has Established a Claim for False Arrest......................................... 13

   III.   Plaintiff Has Established a Claim for Assault and Battery............................. 16

   IV.   Plaintiff Withdraws Her Claim for Intentional Infliction of Emotional Distress .......... 17

   V.   Plaintiff Withdraws Her Claim for Negligent Hiring.................................... 17

   VI.   The City Is Not Protected by State Law Immunity........................................ 17

   VII.   Municipal Liability Does Lie ....................................................................... 18

      a.  Municipal Liability Under the ADA and Rehabilitation Act......................... 19

      b.  Municipal Liability Under 42 U.S.C. § 1983................................................. 22

      c.  Defendant Had Notice of Municipal Liability ............................................... 24

**CONCLUSION** ................................................................................................................. 25

**TABLE OF AUTHORITIES:**

**Cases**

Alexander v. Choate, 469 U.S. 287 (1985) ................................................................ 20

Amnesty America v. Town of West Hartford, 361 F. 3d 113 (2d. Cir. 2004) ............... 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................ 3

Bahl v. Cnty of Ramsey, 695 F.3d 778 (8th Cir. 2012) ........................................ 5, 6, 9

Bircoll v. Miami-Dade Cnty., 480 F.3d 1072 (11th Cir. 2007) .................................... 8

Brady v. Wal-Mart Stores, Inc., 531 F.3d 127 (2d. Cir. 2008) ............................. 21, 23

Brandon v. City of New York, 705 F. Supp. 2d 261 (S.D.N.Y. 2010) ........................ 22

Brooklyn Center for Independence v. Bloomberg, 980 F. Supp. 2d 588 (S.D.N.Y. 2013) ..... 13, 20

Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543 (D.N.J. 2000) .................... 6

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................. 3

Center v. City of West Carrollton, 227 F. Supp. 2d 863 (S.D. Ohio 2002) ................... 6

Cerrone v. Brown, 246 F.3d 194 (2d Cir. 2001) ......................................................... 13

Chisolm v. McManimon, 275 F.3d 315 (3d. Cir. 2001) ................................................ 8

City of Canton v. Harris, 489 U.S. 378 (1989) .......................................................... 24

Coollick v. Hughes, 699 F.3d 211 (2d Cir. 2012) ....................................................... 17

Crocker v. Lewiston Police Dep't, No. 00-13-P-C (D. Maine Feb. 9, 2001) ................ 7

DeCarlo v. Fry, 141 F.3d 56 (2d Cir. 1998) ............................................................... 23

Delano-Pyle v. Victoria Cnty., Texas, 302 F.3d 567 (5th Cir. 2002) .......................... 19

Dillard v. City of Syracuse, 51 A.D.2d 432, 381 N.Y.S.2d 913 (N.Y. App. Div. 1976) .............. 13

DiSorbo v. Hoy, 343 F.3d 172 (2d Cir. 2003) ............................................................ 22

Douglas v. City of New York, 595 F. Supp. 2d 333 (S.D.N.Y. 2009) .......................... 14

Duvall v. Cnty. of Kitsap, 260 F.3d 1124 (9th Cir. 2001) ............................................................ 19

Eckardt v. City of White Plains, 87 AD 3d 1049 (N.Y. App. Div., 2nd Dept. 2011) .................... 16

Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999) ........................................................................ 6

Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000) ..................................................................... 5, 9

Henrietta D. v. Bloomberg, 331 F. 3d 261 (2d Cir. 2003) ...................................................... 19, 20

Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37 (2d Cir. 1997) ......................... 5

Jenkins v. City of New York, 478 F. 3d 76 (2d Cir. 2007) ...................................................... 13, 16

Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268 (2d Cir. 2009) ............................................11

Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir. 2003) ........................................................ 23

McCray v. City of Dothan, 169 F. Supp. 2d 1260 (M.D. Ala 2011) ......................................... 6, 9

McLean v. City of New York, 12 N.Y.3d 194 (N.Y. Ct. App. 2009) ........................................... 18

Mihalik v. Credit Agricole Cheuvreux, 715 F. 3d 102 (2d Cir. 2013) ........................................ 12

Minott v. Duffy, No. 11 Civ. 1217 (KPF) (S.D.N.Y. April 8, 2014) ........................................... 14

Mon v. City of New York, 78 N.Y.2d 309 (N.Y. Ct. App. 1991) ................................................. 18

Monell v. Department of Social Services, 436 U.S. 658 (1978)...................................... 19, 22, 23

Noel v. New York City Taxi and Limousine Com'n, 687 F. 3d 63 (2d Cir. 2012) ......................... 5

Oliveira v. Mayer, 23 F. 3d 642 (2d. Cir. 1994).......................................................................... 15

Patrice v. Murphy, 43 F. Supp. 2d 1156 (W.D. Wash. 1999) ....................................................... 7

Patton v. Dumpson, 498 F.Supp. 933 (S.D.N.Y. 1980)............................................................... 19

Paulone v. City of Frederick, 787 F. Supp. 2d 360 (D. Md. 2011) ............................................... 6

Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998)............................................... 4, 5, 6

Perez v. Duran, 962 F. Supp. 2d 533 (S.D.N.Y. 2013)............................................................... 14

Phillips v. City of New York, 66 AD 3d 170 (App. Div., 1st Dept. 2009).................................... 12

Rosen v. Montgomery County Maryland, 121 F.3d 154 (4th Cir. 1997) .............................. 5, 6, 19

Salinas v. City of New Braunfels (Salinas I), 557 F. Supp. 2d 771 (W.D. Tex. 2006) .................. 6

Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232 (M.D. Pa. 2003) ................................ 20, 21

Segal v. City of New York, 459 F. 3d 207 (2d Cir. 2006) ............................................ 22

Seremeth v. Bd. Of Cnty. Comm'rs of Frederick Cnty., 673 F.3d 333 (4th Cir. 2012) .......... 5, 6, 7

Sforza v. City of New York, No. 07 Civ. 6122 (DLC) (S.D.N.Y. March 31, 2009) .............. 22, 23

Standt v. City of New York, 153 F. Supp. 2d 417 (S.D.N.Y. 2001) ................................. 14

Tango v. Tulevech, 61 N.Y.2d 34 (N.Y. Ct. App. 1983) ............................................. 17

Taylor v. City of Mason, 970 F. Supp. 2d 776 (S.D. Ohio 2013) ........................................ 5, 9, 10

Thompson v. Davis, 295 F.3d 890 (9th Cir. 2002) ....................................................... 6

Travellers Int'l, AG v. Trans World Airlines, 41 F. 3d 1570 (2d Cir. 1994) ................................ 12

Tucker v. Tennessee, 539 F.3d 526 (6th Cir. 2008) ...................................................... 5

TW ex rel. Wilson v. Sch. Bd. of Seminole County, 610 F. 3d 588 (11th Cir. 2010) .................. 19

Zervos v. Verizon N.Y., Inc., 252 F.3d 163 (2d Cir. 2001) ............................................ 5

**Statutes**

29 U.S.C. § 794 ......................................................................................... 1

42 U.S.C. § 12101 ..................................................................................... 18

42 U.S.C. § 12131 .................................................................................... 1, 4

42 U.S.C. § 12132 ..................................................................................... 4, 6

42 U.S.C. § 1983 ................................................................................ 1, 18, 22

N.Y. Executive Law § 290 ............................................................................ 1

N.Y.C. Admin. Code § 8-101 ........................................................................ 1

N.Y.C. Admin. Code § 8-102(18) ................................................................... 12

**Other Authorities**

136 Cong. Rec. 11,461 (1990) ....................................................................... 7, 23

H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 3, at 50 (1990) ....................................... 7

Settlement Agreement, <u>Lawrence et al. v. City of Englewood et al.</u>, DOJ Compl. No. 204-13-311

    (Mar. 22, 2013), available at www.ada.gov/englewood.htm ..................................................... 9

**Regulations**

28 C.F.R. § 35.130 ................................................................................ 20, 21

28 C.F.R. § 35.164 .................................................................................... 8

**Rules**

Fed. R. Civ. P. 56.................................................................................... 3

## PRELIMINARY STATEMENT

Plaintiff Diana Williams ("Plaintiff" or "Ms. Williams") hereby respectfully submits her Memorandum of Law opposing Defendant's motion for partial summary judgment. For the reasons set forth below, the record supports Plaintiff's claims, and establishes disputed issues of material fact that cannot be resolved in Defendant's favor as a matter of law.

Ms. Williams brings this case under the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New York Human Rights Law, N.Y. Executive Law § 290, et seq. ("NYHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et. seq. ("NYCHRL") to redress the New York City Police Department's ("NYPD") failure to accommodate her disability during her arrest and confinement on September 11 and 12, 2011, and to redress the NYPD's discriminatory policies and failure to train. Ms. Williams also brings this case under 42 U.S.C. § 1983, as the City's discriminatory policies and failure to train resulted in her unconstitutional arrest without probable cause and in the deprivation of her liberty without due process of law.

## STATEMENT OF FACTS

To avoid unnecessary repetition, Plaintiff respectfully refers the Court to its Responses to Defendant's Statement of Material Facts ("RDSMF") and Plaintiff's Additional Statement of Material Facts ("ASMF") for a full and complete recitation of the established record in this case. The record presents numerous material questions of fact in dispute regarding the existence of probable cause to arrest, and the reasonableness and propriety of denying accommodations to Ms. Williams under the circumstances. Each of these disputes will be set forth below.

This case stems from the unlawful arrest and detention of Diana Williams, a deaf individual, by the NYPD, and the repeated, intentional refusal to provide her with a qualified sign-

language interpreter. Ms. Williams owned property in Staten Island, which she rented out as a landlord. ASMF ¶ 6. One of her tenants, Lorena White, who is also deaf, agreed to surrender her rented apartment due to her inability to pay rent. ASMF ¶¶ 7, 10. On September 11, 2011, the morning of the planned surrender, Ms. Williams requested police supervision, which was never provided. ASMF ¶ 14. When the tenant's boyfriend came to the scene, Ms. Williams' husband and brother made a second request for police intervention, and the NYPD dispatched two officers, Christopher Romano and Gillio Costanzo, to the Williams' property. ASMF ¶¶ 28–33. But when the officers arrived, even though the situation did not present an emergency, they completely ignored Ms. Williams and instead focused all of their attention on the only person at the scene who was capable of speaking English: the tenant's boyfriend. ASMF ¶ 36. Ms. Williams gestured for an interpreter, but neither officer made any effort to provide one or to communicate with her in any way, even by writing notes. ASMF ¶¶ 36–39. As a result of their failure to properly investigate by communicating with Ms. Williams—the person who called the police in the first place—the officers gravely misunderstood the situation, and arrested Ms. Williams even though there was no probable cause to believe she had committed any crime. ASMF ¶¶ 41–46. The officers also arrested the tenant. ASMF ¶¶ 52. It is undisputed that the officers did not personally witness any criminal activity by either of the two women arrested. ASMF ¶¶ 41–46. The record presents no credible evidence that Ms. Williams engaged in any criminal conduct.

Thereafter, Ms. Williams was handcuffed and confined at various police precincts without ever being given an explanation as to why she was arrested or when she would be released, and her repeated requests for an interpreter were again ignored. E.g., ASMF ¶¶ 48, 60, 67. With her hands bound behind her back, she had lost her only way of communicating—through sign language—and with no one there to explain what was happening to her, she was terrified. ASMF

2

¶66. She suffered panic attacks so severe that she was hospitalized twice during her ordeal of false imprisonment. ASMF ¶¶ 70, 71, 77. Even when she was released from jail the next day, the NYPD gave no explanation about what had happened. ASMF ¶ 86. All of the false and unsupported charges against Ms. Williams were summarily dropped after she was presented with a form to sign stating that she was not pressing charges against the tenant, a form she could not begin to properly understand given the total lack of effective communication with the police from the moment she first encountered them until her release from custody. ASMF ¶¶ 84, 85. Ms. Williams will demonstrate at trial that the NYPD falsely arrested her and discriminated against her on the basis of her disability by failing to accommodate her in any way, even though she repeatedly expressed her need for an accommodation.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when the pleadings, depositions, and other documents in the record show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. The moving party has the burden of demonstrating that no genuine issue of material fact exists, and the record must be viewed in the light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could return a verdict for the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). Furthermore, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

**ARGUMENT**

I.     **The City Is Liable for Discrimination at the Scene of an Arrest**

Title II of the ADA ("Title II"), which broadly proscribes discrimination by public entities on the basis of disability, applies to all government functions. 42 U.S.C. § 12132. The facts of this case demonstrate that the NYPD had no excuse for its noncompliance with the requirements of Title II at the scene of Diana Williams' arrest. Furthermore, the NYCHRL provides even broader coverage than Title II of the ADA, and serves as an independent basis of liability for the NYPD's discriminatory failure to accommodate Diana Williams' disability.

    a.   Title II Applies to Everything the City Does

Title II's antidiscrimination provision provides that no individual with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendant incorrectly argues that "on the street" police interactions are exempted from coverage under Title II. Def. Mem. at 9–10. Defendant's argument is contrary to both the plain meaning of Title II, as interpreted by the Supreme Court, and to the vast weight of authority on the issue.

Analysis of a statute begins by examining the statutory text for its plain meaning. See Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209 (1998) (examining the plain meaning of Title II of the ADA and holding that it applies to state prisons). Title II defines "public entity" to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A) and (B). In Yeskey, the Supreme Court held that Title II applies to all government activities unless there is a specific exception in the statute. Id. at 209-10. In reaching this conclusion, the Court held that "the text of the ADA is not ambiguous" and rejected the argument that prisons do not offer covered "services, programs or activities." Id. at 210, 212. Borrowing the reasoning from Yeskey, since the

statutory text contains no "exception that could cast the coverage of [them] into doubt," it is clear that Title II also applies to arrests. See Yeskey, 524 U.S. at 209.

While this case presents an issue of first impression, this Circuit has long adhered to the broad interpretation of Title II propounded in Yeskey, stating that "the language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the programs, services, or activities of the City. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context, and that should avoid the very type of hair-splitting arguments the City attempts to make here." Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir. 1997) (internal quotations omitted), recognized as superseded on other grounds by Zervos v. Verizon N.Y., Inc., 252 F.3d 163 (2d Cir. 2001), cited with approval by Noel v. New York City Taxi and Limousine Com'n, 687 F. 3d 63, 68 (2d Cir. 2012).

Indeed, courts around the country have consistently *extended* coverage of the ADA and Rehabilitation Act to police investigations, both pre- and post-arrest, and *regardless* of whether the police had probable cause. See Bahl v. Cnty of Ramsey, 695 F.3d 778, 787–88 (8th Cir. 2012) (the ADA effective communication requirement applies to police interviews); Seremeth v. Bd. Of Cnty. Comm'rs of Frederick Cnty., 673 F.3d 333, 336–37 (4th Cir. 2012) (distinguishing Rosen v. Montgomery County Maryland, 121 F.3d 154, 158 (4th Cir. 1997) and holding that the ADA requires effective communication during police investigations that do not lead to arrests); Tucker v. Tennessee, 539 F.3d 526, 535, 537 (6th Cir. 2008) (the ADA effective communication requirement applies to pre- and post-arrest police activity); Hainze v. Richards, 207 F.3d 795, 802 (5th Cir. 2000) (the ADA does apply to arrests if the scene is secure); Taylor v. City of Mason, 970 F. Supp. 2d 776, 782 (S.D. Ohio 2013) (the ADA requires officers to provide effective communication during an on-the-scene pre-arrest interview even though the police had probable

cause to make an arrest); McCray v. City of Dothan, 169 F. Supp. 2d 1260, 1275 (M.D. Ala 2011), affirmed in pertinent part 67 F. App'x 582 (11th Cir. 2003) (applying the ADA effective communication requirement to an on-the-scene pre-arrest interview); Salinas v. City of New Braunfels (Salinas I), 557 F. Supp. 2d 771, 776–77 (W.D. Tex. 2006) (the ADA requires officers to provide for effective communication during on-the-scene responses to emergency situations); Center v. City of West Carrollton, 227 F. Supp. 2d 863, 867–68 (S.D. Ohio 2002) (applying the ADA effective communication requirement to an on-the-scene interview of a deaf crime victim).

The Court should note that Defendant had to dig all the way back to 2001 to find a court that did not extend the ADA and Rehabilitation Act to the scene of an arrest, and to 1997 to find any appellate authority on the topic. Clearly, the weight of authority on this issue indicates that "Title II applies to anything a public entity does," including police interviews. Bahl, 695 F.3d at 788. The only appellate authority that Defendant cites against this proposition is Rosen, which predates the Supreme Court's ruling on the breadth of Title II in Yeskey and has since been discredited.[1] More recent Fourth Circuit authority, Seremeth, distinguished Rosen and confined it largely to its facts on the grounds that "Title II applies to anything a public entity does." 673 F.3d

---

[1] "Courts across the country have called Rosen's holding into question in light of the Supreme Court's decision in Penn. Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), which interpreted the ADA to cover disabled state inmates who have been discriminated against in correctional programming. See, e.g., Thompson v. Davis, 295 F.3d 890, 897 (9th Cir. 2002); Paulone v. City of Frederick, 787 F. Supp. 2d 360, 381 (D. Md. 2011) ("[T]he weight of subsequent authority, in the Supreme Court as well the Fourth Circuit and other courts, calls into question . . . reliance on Rosen."); Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543, 556 (D.N.J. 2000) (Rosen's reasoning is "now discredited"). These glosses on Rosen assume that Rosen was decided on broader grounds than it was—perhaps aided in no small part by Rosen's general discussion of the ADA. See Rosen, 121 F.3d at 158 ("Rosen was in no way 'denied the benefits of' his arrest." (quoting 42 U.S.C. § 12132)); compare Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law."). But, as noted above, Rosen's precedential reach is more properly cast as limited to the injury grounds necessary to reach its conclusion." Seremeth v. Bd. Of Cnty. Comm'rs of Frederick Cnty., 673 F.3d 333, 337–38 (4th Cir. 2012).

at 338 (internal quotations and citations omitted). Defendant's other cases, <u>Crocker</u> and <u>Patrice</u>, are similarly distinguishable and discredited by the massive weight of contrary appellate authority that followed them. <u>Patrice</u> relied heavily on the discredited reasoning in <u>Rosen</u>. See <u>Patrice v. Murphy</u>, 43 F. Supp. 2d 1156, 1159 (W.D. Wash. 1999). <u>Crocker</u> went one step further, relying on both <u>Rosen</u> and <u>Patrice</u>. See <u>Crocker v. Lewiston Police Dep't</u>, No. 00-13-P-C, 2001 U.S. Dist. LEXIS 25872, at 27–28 (D. Maine Feb. 9, 2001). These cases did not consider <u>Yeskey</u>, and are therefore unpersuasive in light of more recent authority.

Legislative history further confirms that Congress intended Title II to apply to law enforcement operations generally, including arrests. The House Report singles out arrests as an example of an activity where "discriminatory treatment based on disability can be avoided by proper training." H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 3, at 50 (1990). In addition, during the legislative debate on the ADA, one member of Congress stated:

> One area that should be specifically addressed by the ADA's regulations should be the issue of nondiscrimination by police. Regretfully, it is not rare for persons with disabilities to be mistreated by police . . . Many times, deaf persons who are arrested are put in handcuffs. But many deaf persons use their hands to communicate, either through sign language or by writing a note to a nondisabled person who does not know sign language. The deaf person thus treated is completely unable to communicate.

> Although I have no doubt that police officers in these circumstances are acting in good faith, these mistakes are avoidable and should be considered illegal under the Americans with Disabilities Act. They constitute discrimination, as surely as forbidding entrance to a store or restaurant is discrimination.

136 Cong. Rec. 11,461 (1990) (statement of Rep. Levine).

Accordingly, by examining plain meaning and legislative history, and by considering the overwhelming weight of authority of courts that have addressed this issue, it is clear that Title II's requirements apply to all actions of the NYPD, including arrests. The record is likewise clear that

Defendant did not provide any accommodation for Ms. Williams at the scene of the arrest. ASMF ¶¶ 36–39. The officers could easily have at least attempted to accommodate Ms. Williams by using written notes. But they offered no accommodation at all, creating liability under the ADA.

b.  Exigent Circumstances Did Not Exist

Defendant also argues that an "exigent circumstances" analysis excuses Title II obligations at the scene of an arrest. Def. Mem. at 11–12. This exception is much narrower than Defendant suggests, and cannot be said to apply to this case.

"The lone regulatory limitation" on the duty to provide auxiliary aids and services is when "the proposed action would result in either (1) a fundamental alteration in the nature of the service, program, or activity or (2) undue financial or administrative burdens." Chisolm v. McManimon, 275 F.3d 315, 325 (3d. Cir. 2001) (citing 28 C.F.R. § 35.164); see also Scharff v. County of Nassau, No. 10 CV 4208 (DRH)(AKT) (E.D.N.Y. June 2, 2014). One example of a circumstance that would "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden" is when exigent circumstances exist. Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1085–88 (11th Cir. 2007). With respect to any delay involved with procuring an interpreter, a fundamental alteration can be caused only during a situation where "time is of the essence," the investigation "[d]oes not involve lengthy communications," and "the suspect is not asked to give a written statement." Id. at 1086. None of those circumstances were present in this case.

The "exigent circumstances" exception applies to a much narrower category of situations than Defendant depicts. The United States Department of Justice, the federal agency charged with enforcing the ADA, has indicated that a fundamental alteration does not arise during "the typical and foreseeable emergency situations that are part of the normal operations of [a city's] law enforcement and related programs, services, and activities." See Settlement Agreement, Lawrence

et al v. City of Englewood et al., DOJ Compl. No. 204-13-311 (Mar. 22, 2013), available at www.ada.gov/englewood.htm. Rather, it arises "only in truly exigent circumstances, i.e., where any delay in providing immediate services to the individual could have life-altering or life-ending consequences to members of the public or personnel." Id. (citing 28 C.F.R. pt. 35, App. A.). The DOJ advises that "once the exigency has lifted, personnel should revisit the decision of what auxiliary aids and services are appropriate, inquire as to the person's preferences under the non-exigent circumstances, and give primary consideration to those preferences." Id.

It bears considerable emphasis that, with respect to the "exigent circumstances" analysis, Defendant's discussion of the Hainze decision is deficient. The Hainze case involved a police shooting of a mentally ill person who was brandishing a knife and walking threateningly toward a police officer. Hainze, 207 F.3d at 797. While Hainze did hold that ADA-based modifications to police policy would not be reasonable "prior to the officer's securing the scene and ensuring that there is no threat to human life," the court went on to say that "[o]nce the area was secure and there was no threat to human safety, the [police] deputies would have been under a duty to reasonably accommodate [the plaintiff's] disability." Id. at 801–02.

Other courts agree. Once officers begin conducting interviews, they must ensure effective communication during those interviews. McCray, 169 F. Supp. 2d at 1275 ("The inherent presumption . . . is that investigative activities are 'activities' within the umbrella of ADA protections."). This is true even if the officers believe they have enough information to proceed without conducting the interview. Bahl, 695 F.3d at 788–89. It continues to be true even if the officers already have probable cause for an arrest. Taylor, 970 F. Supp. 2d at 781.

The facts in Taylor are strikingly similar to those in this case. Mr. Taylor, who was deaf, called the police and alleged that he had been assaulted by Ms. Vissing, who was hard of hearing.

Id. at 777. After the police arrived, they called an interpreter in accordance with Mr. Taylor's request. Id. However, the police did not wait for the interpreter to arrive, and instead proceeded to investigate by gathering information from Ms. Vissing and using her to interpret for Mr. Taylor. Id. During the course of this investigation, Ms. Vissing told the police that Mr. Taylor had assaulted her, and the police proceeded to arrest Mr. Taylor. Id. The defendant City of Mason moved to dismiss the case, arguing that "all the police needed was probable cause to arrest [the plaintiff], which they received from Vissing's report of the incident." Id. at 781. The court disagreed, on the ground that the "[d]efendants' arguments fail[ed] to take into account allegations that Taylor initiated the phone call to police and he did so because Vissing had assaulted him." Id. In Taylor, as in this case, the defendant did not present "any caselaw demonstrating that an individual who initiated contact with police does not have a right to effectively communicate with those police when they arrive on the scene." Id. The court in Taylor went on to hold that it was inappropriate for the police to use another adult at the scene to interpret for Mr. Taylor without his consent, and that the city had not demonstrated that "the provision of an interpreter under those circumstances would fundamentally alter the nature of the police department's services or would constitute an undue burden." Id. at 782. Finally, in construing the facts in favor of the plaintiff, the Taylor court found that "the allegations do not show that Taylor posed a threat to the health or safety of officers or others, or that exigent circumstances existed so as to require a rushed investigation," because "the situation was under control and the police could have waited for the interpreter to arrive on the scene." Id.

As in Taylor, the record in this case indicates that exigent circumstances simply did not exist at the scene of the arrest. Despite the City's attempt to paint the scene as "chaotic," the record shows that the situation was under control when the police arrived. ASMF ¶¶ 33, 34. In describing

the situation as "chaotic," Defendant uses a word plucked from the deposition of Chris Williams, the deaf husband of Diana Williams, who described the scene as such not because of any threatening behavior of those present, but because he could not understand what was going on due to the lack of effective communication. ASMF ¶ 37. Neither of the police officers testified that the situation was anything other than orderly at the time of their arrival; neither stated that an altercation was taking place, and Officer Constanzo confirmed that they arrived to see a group of people "waiting outside." ASMF ¶ 33. The other four deposed witnesses to the scene (Diana Williams, Chris Williams, David Rivera, and Nicole Sabella) confirm that everyone was simply waiting outside for the police to arrive. ASMF ¶ 34. In light of this undisputed testimony, the exigent circumstances exception cannot, as a matter of law, be said to apply to this case. Therefore, the Court should not attempt to determine at the summary judgment stage that exigent circumstances existed such that no accommodation was necessary.

### c. The NYCHRL Warrants Independent Consideration

Plaintiff's burden under the NYCHRL is much lower than her burden under federal law, and no reasonable argument can be made that she is unable to sustain it.

Defendant's analysis of the NYCHRL is erroneous and misleading. Defendant cites Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) for the proposition that federal, state, and city disability laws have "typically been treated as co-extensive." [Def. Mem. at 12]. Defendant should have gone on to cite the next few paragraphs of that decision, in which the court "confirmed that claims under the City HRL must be reviewed independently from and more liberally than their federal and state counterparts." Id. (internal citation and quotation omitted). Recently, the Second Circuit lamented that "district courts continue[]—erroneously—to apply federal standards to NYCHRL claims." Mihalik v. Credit Agricole Cheuvreux, 715 F. 3d 102, 109

(2d Cir. 2013). The court in <u>Mihalik</u> instructed that "courts *must* analyze NYCHRL claims separately and independently from any federal and state law claims . . . construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." <u>Id.</u> (emphasis added; internal citations omitted). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." <u>Id.</u>

The NYCHRL definition of "reasonable accommodation" is "such accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business." N.Y.C. Admin. Code § 8-102(18). In contrast to the ADA, under the NYCHRL definition "there is no accommodation . . . that is categorically excluded from the universe of reasonable accommodation. And unlike the ADA, there are no accommodations that may be 'unreasonable' if they do not cause undue hardship." <u>Phillips v. City of New York</u>, 66 AD 3d 170, 181–82 (App. Div., 1st Dept. 2009). This is to say that, under the NYCHRL, "[a]n accommodation . . . cannot be considered unreasonable unless the covered entity proves that the accommodation would cause undue hardship." <u>Id.</u> at 185. Accordingly, the burden is on the Defendant to prove that accommodating Plaintiff's disability at the scene of an arrest would present an undue hardship. Doing so involves a case-by-case inquiry that requires an examination of the accommodation requested and the resources available to the covered entity. See <u>id.</u> at 185 n.17; N.Y.C. Admin. Code § 8-102(18). Defendant has not even alleged, far less proven, that accommodating Plaintiff would present an undue burden. As Defendant did not raise undue burden as a defense in its Amended Answer, nor at any other point during this extensive litigation, Defendant has waived it and is precluded from raising it at this time. See <u>Travellers Int'l., AG v. Trans World Airlines</u>, 41 F. 3d 1570, 1580–81 (2d Cir. 1994).

The record is clear that Defendant did not provide *any* accommodation for Ms. Williams at the scene of the arrest. ASMF ¶¶ 36–39. Even assuming, for the sake of argument, that providing an interpreter would have been an undue burden, the officers could easily have attempted to communicate with Ms. Williams by using written notes. But they offered no accommodation at all, creating clear liability under the NYCHRL.

This Court has recognized that "the NYCHRL has a broader definition of disability than the definitions contained in the ADA and the Rehabilitation Act . . . as well as a broader notion of which accommodations are reasonable." Brooklyn Center for Independence v. Bloomberg, 980 F. Supp. 2d 588, 643 (S.D.N.Y. 2013). Pursuant to Mihalik, this Court must make note of this higher standard. Even if the Court, after viewing the record in the light most favorable to the Plaintiff, finds that it was "unrealistic" for the City to provide an "effective way of communicating with plaintiff" at the scene of the arrest (see Def. Mem. fn 1., citing Dkt. No. 50, 10/22/14 Tr. 21:21-25), the NYCHRL specifically does not exempt a covered entity from accommodating a person with a disability for that reason.

## II. Plaintiff Has Established a Claim for False Arrest

Under both Federal and New York law, summary judgment dismissing a plaintiff's false arrest claim is appropriate only "if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." Jenkins v. City of New York, 478 F. 3d 76, 88 (2d Cir. 2007) (citing Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001); Dillard v. City of Syracuse, 51 A.D.2d 432, 435, 381 N.Y.S.2d 913 (N.Y. App. Div. 1976)). "If, however, on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims." Id. This Court has denied

summary judgment on false arrest claims when the plaintiff's corroborated testimony calls into question whether the probable cause determination was objectively reasonable. <u>Douglas v. City of New York</u>, 595 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) ("Defendants' argument, however, is predicated upon the Court accepting wholesale defendants' version of events and ignoring the fact that plaintiff disputes almost every aspect of what defendants maintain happened that day. Accordingly, defendants' motion for summary judgment as to the false arrest claim is denied."); see also, e.g., <u>Minott v. Duffy</u>, No. 11 Civ. 1217 (KPF) (S.D.N.Y. April 8, 2014) ("What matters here is not the specifics of the divergence in testimony, but rather the fact of the divergence; the failure of Defendants' memory here is illustrative of the factual issues precluding summary judgment."); <u>Perez v. Duran</u>, 962 F. Supp. 2d 533, 539–40 (S.D.N.Y. 2013); <u>Standt v. City of New York</u>, 153 F. Supp. 2d 417, 433 (S.D.N.Y. 2001). Defendant in this case makes two arguments as to why the officers' conclusion that probable cause existed was objectively reasonable as a matter of law, both of which fail when held up to scrutiny.

First, Defendant argues that the tenant's alleged identification of Diana Williams as her assailant allowed the arrest of Diana Williams under the "complaining witness rule." [Def. Mem. at 15-16]. But the record does not actually establish that the tenant ever made such an accusation. In fact the tenant, Ms. Lorena White, has not been deposed in this case. Not only is Ms. White deaf, but like Ms. Williams, she cannot speak English. ASMF ¶ 7. Even assuming it was possible for Ms. White to communicate with the officers, it is still unclear based on the officers' testimony whether she told them that Ms. Williams had assaulted her. Officer Romano stated that he interviewed "one of the women", but also that "both of them admitted to assaulting each other" ASMF ¶ 41. It is indeed hard to imagine how this could have happened, given that Ms. White could not communicate verbally in English and could not hear a single word the officer would

have spoken. A material issue of credibility therefore exists, as the officer's testimony is both inconsistent and implausible on its face. The record indicates that the officers communicated exclusively with the hearing people at the scene, primarily Alendi, Lorena White's boyfriend. ASMF ¶¶ 36, 39, 45. Neither Alendi nor Nicole Sabella, the two hearing people at the scene, were eyewitnesses to the alleged assault, so their identification of Diana Williams to the officers cannot have been sufficient under the "complaining witness" rule, as they were not witnesses. ASMF ¶¶ 25, 28. "Information about criminal activity provided by a single complainant can establish probable cause" only when that information is "sufficiently reliable and corroborated." Oliveira v. Mayer, 23 F. 3d 642, 647 (2d. Cir. 1994). The record demonstrates that any information the officers could have obtained about an assault was neither reliable nor corroborated.

Second, Defendant argues that the officers' investigation at the scene uncovered physical injuries to both Lorena White and Diana Williams. [Def. Mem. at 15]. But this too is a material issue of disputed fact that can only be resolved by a jury at trial. Three other witnesses at the scene have testified that neither of the two women had any injuries. ASMF ¶ 57. Diana Williams has specifically denied having any injuries as a result of an assault. ASMF ¶ 56. Furthermore, the photographs taken of both women shortly after their arrest and while they were in custody do not demonstrate physical injuries consistent with assault. ASMF ¶ 58. While medical professionals at Richmond University Medical Center did observe a small scratch on Diana Williams' face, ASMF ¶ 74, the scratch was not attributable to Lorena White, but to Diana Williams' dog. ASMF ¶ 21. The medical records do not mention any bruising, even though Officer Romano cited bruising to justify the arrest and included bruising in the list of injuries on the arrest reports, again calling his testimony into question. ASMF ¶ 55. In short, there is plenty of evidence in the record to cast

serious doubt on the objective reasonableness of concluding that the parties had physical injuries resulting from an assault.

The arrest of Diana Williams was based solely on information the arresting officers obtained by interviewing people who were present at the scene of the arrest and not on their personal observations—other than their claim to have observed injuries caused by a fight, which is a disputed material fact. ASMF ¶¶ 36, 39, 45. The two women who allegedly assaulted each other, Ms. Williams and her tenant, are deaf. ASMF ¶¶ 1, 2, 7, 40, 46, 52. The arresting officers made no attempt to bring a sign language interpreter to the scene, or to use a pen and paper, in order to directly communicate with either of the two participants in the alleged fight, and there was no third eyewitness to the alleged confrontation. ASMF ¶¶ 25, 36–39. Given these facts, it is beyond dispute that the officers relied solely on an unacceptable means of communicating that would be extremely unlikely to provide them with accurate information.

On both of its arguments, Defendant's explanation of events is contradicted throughout the record, and there is a material issue of fact as to whether the finding of probable cause to arrest Diana Williams was objectively reasonable. See <u>Jenkins</u>, 478 F. 3d at 88. Accordingly, the Court must not grant summary judgment on this claim.

### III.     Plaintiff Has Established a Claim for Assault and Battery

Plaintiff has also testified that, aside from the arrest, she was the victim of battery while incarcerated. Specifically, a police officer shoved her into a wall, causing her to hit her head on the wall. ASMF ¶ 65. Under New York law, "a municipality may be vicariously liable on a state law assault and battery claim for torts committed by a police officer under a theory of respondeat superior." <u>Eckardt v. City of White Plains</u>, 87 AD 3d 1049, 1051 (N.Y. App. Div., 2nd Dept. 2011). A genuine issue of material fact therefore exists for trial as to Defendant's liability for this action.

Defendant attempts to avoid Plaintiff's cause of action for assault and battery at the scene of the arrest by asserting the defense of qualified immunity. "[A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that *no rational jury* could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." <u>Coollick v. Hughes</u>, 699 F.3d 211, 219 (2d Cir. 2012) (emphasis added, internal quotations omitted). Reading the record in the light most favorable to the Plaintiff, it cannot be said that Defendant has met this burden. Based on the record, a rational jury could conclude that the arrest of Diana Williams was unlawful both due to lack of probable cause (violation of a constitutional right) and due to failure to accommodate (violation of a statutory right, as discussed <u>supra</u>). See <u>id.</u> Therefore, her claim for assault and battery must stand.

### IV.     Plaintiff Withdraws Her Claim for Intentional Infliction of Emotional Distress

Plaintiff agrees that the totality of the record does not establish the elements of this claim, and withdraws it accordingly.

### V.     Plaintiff Withdraws Her Claim for Negligent Hiring

Plaintiff agrees that the totality of the record does not establish the elements of this claim, and withdraws it accordingly.

### VI.     The City Is Not Protected by State Law Immunity

Defendant cherry-picks state immunity law to the extent of caricature by claiming that its police officers' actions were "discretionary," and that the City is therefore absolved of liability for their actions. Def. Mem. at 20–21. "Municipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago." <u>Tango v. Tulevech</u>, 61 N.Y.2d 34 (N.Y. Ct. App. 1983). State law immunity only comes into play "when official action involves the

exercise of discretion or expert judgment in *policy matters*." <u>Mon v. City of New York</u>, 78 N.Y.2d 309 (N.Y. Ct. App. 1991) (emphasis added, internal quotations omitted). NYPD officers were clearly not exercising expert judgment on policy matters when they arrested and confined Diana Williams. Defendant admits as much later in its memorandum, where it describes the incident as involving "only officials below the policymaking level." [Def. Mem. at 22].

Furthermore, Defendant itself cites <u>McLean v. City of New York</u>, 12 N.Y.3d 194 (N.Y. Ct. App. 2009), in which the New York Court of Appeals stated that an agency of government is liable for the negligent performance of a governmental function if "there existed a special duty to the injured person, in contrast to a general duty owed to the public." <u>Id.</u> at 199. A special duty exists, for example, "when the municipality violates a statutory duty enacted for the benefit of a particular class of persons," which is what happened in this case. <u>Id.</u> Specifically, the City owed Diana Williams a duty to accommodate her disability under federal, state, and local antidiscrimination laws, which were enacted for the benefit for disabled individuals. E.g. 42 U.S.C. § 12101(a)(5), (b)(1). Additionally, in order "[t]o form a special relationship through breach of a statutory duty, the governing statute must authorize a private right of action," and the ADA, Rehabilitation Act, NYSHRL, NYCHRL, and 42 U.S.C. § 1983 all do. See <u>McLean</u>, 12 NY3d at 200. Accordingly, the City is not protected by state law immunity.

## VII. Municipal Liability Does Lie

In the final section of Defendant's Memorandum of Law, Defendant argues that municipal liability does not lie because "the only theory" that Plaintiff pled is under 42 U.S.C. § 1983, and the City cannot be held liable thereunder. Def. Mem. at 21. Defendant's argument ignores that municipal liability can and does lie under the ADA and Rehabilitation Acts. Furthermore, the

record supports Plaintiff's municipal liability claim under 42 U.S.C. § 1983 pursuant to the rule articulated by the Supreme Court in <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

    a.   Municipal Liability Under the ADA and Rehabilitation Act

    i.   Respondeat Superior

"[T]he Americans with Disabilities Act[] permits an employer to be held liable for the actions of its agents." <u>TW ex rel. Wilson v. Sch. Bd. of Seminole County</u>, 610 F. 3d 588, 604 (11th Cir. 2010); accord <u>Henrietta D. v. Bloomberg</u>, 331 F. 3d 261, 285–87 (2d Cir. 2003) ("Congress's intent would best be effectuated by imposing supervisory liability on the state defendant."); <u>Delano-Pyle v. Victoria Cnty., Texas</u>, 302 F.3d 567, 574–75 (5th Cir. 2002); <u>Duvall v. Cnty. of Kitsap</u>, 260 F.3d 1124, 1141 (9th Cir. 2001) (the doctrine of *respondeat superior* applies to claims asserted under the ADA and Rehabilitation Act "in part because the historical justification for exempting municipalities from *respondeat superior* liability does not apply to [these statutes], and in part because the doctrine would be entirely consistent with the policy of that statute, which is to eliminate discrimination against the handicapped"); <u>Rosen v. Montgomery Cnty., Md.</u>, 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent."); <u>Patton v. Dumpson</u>, 498 F.Supp. 933, 942–43 (S.D.N.Y. 1980) (*respondeat superior* liability under the Rehabilitation Act). Municipal liability therefore does lie under the ADA and Rehabilitation Act under a theory of *respondeat superior*, making the City liable for its employees' discriminatory actions.

    ii.   Direct Liability

In addition to liability under *respondeat superior*, the NYPD is directly liable under the ADA and Rehabilitation Act for maintaining discriminatory policies, and also for discriminatory failure to train. Federal Regulations implementing Title II of the ADA state that "[a] public entity

shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). This is because "[t]he ADA seeks to prevent not only intentional discrimination against people with disabilities, but also—indeed, primarily—discrimination that results from 'thoughtlessness and indifference,' that is, from 'benign neglect.'" Brooklyn Center for Independence, 980 F. Supp. 2d at 640 (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)). Second Circuit law holds that a "handicapped individual must be provided with meaningful access to the benefit that the grantee offers," and "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." Henrietta D., 331 F. 3d at 271 (quoting Choate, 469 U.S. at 301) (emphasis added). This same standard and analysis applies under the Rehabilitation Act. Id. at 272 ("[T]he standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities . . . [and] we treat claims under the two statutes identically.").

Furthermore, the NYPD may not rely on exigent circumstances to defend against a claim that it failed to properly train law enforcement officers in recognizing and accommodating disabilities. A failure to train claim is unaffected by any on-the-ground exigencies because "[t]he alleged noncompliance with the training requirements of the ADA" occurs not at the moment of the arrest, but at an earlier time, "when policy makers fail[] to institute policies to accommodate disabled individuals by giving the officers the tools and resources to handle the situation peacefully." Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 238 (M.D. Pa. 2003).

In this case, the record establishes that the City has failed to modify its policies and failed to train its officers regarding how to interact with and accommodate deaf individuals, in violation of the ADA and Rehabilitation Act. Carol Ann Roberson, Assistant New York City Commissioner

of Training for the NYPD, admitted that the NYPD has a rubber-stamp procedure for deeming interpreters qualified, and that she had never seen provision of auxiliary aides recorded. ASMF ¶¶ 105–107. The NYPD has a policy of handcuffing all arrestees behind their backs, and has never considered any modification to this policy for unarmed deaf arrestees, even though this policy also "constitutes discrimination." ASMF ¶ 102; see 136 Cong. Rec. 11,461 (1990). Officer Romano was unaware of the procedure for getting an interpreter for a deaf person as of the time of the arrest of Diana Williams. ASMF ¶ 108. When interviewed, multiple police officers involved with the arrest and custody of Diana Williams were unable to recall whether they had received training on how to accommodate deaf individuals. ASMF ¶¶ 109, 111, 112, 113, 115. As a result of discriminatory policies and a lack of training, NYPD personnel did not possess the skills or knowledge to accommodate Diana Williams' disability, resulting in discrimination against her on the basis of her disability.

Finally, the NYPD did not take affirmative steps to comply with the Settlement Agreement between the United States of America and the City of New York. See ASMF ¶ 104. "A consent decree may properly be admitted to demonstrate that a defendant was aware of its legal obligations." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 136 (2d. Cir. 2008). The Agreement demonstrates that the NYPD was aware of, and under an affirmative obligation to adhere to, federal requirements for accommodating deaf individuals. ASMF ¶ 101. The fact that NYPD procedures and training have not changed since this Agreement is evidence of the NYPD's failure to make reasonable modifications to discriminatory policies. 28 C.F.R. § 35.130(b)(7). Additionally, the fact that that multiple police officers could not recall being trained on any procedures at all, is evidence of a failure to train on the part of the NYPD. See Schorr, 243 F. Supp. at 238.

Accordingly, the record establishes genuine issues of material fact with respect to the City's maintenance of discriminatory policies, as well as its discriminatory failure to train.

   b.   Municipal Liability Under 42 U.S.C. § 1983

Plaintiff's claims under 42 U.S.C. § 1983 allege violations of the Fourth and Fourteenth Amendments to the United States Constitution, on the grounds that she was subject to unreasonable search and seizure and deprived of liberty without due process of law. See Amended Complaint, Dkt. No. 14, Count I. Plaintiff can bring such a claim against the City of New York, as a "person" within the meaning of 42 U.S.C. § 1983, under the rule articulated by the Supreme Court in Monell, 436 U.S. 658. This rule "extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of New York, 459 F. 3d 207, 219 (2d Cir. 2006). This Court has recognized four circumstances that can lead to Monell liability, which include maintenance of discriminatory policies, as well as discriminatory failure to train. See Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010).[2]

Additionally, and contrary to Defendant's argument, "Monell liability may spring from a single violation, as long as the conduct causing the violation was undertaken pursuant to a City-wide custom, practice, or procedure." Sforza v. City of New York, No. 07 Civ. 6122 (DLC), at *27–28 (S.D.N.Y. March 31, 2009) (citing DiSorbo v. Hoy, 343 F.3d 172, 180-81 (2d Cir. 2003)

---

[2] "A plaintiff may satisfy the "policy, custom or practice" requirement in one of four ways . . . . The plaintiff may allege the existence of (1) a formal policy officially endorsed by the municipality . . . (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question . . . (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom . . . or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon, 705 F. Supp. at 267–77 (internal citations omitted).

(city liable under Monell for excessive force in simultaneous arrest of two sisters); Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003) (county held liable under Monell following the retaliatory discharge of an employee)). The important distinction is that a single event cannot be said to establish the existence of a policy; but if the policy is separately established, the single event can trigger liability as being in accordance with that policy. Cf. DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998). Incidentally, in Sforza—a case cited by Defendant—the Court denied the City's Motion for Summary Judgment with regard to plaintiff's claim for municipal liability in violation of 42 U.S.C. § 1983 for this reason. Id. at *49.

    i.    Maintenance of a Discriminatory Policy

Liability exists under Monell when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690. The record in this case presents ample evidence that the NYPD maintains official policies that discriminate against deaf individuals. Ms. Roberson admitted that the NYPD has a rubber-stamp procedure for deeming interpreters qualified, and that she had never seen provision of auxiliary aides recorded. ASMF ¶¶ 105–107. The NYPD also has a policy of handcuffing all arrestees behind their backs, and has never considered any modification to this policy, even though this policy "constitutes discrimination." ASMF ¶ 102; see 136 Cong. Rec. 11,461 (1990).

The NYPD did not take affirmative steps to comply with a Settlement Agreement between the United States of America and the City of New York. See ASMF ¶ 104. "A consent decree may properly be admitted to demonstrate that a defendant was aware of its legal obligations." Brady, 531 F.3d at 136. The Agreement demonstrates that the NYPD was aware of, and under an affirmative obligation to adhere to, federal requirements for accommodating deaf individuals.

ASMF ¶ 101. The fact that NYPD procedures have not changed since this agreement is evidence of the NYPD's continued maintenance of discriminatory policies.

### ii. Discriminatory Failure to Train

"[A] municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." <u>Amnesty America v. Town of West Hartford</u>, 361 F. 3d 113, 129 (2d. Cir. 2004) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 387-90 (1989)). In order to prevail on a failure-to-train theory, Plaintiff must "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." <u>Id.</u> (internal quotations omitted) (citing <u>City of Canton</u>, 489 U.S. at 391).

Here, Plaintiff has specifically identified a deficiency in the City's training of its police officers that is closely related to the unconstitutional arrest and confinement of Diana Williams. The evidence on record demonstrates that NYPD personnel did not possess the skills or knowledge to accommodate Diana Williams' disability, despite the City's awareness of its legal obligation through the Settlement Agreement, resulting in a botched investigation, unlawful arrest, and traumatic deprivation of liberty through confinement. ASMF ¶¶ 101–115. Accordingly, the record supports a <u>Monell</u> claim premised on a discriminatory failure to train.

### c. Defendant Had Notice of Municipal Liability

Defendant's assertion that Plaintiff failed to plead a municipal liability theory is erroneous. [Def. Mem. at 29 n. 1]. Plaintiff pleaded and gave Defendant notice of this theory in paragraph 34 of the Amended Complaint, Dkt. No. 14, which reads: "The actions described herein constitute not

an isolated incident but rather part of a pattern and practice routinely followed as policy within the New York City Police Department, indicative of a custom to disregard the constitutional rights of persons who have hearing impairments." While Plaintiff did not use the phrase "failure to train," there is no requirement for her to do so, and the language of the complaint is clear. Furthermore, Defendant had enough notice of the claim and its legal underpinnings to oppose it at length in its memorandum, and the parties have been disputing it for some time, so it is incongruous for Defendant to claim that it does not have "fair notice" of the claim. Accordingly, Plaintiff's Complaint gives adequate notice of the nature of this claim to Defendant.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment should be denied.

Dated:      New York, New York
          February 13, 2015

                                       Respectfully submitted,

                                       EISENBERG & BAUM, LLP

By: _____
                                       Andrew Rozynski, Esq.
                                       Attorneys for Plaintiff