EISENBERG & BAUM, LLP
24 Union Square East
Fourth Floor
New York, NY 10003
(212) 353-8700

ATTORNEYS FOR PLAINTIFF


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| | |
|---|---|
| DIANA WILLIAMS, | **CIV. NO. 12-CV-06805(VEC)** |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO** |
| | **DEFENDANT'S LOCAL RULE** |
| v. | **56.1 STATEMENT OF** |
| | **UNDISPUTED MATERIAL** |
| THE CITY OF NEW YORK, | **FACTS AND PLAINTIFF'S** |
| | **ADDITIONAL STATEMENT OF** |
| Defendant. | **MATERIAL FACTS** |

-----------------------------------------------------------------


 Plaintiff Diana Williams, by her attorneys Eisenberg & Baum, LLP, respectfully submits

this Response to Defendant's Statement of Undisputed Material Facts and Additional Statement of

Material Facts, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in opposition to

Defendant's Motion for Partial Summary Judgment.

## GENERAL OBJECTIONS

1.      Plaintiff objects to Defendant's inclusion of any purported facts in its Statement of Material Facts to the extent that Defendant impermissibly seeks to present this Court with facts relating to matters other than those on which it seeks summary judgment.

2.      Plaintiff objects to Defendant's submission of facts that contradict, disclaim, mischaracterize or otherwise alter, on a *post hoc* basis, either the plain meaning of sworn testimony given by any party, witness, or expert in this action, or any documents and pleadings in this action, including Defendant's selective use of text quoted out of context.

3.      Plaintiff objects to Defendant's submission of unsubstantiated facts that are not supported by a citation to admissible evidence, as required by Federal Rules of Civil Procedure 56(e) and Local Civil Rule 56.1(d).

4.      Plaintiff objects to Defendant's cited exhibits to the extent that they are not complete, are not characterized as being what they purport on their face to be, or otherwise fail as to authenticity, foundation, or admissibility.

## GENERAL STATEMENTS

1.      The phrases "do not dispute," "undisputed," and "not disputed" should not be construed as a concession by Plaintiff that a statement is material, complete, supported by the documents or exhibits cited in a particular paragraph, admissible at trial, or otherwise relevant.

2.      Where Plaintiff does not dispute the facts in a particular paragraph, it does so for purposes of Defendant's Motion for Partial Summary Judgment only, and Plaintiff reserves all other objections, including the right to challenge each assertion of fact as to admissibility at trial or at any other appropriate time.

3.    Evidence cited by Plaintiff in support of or in contradiction to a particular proposition should not be construed as the only evidence supporting or contradicting the proposition in question, and Plaintiff specifically reserves the right to provide additional evidence as is necessary and appropriate.

## RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. *The events giving rise to this lawsuit occurred on September 11-12, 2011. (See Amended Complaint)*

   **Disputed. Plaintiff also brings direct liability claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New York Human Rights Law, N.Y. Executive Law §§ 290, et seq.; the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et. seq.; and 42 U.S.C. § 1983. [Amended Complaint ¶¶ 29–48] Unlawful conduct under these statutes occurred not only on September 11-12, 2011, but also whenever policy makers failed to institute policies to accommodate disabled individuals and failed to give police officers the training, tools, and resources to do so. The record demonstrates that the NYPD has failed to institute appropriate policies and failed to train its officers, and these failures are also events giving rise to this lawsuit. [Ex. A to Declaration of Andrew Rozynski, hereinafter "Rozynski Decl.,", Roberson Dep. 9:4-12, 10:6-13, 35:3-5, 38:25-39:17, 40:13-17; Rozynski Decl., Ex. B, Settlement Agreement]**

2. *As of September 11, 2011, plaintiff and her husband, Christopher Williams, owned residential real estate located at 265 Hillbrook Drive, Staten Island, New York. (Amended*

*Complaint, ¶ 7; Ex. A to Declaration of Mark D. Zuckerman, hereinafter "Zuckerman Decl.," C. Williams dep., p. 25, ll. 12-17, p. 26, ll. 14-20)*

**Undisputed.**

3. *On September 11, 2011, Christopher Williams was living in the basement of 265 Hillbrook Drive, and the Williams' two tenants, Lorena White and Nicole Sabella, were renting rooms upstairs. The three of them also shared common areas within the premises. (Zuckerman Decl., Ex. A, C. Williams dep., p. 34, l. 25-p. 35, l. 22; p. 46, ll. 22-25; p. 48, ll. 1-3)*

**Undisputed.**

4. *Lorena White and Nicole Sabella were friends at the time that they had rented the foregoing space from the Williams'. (Zuckerman Decl., Ex A, C. Williams dep., p. 38, ll. 14-19)*

**Disputed. Nicole Sabella and Lorena White met only a week or two before they both moved in to 265 Hillbrook Drive. When asked if Lorena White had become a friend of hers at that time, Nicole Sabella responded "Not really." [Rozynski Decl., Ex. C, Sabella Dep. 23:4-24:2, 27:8-20]**

5. *Thereafter, the Williams' began to have problems with Lorena White due to her non-payment of rent. (Ex. A, C. Williams, p. 38, l. 20, p. 40. l. 3)*

**Disputed. The record demonstrates that nonpayment of rent was the <u>only</u> problem, not that it led to ongoing conflict as this statement implies. [Rozynski Decl., Ex. D, Chris Williams Dep. 38:22-39:4, 39:16-18]**

6. *Christopher Williams had also been told by Lorena White's ex-husband that Lorena White was a "very violent person" and "crazy person." Christopher Williams also thought that she was "crazy" from his interactions with her and thought she had gotten very "angry,"*

*"aggressive" and "intimidating" with him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, ll. 4-17; p. 44, ll. 12-17; p. 45, l. 24-p. 46, l. 15)*

**Undisputed.**

7. *As a result, the Williams' lawyer sent Lorena White a letter "advising her to move out within 30 days." (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, ll. 18-19)*

> **Disputed. Chris Williams had the Williams' attorney send Lorena White the letter because she had not been paying rent, but not "as a result" of any other actions. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:10-14; Rozynski Decl., Ex. D, Chris Williams Dep. 38:20-41:8; Rozynski Decl., Ex. C, Sabella Dep. 37:11-20]**

8. *Upon receiving the letter, according to Christopher Williams, Lorena White "threatened" him, was "angry" and called the police to complain about him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 40, l. 19-p. 42, l. 9; p. 49, ll. 12-20; p. 54, l. 7-p. 57, l. 16)*

> **Undisputed.**

9. *The 30th and final day for Lorena White to move out was September 11, 2011, and Christopher Williams decided to call the police to assist in that process as he knew in advance that Nicole Sabella and Lorena White were planning to move out that day. (Zuckerman Decl., Ex. A, C. Williams dep., p. 42, ll. 10-12; p. 49, ll. 12-20; p. 59, l. 22-p. 60, l. 9; p. 62, ll. 17-23; Zuckerman Decl., Ex. B., Sabella dep., p. 43, l. 19-p. 44, l. 1)*

> **Disputed. Diana Williams and Chris Williams made both this decision, and the phone call itself, together. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-81:15; Rozynski Decl., Ex. D, Chris Williams Dep. 63:16-25]**

10. *As September 10, 2011, plaintiff was residing principally in Maryland, where the Williams'* *two children were attending to school. (Zuckerman Decl., Ex. A, C. Williams dep., p. 27, ll.* *11-p, 28, l. 12; Zuckerman Decl., Ex. C, D. Williams dep., p. 78, l. 19-p. 79, l. 3)*

       **Undisputed.**

11. *Plaintiff is deaf. (See Amended Complaint; Zuckerman Decl., Ex. D, D. Williams 50-h, p.* *7, ll. 12-13)*

       **Undisputed.**

12. *Plaintiff drove to Staten Island in the evening of September 10, 2011 to be present when* *Lorena White and Nicole Sabella moved out (Nicole Sabella decided to move out when* *Lorena White was asked by the Williams' to move out in order to continue to live with her),* *as was requested of Lorena White for non-payment of rent. (Zuckerman Decl., Ex. A, C.* *Williams dep. 50, ll. 7-24; p. 59, ll. 15-17; p. 59, l. 22-p. 60, l. 9; Zuckerman Decl., Ex. B,* *Sabella dep., p. 40, ll. 8-23)*

       **Disputed to the extent that this statement is ambiguous and confusing. Diana** **Williams was living in Maryland at the time, but had driven to 265 Hillbrook** **Drive on 9/10/11 to assist with the planned surrender of Lorena White's rented** **apartment on 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:10-14]** **Undisputed that Nicole Sabella also decided to move out at this time to** **continue living with Lorena White.**

13. *The Williams' felt that Diana Williams had to be present for the "move-out" to ensure that* *"everything went smoothly." (Zuckerman Decl., Ex. A, C. Williams dep., p. 60, ll. 19-21)*

       **Disputed. More accurately, the totality of the record indicates that the** **Williams' felt that it would be "better" if Diana Williams were present, but not**

necessarily that she "had to" be present. [Rozynski Decl., Ex. D, Chris Williams Dep. 59:15-60:9]

14. *Christopher and Diana Williams had agreed with each other in advance that they would call the police to ensure that the "move-out" "went smoothly" and so the police could "monitor" it. (Zuckerman Decl., Ex. A, C. Williams dep., l. 59-p. 60, l. 21; p. 61, ll. 3-7)*

**Undisputed.**

15. *The Williams' were expecting problems, which is why they wanted the police present for the "move-out." (Zuckerman Decl., Ex. A, C. Williams dep., p. 63, ll. 4-8)*

**Disputed, to the extent that "problems" implies physical altercation or other criminal activity. More accurately, the totality of the record cited indicates that the Williams' wanted to be prepared in case there were problems, and to ensure there would be no damage to the property, but not that they expected there would be problems to any degree of certainty. [Rozynski Decl., Ex. D, Chris Williams Dep. 63:4-8; Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-80:2]**

16. *Pursuant to their plan to call the police to "monitor" the "move-out," the Williams' placed a phone call to the police around 10 a.m. on the morning of September 11, 2011, from the Williams' basement where Christopher Williams had been residing and Diana Williams had spent the night. (Zuckerman Decl., Ex. A, C. Williams dep., p. 61, l. 25-p. 62, l. 8; p. 63, ll. 12-25)*

**Disputed. The record indicates that Diana and Chris Williams did call the police that morning, at approximately 9:15am, using the videophone in the basement of 265 Hillbrook Drive, but police officers were not dispatched in**

**response to that call. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-80:23, Rozynski Decl., Ex. D, Chris Williams Dep. 61:20-62:8, 63:16-25; Rozynski Decl., Ex. F, SPRINT report]**

17. *In their phone call to the police, the Williams' explained to the 911 operator that Lorena White "was very angry" and that they were "afraid that anything could happen." (Zuckerman Decl., Ex. A, C. Williams dep., p. 64, ll. 11-20; Zuckerman Decl, Ex. C, D. Williams dep., p. 80, ll. 3-14)*

    **Undisputed.**

18. *Plaintiff then went upstairs to talk to Nicole Sabella about some "missing items that were in the kitchen." (Zuckerman Decl., Ex. A, C. Williams dep., p. 65, ll. 12-24; Zuckerman Decl, Ex. D, D. Williams 50-h, p. 12, ll. 2-13; Zuckerman Decl., Ex. B, Sabella dep. p. 49, ll. 15-23))*

    **Disputed, to the extent that there was only one missing item, which was a cutting board that was missing <u>from</u> the kitchen, not <u>in</u> the kitchen at that time. [Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-24; Rozynski Decl., Ex. D, Chris Williams Dep. 65:18-23, Rozynski Decl., Ex. C, Sabella Dep. 49:15-23]**

19. *Plaintiff had brought the family dog with her from Maryland to 265 Hillbrook Drive when she traveled to New York in the evening of September 10, 2011. (Zuckerman Decl., Ex. A, C. Williams dep., p. 48, ll. 19-20; 59, ll. 15-17)*

    **Undisputed.**

20. *Pursuant to the Williams' agreement with their tenants, the dog was not supposed to go into Lorena White's bedroom. (Zuckerman Decl., Ex. A, C. Williams dep., p. 48, l. 24-p. 49, l. 5)*

> **Disputed. The record does not indicate that there was any agreement, but merely that the Williams' decided that the dog should not go upstairs out of respect for the tenants' space. [Rozynski Decl., Ex. D, Chris Williams Dep. 49:3-5; Rozynski Decl., Ex. E, Diana Williams Dep. 95:11-14; Rozynski Decl., Ex. G, Rivera Dep. 56:21-57:4, 61:2-17]**

21. *After plaintiff went upstairs to discuss the "missing items" from the kitchen (the "cutting board") with the Williams' tenants, Christopher Williams heard the dog barking, seemingly because plaintiff's brother David Rivera, was at the front door. (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 1-7; 69, ll. 1-10)*

> **Disputed. Chris Williams is deaf, and he did not state that he heard the dog, but rather that he <u>noticed</u> the dog barking. [Rozynski Decl., Ex. D, Chris Williams Dep. 65:25-66:7]. Additionally, Diana Williams did not plan to discuss the cutting board with both tenants, but rather only with Nicole Sabella. [Rozynski Decl., Ex. D, Chris Williams Dep. 69:6-19; Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-24]**

22. *As Christopher Williams and David Rivera were talking, the dog ran upstairs to find plaintiff and David Rivera couldn't catch the dog. (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 8-12)*

> **Disputed, to the extent that "David Rivera couldn't catch the dog" misstates the testimony. The dog ran past Chris Williams and David Rivera and up the**

**stairs, at which point David Rivera followed the dog up the stairs. [Rozynski Decl., Ex. D, Chris Williams Dep. 66:2-13; Rozynski Decl., Ex. G, Rivera Dep. 55:11-56:7] Further disputed to the extent that this statement attempts to ascribe motive to the dog's action, as such motive is both inherently speculative and wholly irrelevant. [See Rozynski Decl., Ex. D, Chris Williams Dep. 66:2-13]**

23. *The dog went into Lorena White's room, plaintiff went to retrieve it, and there was a confrontation between Lorena White and plaintiff, as Lorena White was in her room. (Zuckerman Decl., Ex. A, C. Williams dep., p. 68, ll. 4-6; p. 70, l. 1-7; p. 75, l. 21-p. 76, l. 5; Zuckerman Decl., Ex. D, D. Williams 50-h, p. 10, l. 10-p. 11, l. 2; Zuckerman Decl., Ex. B, Sabella dep., p. 49, l. 24-p. 50, l. 2; Zuckerman Decl., Ex. C, D. Williams dep., p. 97, ll. 2-4)*

> **Disputed, to the extent that the term "confrontation" is meant to involve physical touching. The record is, at best, unclear as to whether Plaintiff Diana Williams and Lorena White ever physically touched one another. The totality of the record demonstrates, however, that Diana Williams and Lorena White did not <u>fight</u> one another. Lorena White has not been deposed as a witness in this matter and Diana Williams repeatedly denied that any physical altercation took place. [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:24-33:4; Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-9, 99:10-20] Diana Williams stated that she responded to Lorena White's threatening posture by extending her arm, and that the palm of her hand possibly made contact with Lorena White. [Rozynski Decl., Ex. H, Diana Williams 50-H 18:4-**

14, 32:20-23; Rozynski Decl., Ex. E, Diana Williams Dep. 99:21-25] Diana Williams denied that the scratch on her face was caused by Lorena hitting her, and states that Lorena never touched her. [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-16] Diana Williams states that the scratch on her face was caused by the dog, when she bent down to pick up the dog. [Rozynski Decl., Ex. I, Affidavit of Diana Williams] David Rivera, the only other person to witness any part of the incident, did not see any physical contact; he stated that Diana Williams picked up the dog and then backed away from Lorena White while Lorena White was angrily signing at her. [Rozynski Decl., Ex. G, Rivera Dep. 58:7-59:6] Both David Rivera and Nicole Sabella stated that they saw no injuries on either Diana Williams or Lorena White. [Rozynski Decl., Ex. G, Rivera Dep. 87:3-5, 90:2-3; Rozynski Decl., Ex. C, Sabella Dep. 66:9-17].

24. *During the confrontation, according to Diana Williams, Lorena White threatened to hurt her. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 17, l. 25-p. 18, l. 2)*

**Disputed. At her deposition, Diana Williams stated that Lorena White did not say anything to her at all. [Rozynski Decl., Ex. E, Diana Williams Dep. 98:7]. See response to No. 23, supra.**

25. *During the confrontation, plaintiff admits that she "push[ed] [Lorena] away to stop her," as plaintiff was holding her dog in her hand. (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 4-9) Plaintiff was pushing Lorena White away with an "open palm toward her." (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 15-23) Plaintiff admits to "mov[ing] her back with [her] hand" and that it was "possible" that she touched her. (Zuckerman*

*Decl., Ex. D, D. Williams 50-h, p. 32, ll. 20-22, Zuckerman Decl., Ex. C, D. Williams dep. p. 99, ll. 21-22)*

**Disputed. The record is, at best, unclear as to whether Plaintiff Diana Williams and Lorena White ever physically touched one another. Diana Williams repeatedly denied that any physical altercation took place. [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:24-33:4; Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-9, 99:10-20] Diana Williams stated that she responded to Lorena White's threatening posture by extending her arm, and that the palm of her hand possibly made contact with Lorena White. [Rozynski Decl., Ex. H, Diana Williams 50-H 18:4-14, 32:20-23; Rozynski Decl., Ex. E, Diana Williams Dep. 99:21-25] David Rivera, the only other person to witness any part of the incident, did not see any physical contact; he stated that Diana Williams picked up the dog and then backed away from Lorena White while Lorena White was angrily signing at her. [Rozynski Decl., Ex. G, Rivera Dep. 58:7-59:6] See response to No. 23, supra.**

26. *During the confrontation, plaintiff contends that Lorena White "came right in [her] face…" (Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 4-9)*

**Disputed, to the extent that the term "confrontation" is meant to involve physical touching. David Rivera, the only other person to witness any part of the incident, did not see any physical contact; he stated that Diana Williams picked up the dog and then backed away from Lorena White while Lorena White was angrily signing at her. [Rozynski Decl., Ex. G, Rivera Dep. 58:7-59:6] See response to No. 23, supra.**

27. *During the confrontation, plaintiff "got a scratch on her chin" from Lorena White.*
   *(Zuckerman Decl., Ex. D, D. Williams 50-h, p. 18, ll. 10-14, Zuckerman Decl., Ex. E;*
   *Zuckerman Decl., Ex. G, Romano dep. 4/4/14 p. 64, l. 18-22)*

   **Disputed. Diana Williams denied that the scratch on her face was caused by
   Lorena hitting her, and states that Lorena never touched her. [Rozynski Decl.,
   Ex. E, Diana Williams Dep. 99:10-16] Diana Williams states that the scratch
   on her face was caused by the dog, when she bent down to pick up the dog.
   [Rozynski Decl., Ex. I, Affidavit of Diana Williams] See response to No. 23,
   supra.**

28. *Plaintiff's brother, David Rivera, had to "get in the middle of them" to keep Lorena White*
   *and plaintiff apart. (Zuckerman Decl., Ex. B, Sabella dep., p. 50, ll. 3-7; p. 51, l. 9-p. 52,*
   *l. 21; p. 70, ll. 2-5; Zuckerman Decl., Ex. C, D. Williams dep., p. 98, l. 24-p. 99, l. 8)*

   **Disputed, to the extent that the phrase "had to" implies that a physical fight
   was taking place, or that his actions were necessary to prevent physical harm
   to any person. Nicole Sabella testified that Diana Williams and Lorena White
   were "not that close" to each other, and that David Rivera stood between them
   with his arms outstretched. [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-
   25; Rozynski Decl., Ex. C, Sabella Dep. 51:11-52:16]**

29. *Christopher Williams then saw plaintiff coming downstairs with the dog and "when [he]*
   *looked at her [he] knew something wasn't right. (Zuckerman Decl., Ex. A, C. Williams dep.,*
   *p. 66, ll. 15-20)*

   **Undisputed.**

30. *At or about the same time, Christopher Williams could see David Rivera calming Lorena White down, and noticed that Lorena White "was very upset." (Zuckerman Decl., Ex. A, C. Williams dep., p. 66, ll. 21-24)*

      **Undisputed.**

31. *That's when Christopher Williams "knew something was going to happen…..I knew I was going to have to call the police." (again)(Zuckerman Decl., Ex. A, C. Williams dep., p. 71, ll. 12-14)*

      **Disputed, to the extent that this statement, taken out of context, implies that Chris Williams expected the situation to become out of control or to involve any form of violence, or that the situation ever did become out of control or involve any form of violence. The record indicates that seeing Lorena White's excitement and anger was "nothing new" for Chris Williams, and that it merely confirmed Chris Williams' desire to call the police to make sure the surrender went smoothly. [Rozynski Decl., Ex. D, Chris Williams Dep. 71:10-22]**

32. *Plaintiff, who had gone outside after the altercation with Lorena White, then told Christopher Williams that she was mad at him for letting the dog go upstairs as they talked outside. (Zuckerman Decl., Ex. A, C. Williams dep., p. 67, ll. 23-25)*

      **Disputed, to the extent that the term "altercation" is meant to involve physical touching. See response to No. 23, supra.**

33. *The Williams then waited 10-15 minutes for the police to respond to their initial call, but they didn't arrive. (Zuckerman Decl., Ex. A, C. Williams dep., p. 76, l1. 19-22)*

**Disputed. Chris Williams stated that, after Diana Williams came downstairs with Buddy, "then we waited for the police. And I don't remember how long. I believe it was supposed to be not more than ten or fifteen minutes, but they did not come at all." Chris Williams had believed that the police would come (i.e. were supposed to come) within 10-15 minutes of the initial call earlier that morning , but he said he was not sure how long they actually waited after Diana Williams came downstairs. [Rozynski Decl., Ex. D, Chris Williams Dep. 76:19-22]**

34. *Christopher Williams and David Rivera tried to call the police again, but could not within 265 Hillbrook Drive, because the Williams' internet had been disconnected while Nicole Sabella was packing, to which Christopher Williams was "so angry" with her. (Zuckerman Decl., Ex. A, C. Williams dep., p. 76, l. 23-p. 77, l. 16)*

    **Disputed. More accurately, Nicole Sabella had disconnected the wifi, which was located in Lorena White's room, while she was helping Lorena White pack; Chris Williams did state that he was "so angry" because the internet was not working, but did not state that he was angry <u>at Nicole Sabella</u>. [Rozynski Decl., Ex. D, Chris Williams Dep. 76:23-77:16] Undisputed that Chris Williams tried to call the police again from within 265 Hillbrook Drive.**

35. *Lorena White's boyfriend, first name "Alendi," then arrived and tried to let himself in the residence, to which Christopher Williams objected because the police hadn't arrived. (Zuckerman Decl., Ex. A, C. Williams dep., p. 77, ll. 17-22; Zuckerman Decl., Ex. B, Sabella dep., p. 47, ll. 14-24)*

**Disputed, to the extent that the phrase "let himself in" misstates testimony. Alendi attempted to force his way into the residence past Chris Williams, and after Chris Williams stopped Alendi and told Alendi that he was not allowed inside, Alendi pushed Chris Williams. [Rozynski Decl., Ex. D, Chris Williams Dep. 77:17-78:4; Rozynski Decl., Ex. G, Rivera Dep. 60:2-17]**

36. *Lorena White's boyfriend was "hearing." (not deaf) (Zuckerman Decl., Ex. A, C. Williams dep., p. 80, ll. 13-22)*

   **Undisputed.**

37. *Christopher Williams confronted Lorena White's boyfriend at the entrance to the residence, and the boyfriend pushed him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 77, ll. 17-24)*

   **Disputed. It was the boyfriend who confronted Chris Williams. Alendi attempted to force his way into the residence past Chris Williams, and after Chris Williams stopped Alendi and told Alendi that he was not allowed inside, Alendi pushed Chris Williams. [Rozynski Decl., Ex. D, Chris Williams Dep. 77:17-78:4; Rozynski Decl., Ex. G, Rivera Dep. 60:2-17]**

38. *Lorena White's boyfriend then started to curse at him. (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 1-2)*

   **Undisputed.**

39. *Then Lorena White's boyfriend "made his hand into a clear gun shape—made a gun with his hand, pointed at [Christopher Williams] and said, I'm going to shoot you." (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 14-18)*

   **Undisputed.**

40. *In his own words, Christopher Williams testified at deposition that he and Lorena White's boyfriend "were fighting." (Zuckerman Decl., Ex. A, C. Williams dep., p. 98, ll. 14-15)*

**Disputed. Those words spoken by Chris Williams at his deposition are quoted out of context. Chris Williams expressed that he assumed the police officers would investigate the confrontation that Alendi had instigated, and that he was confused that they instead focused on Diana Williams, even though she had no physical bruising and no physical altercation took place between her and Lorena White. The cited exchange between Chris Williams and Mark Zuckerman, counsel for Defendant, took place as follows:**

**Q.      At the time that your wife was arrested, did she have any visible bruises on her body?**

**A.      No, no bruises. There was no physical anything. I thought it was about me and her boyfriend, that we were fighting. I thought this was all about us, but why my wife was arrested, I don't know.**

**Q.      I asked a question whether or not she had physical bruising. I didn't ask about the boyfriend and Chris Williams, whether they were fighting or no.**

**A.      Then no, no.**

**[Rozynski Decl., Ex. D, Chris Williams Dep. 98:11-20]**

41. *Christopher Williams and David Rivera then "ran" to David Rivera's residence, which was close by, to call the police again, and stayed there for 5 minutes. (Zuckerman Decl., Ex. A, C. Williams dep., p. 78, ll. 21-23; p. 80, ll. 3-7; p. 82, ll. 4-9)*

**Undisputed.**

42. *When the "police picked up," Christopher Williams told the police that "a man is chasing [him] and saying that he has a gun," and "that there is a gun." (Zuckerman Decl., Ex. A, C. Williams dep., p. 79, ll. 2-4)*

    **Undisputed.**

43. *The NYPD's SPRINT report evidencing the call to the 911 operator indicates that there was a male Hispanic with dark skin who had a gun. (Zuckerman Decl., Ex. I, SPRINT report)*

    **Disputed. The SPRINT report at one point contains the text "STS ML HISP DK SKIN—WITH FIREARM," but any translation of the text lacks foundation elsewhere in the record and thus cannot be considered "undisputed." [Rozynski Decl., Ex. F, SPRINT report]**

44. *The responding officers remember the job also "[coming] over as a dispute between landlord and tenant." (Zuckerman Decl., Ex. J, Costanzo dep., p. 28, ll. 21-24)*

    **Disputed. Defendant cites the deposition of only one officer for the proposition that both of them remember this fact. [Rozynski Decl., Ex. J, Costanzo Dep. 28:21-24] In fact, when asked in his deposition "Were you aware that Ms. Williams was a landlord at the property at which you arrested her?", Officer Romano replied, "I don't recall being informed of that." [Rozynski Decl., Ex. K, Romano Day 1 Dep. 85:14-19]**

45. *The police told Christopher Williams that they would "send an officer right over." (Zuckerman Decl., Ex. A, C. Williams dep., p. 79, ll. 4-5)*

    **Undisputed.**

46. *Police Officer Christopher Romano and his partner, P.O. Gillio Costanzo, arrived at the scene 5 minutes later. (Zuckerman Decl., Ex. A, C. Williams dep., p. 83, ll. 11-14, Zuckerman Decl., Ex. G, Romano dep. 4/4/14, p. 33, ll. 4-6; Zuckerman Decl., Ex. J, Costanzo dep. p. 12, ll. 13-15)*

> **Disputed. More accurately, the officers arrived at the scene approximately five minutes later, but the timeliness of their arrival is not a matter of certainty. Chris Williams stated that "It was pretty quick. I would say five minutes. It was pretty quick." [Rozynski Decl., Ex. D, Chris Williams Dep. 83:13-14]**

47. *The officers talked to Lorena White, Nicole Sabella and Lorena White's boyfriend after they arrived on the scene for "fifteen to twenty minutes." (Zuckerman Decl., Ex. A, C. Williams dep., p. 83, l. 24-p. 84, l. 3; p. 84, ll. 21-24, p. 87, ll. 18-21; Zuckerman Decl., Ex. B, Sabella dep., p. 61, ll. 7-21; Zuckerman Decl., Ex. C, D. Williams dep., p. 82, ll. 16-19)*

> **Disputed. More accurately, Nicole Sabella was inside the house when the police first approached Lorena White and Alendi, and was observing through a window; Nicole Sabella came out of the house and approached the police officers after the interaction had begun. [Rozynski Decl., Ex. C, Sabella Dep. 60:1-61:18] Furthermore, the NYPD SPRINT report indicates that the officers arrived at the scene sometime around 10:30am, but they placed Diana Williams under arrest at 11:19am, meaning they were on the scene for a total of at least 45 minutes. [Rozynski Decl., Ex. F, SPRINT report]**

48. *The officers also searched Lorena White's boyfriend's car for the gun. (Zuckerman Decl., Ex. A, C. Williams dep., p. 93, ll. 16-22)*

**Disputed. Officer Costanzo has no recollection of any mention of a gun, nor does he recall searching any vehicle for a gun. [Rozynski Decl., Ex. J, Costanzo Dep. 36:20-37:8]**

49. *Upon arriving at the scene, Officer Romano and Officer Costanzo were told that two women had gotten into a physical altercation and P.O. Romano's investigation confirmed same. They were told about the physical altercation by one of the women participants. They also observed physical injuries, including a "lip" injury to Lorena White and a scratch on Diana Williams' chin. No gun was found. (Zuckerman Decl., Ex. G, Romano 4/4/14 dep., p. 34, l. 21-p. 37, l. 19; p. 40, ll. 17-23; p. 43, ll. 5-20; p. 47, l. 25-p. 48, l. 5, Zuckerman Decl., Ex. H, Romano 10/9/14 dep., p. 101, ll. 16-23; Zuckerman Decl., Ex. J, Costanzo dep., p. 30, l. 17-20; p. 37, l. 25-p. 38, l. 6; p. 41, ll. 15-18; Zuckerman Decl., Exs. E and F)*

**Disputed as to the nature of the investigation and its findings. Neither officer witnessed the alleged physical altercation, as they arrived after the confrontation took place. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 93:17-20; Rozynski Decl., Ex. J, Costanzo Dep. 28:2-5] Officer Romano stated that he interviewed "one of the women," but not the other woman, without identifying which woman he interviewed; immediately after saying this, he stated that both of them admitted to assaulting each other. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 37:6-19] On the booking sheet, Officer Romano had listed that Lorena White was not injured. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 25:3-17; Rozynski Decl., Ex. M, Booking Sheets of Diana Williams, D4024-D4027 and Lorena White, D4030-D4033]. Diana Williams states that**

the scratch on her face was caused by the dog, when she bent down to pick up the dog. [Rozynski Decl., Ex. I, Affidavit of Diana Williams] Every person who was present immediately after the confrontation denies that any observable physical injuries existed. [Rozynski Decl., Ex. G, Rivera Dep. 87:3-5, 90:2-3; Rozynski Decl., Ex. C, Sabella Dep. 66:9-17; Rozynski Decl., Ex. E, Chris Williams Dep. 98:21-23] The NYPD SPRINT report indicates that the officers arrived at the scene sometime around 10:30am, but they placed Diana Williams under arrest at 11:19am, meaning they were on the scene for a total of at least 45 minutes. [Rozynski Decl., Ex. F, SPRINT report] Finally, the pictures cited as Zuckerman Decl., Exs. E and F are of poor quality and cannot be used to show, as an undisputed fact, that either party had apparent physical injuries. [Rozynski Decl., Ex. N, Pictures of Diana Williams and Lorena White, D4038-4046, D4216, NYC000214] Undisputed that no gun was found.

50. *Lorena White is able to speak English and P.O. Costanzo could communicate with her with the help of her boyfriend. (Zuckerman Decl., Ex. A, C. Williams dep., p. 58, ll. 3-25; Zuckerman Decl., Ex, J, Costanzo dep. p. 28, l. 25-p. 29, l. 18)*

**Disputed. Lorena White is deaf and does not possess native or fluent English capabilities; the record indicates that she cannot communicate in English at all. [Rozynski Decl., Ex. G, Rivera Dep. 35:3-6; Rozynski Decl., Ex. E, Diana Williams Dep. 37:10-18; Rozynski Decl., Ex. C, Sabella Dep. 23:4-24:2]**

51. *According to Christopher Williams, the situation was very "hectic" and "chaotic" when the police arrived. (Zuckerman Decl., Ex. A, C. Williams dep., p. 84, ll. 21-25; p. 85, ll. 6-8)*

Disputed to the extent that this statement implies that the situation was out of control or otherwise presented exigent circumstances. These words are quoted out of context. Chris Williams described the scene as such because he could not understand what was going on due to the lack of communication, not because of the nature of the interaction between the parties. [Rozynski Decl., Ex. D, Chris Williams Dep. 84:21-85:15]

52. *Plaintiff was ultimately arrested for assaulting her tenant, Lorena White. (Assault in the 3rd Degree) (Amended Complaint, ¶ 7; Zuckerman Decl., Ex. C, D. Williams dep., p. 88, ll. 14-17; Zuckerman Decl., Ex. G, Romano 4/4/14 dep. p. 34, l. 17-p. 35, l. 10; p. 55, l. 15-25).*

Disputed. This was the reason given for the arrest, but it is disputed whether any physical altercation ever occurred. See response to No. 49, supra.

53. *Lorena White was also ultimately arrested for assaulting plaintiff. (Zuckerman Decl., Ex. A, C. Williams dep., p. 97, ll. 3-8; Zuckerman Decl, Ex. C, D. Williams dep. p. 104, ll. 10-15; Zuckerman Decl., Ex. G, Romano 4/4/14 dep., p. 34, l. 17-p. 35, l. 10)*

Disputed. This was the reason given for the arrest, but it is disputed whether any physical altercation ever occurred. See response to No. 49, supra.

54. *Upon her arrest, plaintiff was transported to the NYPD's 122nd Precinct for processing, which was a 3-5 minute ride from 265 Hillbrook Drive. (See Amended Complaint, ¶ 11; Zuckerman Decl., Ex. A, C. Williams dep., p. 96, ll. 23-25; Zuckerman Decl., Ex. C, D. Williams dep., p. 112, ll. 17-19)*

Undisputed.

55. *While in custody, and upon her arrival at Staten Island Central Booking, which is at the same location as the NYPD's 120th Precinct, following transport from the 122nd Precinct, plaintiff requested to go to the hospital. (Zuckerman Decl., Ex. C, D. Williams dep., p. 120, l. 10-,p. 121, l. 6; see Amended Complaint, ¶ 14)*

> **Disputed. Diana Williams suffered from observable anxiety and panic in the precinct for several hours, during which time not a single person attempted to communicate with her. [Rozynski Decl., Ex. E, Diana Williams Dep. 121:23-122:5] Officer Justin Meehan testified that, while at Precinct 120, Ms. Williams appeared stressed and anxious in her cell, that he believed she was crying while in the cell, and admitted that he and other officers were unable to communicate with her. [Rozynski Decl., Ex. O, Meehan Dep. 42:15-43:25, 51:6-17] Only after being taken outside, for purposes of transporting her to a different precinct, was she able to signal her need for medical help by writing "H-O-S-P" with her finger on the hood of a dirty police car, while still handcuffed. [Rozynski Decl., Ex. E, Diana Williams Dep. 119:13-120:22] Only after being transported to the next Precinct, where she continued to gesture for help, was she transported to the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 125:19-126:12]**

56. *In accordance with her request, plaintiff was transported to the Richmond University Medical Center by EMTs in an ambulance. (See Amended Complaint, ¶ 14; Zuckerman Decl., Ex. C, D. Williams dep., p. 127, ll. 7-21)*

> **Disputed, to the extent that "in accordance with her request" implies that Diana Williams' needs were adequately addressed in a timely manner. Diana**

**Williams suffered from observable anxiety and panic in the precinct for several hours, during which time not a single person attempted to communicate with her. [Rozynski Decl., Ex. E, Diana Williams Dep. 121:23-122:5] Officer Justin Meehan testified that, while at Precinct 120, Ms. Williams appeared stressed and anxious in her cell, that he believed she was crying while in the cell, and admitted that he and other officers were unable to communicate with her. [Rozynski Decl., Ex. O, Meehan Dep. 42:15-43:25, 51:6-17] Only after being taken outside, for purposes of transporting her to a different precinct, was she able to signal her need for medical help by writing "H-O-S-P" with her finger on the hood of a dirty police car, while still handcuffed. [Rozynski Decl., Ex. E, Diana Williams Dep. 119:13-120:22] Only after being transported to the next Precinct, where she continued to gesture for help, was she transported to the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 125:19-126:12]**

57. *According to its records, the Richmond University Medical Center provided plaintiff an American Sign Language Interpreter when she was treated at that Hospital. (the first time) (Zuckerman Decl., Exhibit K, Maximos dep. p. 32, ll. 19-24; See Amended Complaint, ¶ 15)*

      **Undisputed.**

58. *Following her discharge from the Richmond University Medical Center (the first time), plaintiff was transported back to Staten Island Central Booking by P.O. Justin Meehan and P.O. Christopher Maki. (See Amended Complaint, ¶ 16; see Zuckerman Decl., Ex. C, D.*

*Williams dep., p. 133, ll. 16-18; Zuckerman Decl., Ex. L, Meehan dep. p. 129. l 20-p. 130, l. 4; 134, ll. 9-18)*

**Undisputed.**

59. *Upon arriving back at Staten Island Central Booking, plaintiff again requested to be hospitalized. (See Amended Complaint, ¶ 17; Zuckerman Decl., Ex. C, D. Williams dep., p. 137, ll. 3-11)*

**Disputed. Plaintiff's second request for medical attention did not happen "upon arriving," but rather roughly 30-40 minutes after. [Rozynski Decl., Ex. E, Diana Williams Dep. 137:15-17] Diana Williams continued to experience severe anxiety and panic, and again gestured for an interpreter; when police officers did not respond, she then gestured to be taken to the hospital, whereupon she was taken back to Richmond University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 137:3-139:17, 143:2-12, 144:4-6] See also response to No. 56, supra.**

60. *In accordance with her request, plaintiff was again transported to the Richmond University Medical Center by EMTs in ambulance. (Zuckerman Decl., Ex. C, D. Williams dep., p. 143, ll. 2-12; 144, 4-13)*

**Disputed, to the extent that "in accordance with her request" implies that Diana Williams' needs were adequately addressed in a timely manner. Diana Williams continued to experience severe anxiety and panic, and again gestured for an interpreter; when police officers did not respond, she then gestured to be taken to the hospital, whereupon she was taken back to Richmond**

**University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 137:3-139:17, 143:2-12, 144:4-6] See also response to No. 56, supra.**

61. *While she was treated at the Richmond University Medical Center (the second time), plaintiff contends that she was not provided an American Sign Language Interpreter, though the Hospital during its Rule 30(b)(6) deposition in this matter, could not determine from its records whether one was provided or not. (see Zuckerman Decl., Ex. K, Maximos dep. p. 104, ll. 14-22; see Amended Complaint, ¶ 17)*

    **Undisputed.**

62. *Plaintiff has not sued the Richmond University Hospital for its alleged failure to provide and American Sign Language Interpreter during plaintiff's second visit to the Hospital. (See Amended Complaint)*

    **Undisputed.**

63. *On September 12, 2011, plaintiff was released from custody without charges being formally brought at or about 1:00 or 2:00 p.m. as the Staten Island District Attorney chose not to proceed if both women agreed not to pursue charges. (Amended Complaint, ¶ 21; Zuckerman Decl., Ex. D, D. Williams 50-h, p. 24, ll. 12-22; Zuckerman Decl., Ex. G, Romano dep. 4/4/14 p. 58, l. 22-p. 59, l. 7; p. 69, l. 24-p. 71, l. 16)*

    **Disputed. While Diana Williams did sign a 343 form to drop the charges against Lorena White, she did not understand its contents as her English reading skills are insufficient to have understood it, and as she was not provided an interpreter. [Rozynski Decl., Ex. P, 343 Form, D4018; Rozynski Decl., Ex. K, Romano Day 1 Dep. 59:8-60:8; Rozynski Decl., Ex. E, Diana Williams Dep. 149:13-17; Rozynski Decl., Ex. Q, Kegl Report pp. 58-61, 68,**

**75] Undisputed that plaintiff was released from custody without charges being formally brought at or about 1:00 or 2:00 p.m. on September 12, 2011.**

64. *Lorena White and Nicole Sabella ultimately moved out of 265 Hillbrook Drive on or about September 11, 2011. (Zuckerman Decl., Ex. A, C. Williams dep., p. 52, ll. 10-13)*

**Undisputed.**

**PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS**

A. BACKGROUND INFORMATION:

1. Plaintiff, Diana Williams, is deaf and primarily communicates in American Sign Language. [Rozynski Decl., Ex. E, Diana Williams Dep. 10:13-12:15; Rozynski Decl., Ex. G, Rivera Dep. 16:9-19]

2. Diana Williams cannot speak, read lips, or communicate effectively using written English, as she only has rudimentary knowledge of the English language. [Rozynski Decl., Ex. E, Diana Williams Dep. 10:13-12:15; Rozynski Decl., Ex. G, Rivera Dep. 16:9-19; Rozynski Decl., Ex. D, Chris Williams Dep. 20:13-23, 24:19-25:4; Rozynski Decl., Ex. Q, Kegl Report pp. 58-61, 68, 75]

3. Diana Williams is married to Chris Williams, who is also deaf. [Rozynski Decl., Ex. E, Diana Williams Dep. 27:14-28:11; Rozynski Decl., Ex. D, Chris Williams Dep. 9:13-16, 10:8-25]

4. Chris Williams, while his primary language is ASL, has some knowledge of the English language and considers himself capable of communicating in written English. [Rozynski Decl., Ex. D, Chris Williams Dep. 12:10-22, 14:23-15:9]

5. On 9/11/11, Diana Williams was approximately five feet, two inches (5'2") tall, and weighed approximately 137 pounds. [Rozynski Decl., Ex. E, Diana Williams Dep. 23:8-18]

6. On 9/11/11, Diana Williams and Chris Williams were renting two upstairs apartments in their jointly-owned property at 265 Hillbrook Drive to Lorena White and Nicole Sabella. [Rozynski Decl., Ex. E, Diana Williams Dep. 35:15-17; Rozynski Decl., Ex. D, Chris Williams Dep., 25:12-17, 26:14-20]

7. Lorena White is deaf and cannot speak English. [Rozynski Decl., Ex. E, Diana Williams Dep. 37:10-11; Rozynski Decl., Ex. G, Rivera Dep. 35:3-6; Rozynski Decl., Ex. C, Sabella Dep. 23:4-24:2]

8. Nicole Sabella is fully hearing (i.e., not deaf or hard-of-hearing), but can speak some American Sign Language, which is how she communicated with Diana and Chris Williams [Rozynski Decl., Ex. E, Diana Williams Dep. 36:24-25; Rozynski Decl., Ex. C, Sabella Dep. 28:3-9, 36:21-37:10]

9. Diana Williams' brother, David Rivera, lives across the street from 265 Hillbrook Drive. [Rozynski Decl., Ex. G, Rivera Dep. 25:21-23]

10. Because Lorena White had not been paying her rent, Chris Williams had the Williams' attorney send her with a 30-day notice, requiring Lorena White to surrender the apartment and vacate by 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:10-14; Rozynski Decl., Ex. D, Chris Williams Dep. 38:20-40:17, 40:18-21:8; Rozynski Decl., Ex. C, Sabella Dep. 37:11-20]

11. Lorena White was angry at Diana and Chris Williams for sending the letter requiring her to surrender the apartment. [Rozynski Decl., Ex. E, Diana Williams Dep. 98:14-18]

12. Diana Williams was living in Maryland at the time, but had driven to 265 Hillbrook Drive on 9/10/11 to assist with the planned surrender on 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:10-14]

13. Diana and Chris Williams planned to call the police to assist with the surrender to ensure there would be no damage to the property. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-80:2]

B. ARREST:

14. Diana and Chris Williams did call the police that morning, at approximately 9:15am, using the videophone in the basement of 265 Hillbrook Drive, but the police did not respond to that call. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-80:23; Rozynski Decl., Ex. D, Chris Williams Dep. 61:20-62:8, 63:16-25; Rozynski Decl., Ex. F, SPRINT report]

15. Sometime after calling the police, Diana Williams went upstairs to ask Nicole Sabella about the location of a missing cutting board from the kitchen. [Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-24; Rozynski Decl., Ex. D, Chris Williams Dep. 65:18-23, 69:6-19; Rozynski Decl., Ex. C, Sabella Dep. 54:4-5]

16. At this time, David Rivera walked from his home across the street to 265 Hillbrook Drive, seeing Lorena White's boyfriend sitting in his car on the street. [Rozynski Decl., Ex. G, Rivera Dep. 51:21-52:10]

17. Lorena White's boyfriend was named Alendi, and he was fully hearing (i.e. not deaf or hard of hearing). [Rozynski Decl., Ex. C, Sabella Dep. 47:14-24]

18. While Diana Williams was conversing with Nicole Sabella, and as Chris Williams opened the door to 265 Hillbrook Drive to let David Rivera in, the Williams' dog, named Buddy, ran upstairs and into Lorena White's bedroom. [Rozynski Decl., Ex. E, Diana Williams Dep. 94:25-95:20; Rozynski Decl., Ex. D, Chris Williams Dep. 66:2-13; Rozynski Decl., Ex. G, Rivera Dep. 55:11-56:7, 63:12-16]

19. Buddy was not supposed to go upstairs, out of respect for the tenants' space. [Rozynski Decl., Ex. D, Chris Williams Dep. 49:3-5; Rozynski Decl., Ex. E, Diana Williams Dep. 95:11-14; Rozynski Decl., Ex. G, Rivera Dep. 56:21-57:4, 61:2-17]

20. Diana Williams walked to the edge of Lorena White's room and picked up Buddy, at which point Lorena White angrily and aggressively approached Diana Williams, causing Diana Williams to back away. [Rozynski Decl., Ex. E, Diana Williams Dep. 95:20-97:25; Rozynski Decl., Ex. G, Rivera Dep. 57:21-59:6]

21. Diana Williams states that Buddy scratched her face when she bent down to pick him up. [Rozynski Decl., Ex. I, Affidavit of Diana Williams]

22. David Rivera was going up the stairs to follow the dog as this altercation occurred, and seeing what was happening, he placed himself between Diana Williams and Lorena White and attempted to defuse the situation [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-25; Rozynski Decl., Ex. G, Rivera Dep. 57:21-59:6; Rozynski Decl., Ex. C, Sabella Dep. 51:19-52:16]

23. Diana Williams stated that there was no physical altercation between her and Lorena White, but that she may have touched Lorena White with her outstretched palm in an effort to create distance between them.  [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:20-23, 32:24-33:4; Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-25]

24. Diana Williams denies that Lorena White ever hit her. [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-11]

25. Nicole Sabella did not witness the exchange between Diana Williams and Lorena White, as she was in the bathroom. [Rozynski Decl., Ex. C, Sabella Dep. 50:3-7]

26. Diana Williams then went downstairs and immediately outside to wait for the police to arrive, while David Rivera stayed upstairs for a moment to attempt to calm Lorena White. [Rozynski Decl., Ex. E, Diana Williams Dep. 102:10-25; Rozynski Decl., Ex. G, Rivera Dep. 59:7-21]

27. Chris Williams then attempted to call the police again from the videophone in the basement, but could not because the internet had been disconnected. [Rozynski Decl., Ex. D, Chris Williams Dep. 77:1-16]

28. At this time, Alendi was at the door attempting to enter 265 Hillbrook Drive, but Chris Williams and David Rivera blocked the door to prevent him from entering. [Rozynski Decl., Ex. G, Rivera Dep. 60:2-17; Rozynski Decl., Ex. D, Chris Williams Dep. 77:17-78:4]

29. Alendi then made a threatening gesture in the shape of a gun with his hand, indicating that he had one with him in his car. [Rozynski Decl., Ex. D, Chris Williams Dep. 78:14-20; Rozynski Decl., Ex. G, David Rivera Dep. 60:19]

30. At approximately 10:20am, Chris Williams and David Rivera went, together, to David Rivera's home across the street, where Chris Williams used David Rivera's videophone to call the police again, and told the police that a man was threatening them with a gun. [Rozynski Decl., Ex. G, David Rivera Dep. 65:25-66:14, 67:17-23; Rozynski Decl., Ex. D, Chris Williams Dep. 78:21-25, 79:1-11]

31. The NYPD's SPRINT report evidencing the calls to the 911 operator shows that over one hour elapsed between the first time Diana Williams and Chris Williams called the police from the basement of 265 Hillbrook Drive, and the second time when Chris Williams and David Rivera called the police from David Rivera's home across the street. [Rozynski Decl., Ex. F, SPRINT Report]

32. The NYPD's SPRINT report further indicates that the call was identified as coming through a Sorensen Relay Service, and refers to a deaf family requesting police assistance ("DEAF FML THAT NEEDS PD"). [Rozynski Decl., Ex. F, SPRINT Report]

33. NYPD officers Christopher Romano and Gillio Costanzo arrived at the scene about five minutes after Chris Williams and David Rivera called, and when they arrived, they saw a group of people "waiting outside." [Rozynski Decl., Ex. K, Romano Day 1 Dep. 34:7-19; Rozynski Decl., Ex. J, Costanzo Dep. 28:2-10; Rozynski Decl., Ex. D, Chris Williams Dep. 83:11-17]

34. When the police arrived, the following people were waiting outside of 265 Hillbrook Avenue: Diana Williams, Chris Williams, David Rivera, Lorena White, and Alendi. [Rozynski Decl., Ex. E, Diana Williams Dep. 83:10-25; Rozynski Decl., Ex. G, Rivera Dep. 79:2-12; Rozynski Decl., Ex. C, Sabella Dep. 60:25-61:24]

35. Chris Williams attempted to communicate with the police by showing them a copy of the lease, but the police ignored Chris Williams. [Rozynski Decl., Ex. E, Diana Williams Dep. 85:14-86:1]

36. Diana Williams, Chris Williams, and David Rivera gestured to indicate to the police that they were deaf, but the officers made no attempt to communicate with them, and instead approached Lorena White and Alendi, since Alendi was able to speak English. [Rozynski Decl., Ex. E, Diana Williams Dep. 84:18-24, 87:8-16, Rozynski Decl., Ex. G, Rivera Dep. 80:7-23, Rozynski Decl., Ex. D, Chris Williams Dep. 84:2-3; Rozynski Decl., Ex. C, Sabella Dep. 61:7-62:24]

37. Diana Williams, Chris Williams, and David Rivera continued to try without success to get the attention of the officers, which is what prompted Chris Williams to describe the situation as "hectic" and "chaotic." [Rozynski Decl., Ex. D, Chris Williams Dep. 84:21-85:15]

38. Diana Williams, Chris Williams, and David Rivera were unable to understand the conversation that the police were having with the others, and made repeated requests for an interpreter through signing and writing notes. [Rozynski Decl., Ex. E, Diana Williams Dep. 84:5-9, 87:8-16, 88:1-90:4; Rozynski Decl., Ex. D, Chris Williams Dep. 89:11-25, 90:10-16]

39. Diana Williams, Chris Williams, and David Rivera continued to attempt to get the officers' attention, both through gesturing and writing notes, to request an interpreter so they could explain the situation, but the officers ignored them. [Rozynski Decl., Ex. G, Rivera Dep. 83:23-84:6, 91:14-24, 94:3-8; Rozynski Decl., Ex. D, Chris Williams Dep. 85:9-15, 87:17-22; Rozynski Decl., Ex. C, Sabella Dep. 68:8-12]

40. Officer Romano somehow determined that both Diana Williams and Lorena White had assaulted each other. [Rozynski Decl., Ex. K, Romano Day 1 Dep 36:14-37:18; 40:6-41:2]

41. Officer Romano stated that he interviewed "one of the women," but not the other woman, without identifying which woman he interviewed; immediately after saying this, he stated that both of them admitted to assaulting each other. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 37:6-19]

42. Officer Romano stated in his first deposition that he did not speak directly with Diana Williams and that Chris Williams was able to interpret for him during his investigation [Rozynski Decl., Ex. K, Romano Day 1 Dep. 39:9-14, 49:16-23, 51:7-15]; but he stated during his second deposition that he was able to "communicate with Diana Williams directly." [Rozynski Decl., Ex. L, Romano Day 2 Dep. 32:16-33]

43. Officer Romano later stated that he "believed" the two women had engaged in a physical altercation based only on "physical observation after arriving on a police scene." [Rozynski Decl., Ex. L, Romano Day 2 Dep. 93:17-95:4]

44. In contradiction to Diana Williams' testimony, the arrest sheet filled out by Officer Romano states that Diana Williams told him at the scene that Lorena White hit her with closed fists, causing bruising to her leg, lower lip, and chin area. [Rozynski Decl., Ex. R, Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039]

45. When asked if he did any further investigation other than speaking with Lorena White and Alendi, Officer Costanzo replied, "No." [Rozynski Decl., Ex. J, Costanzo Dep. 37:3-8]

46. At 11:19am, Officer Romano then arrested Ms. Williams and placed her in a police car, which drove her to Precinct 122. [Rozynski Decl., Ex. E, Diana Williams Dep. 105:20-24, 106:9-11, 112:20-113:3; Rozynski Decl., Ex. R, Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039]

47. The NYPD SPRINT report indicates that the officers arrived at the scene sometime around 10:30am, but they placed Diana Williams under arrest at 11:19am, meaning they were on the scene for a total of at least 45 minutes. [Rozynski Decl., Ex. F, SPRINT report]

48. Diana Williams was handcuffed with her hands behind her back. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 85:20-86:5]

49. Officer Romano did not attempt to explain to Ms. Williams her Miranda rights or the reason for her arrest. [Rozynski Decl., Ex. G, Rivera Dep. 85:23-86:9; Rozynski Decl., Ex. K, Romano Day 1 Dep. 51:20-52:13]

50. Diana Williams was in a state of panic, as she had no idea why she had been arrested. [Rozynski Decl., Ex. D, Chris Williams Dep. 94:24-96:18; Rozynski Decl., Ex. C, Sabella Dep. 50:13-51:8]

51. Officer Romano stated in his first deposition that he observed and was aware, at the time he arrested Diana Williams, that Diana Williams was having problems hearing and communicating [Rozynski Decl., Ex. K, Romano Day 1 Dep. 41:10-15]; despite this, he stated in his second deposition that he did not consider her to be disabled and did not think she needed an interpreter. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 47:25-49:8]

52. Officer Romano also arrested Lorena White, for the stated reason that Diana Williams had injuries that he determined were the result of an assault; but he did not confirm through other witnesses that a physical altercation had happened. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 43:5-44:16]

53. Two additional police officers, Sergeant Daniel Watson and Steven Zielinski, were called to the scene to transport one of the arrestees, so each was transported to Precinct 122 in a different vehicle. [Rozynski Decl., Ex. S, Watson Dep. 14:11-14, 18:12-19:3, 24:5-8, 27:15-19; Rozynski Decl., Ex. J, Costanzo Dep. 88:15-23]

54. Office Romano believed, at the time of the arrest, that Lorena White and Diana Williams had gotten into a fight, which produced injuries to both; but he admitted that he did not see the fight. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 90:22-95:4]

55. Officer Romano testified that Diana Williams complained of bruising on her arm, and recorded on both arrest sheets that both Diana Williams and Lorena White suffered bruising. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 17:15-19; Rozynski Decl., Ex. R,

Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039; Rozynski Decl., Ex. T, Lorena White Arrest Sheets, D4034-D4036]

56. Diana Williams repeatedly denies that any physical altercation took place, and states that she had no injuries that were caused by Lorena White. [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:24-33:4; Rozynski Decl., Ex. E Diana Williams Dep. 90:5-9, 99:10-20]

57. Chris Williams, David Rivera and Nicole Sabella state that neither Diana Williams nor Lorena White had any visible physical injuries at the time of the arrests. [Rozynski Decl., Ex. G, Rivera Dep. 87:3-5, 90:2-3; Rozynski Decl., Ex. C Sabella Dep. 66:9-17; Rozynski Decl., Ex. D Chris Williams Dep. 98:21-23]

58. Numerous pictures were taken of Diana Williams and Lorena White after they were taken into custody, and none of them demonstrate visible physical injuries. [Rozynski Decl., Ex. N, Pictures of Diana Williams and Lorena White, D4038-4046, D4216, NYC000214]

59. Officer Costanzo stated in his deposition that he "really did not deal with [Diana] Williams at all" at the scene of the arrest, and that he spent his entire time interviewing Lorena White and Alendi. [Rozynski Decl., Ex. J, Costanzo Dep. 28:8-10, 33:10-23, 42:19-43:8]

C. CUSTODY:

60. Upon arrival at the precinct, Diana Williams was placed in a cell and handcuffed to a bar. [Rozynski Decl., Ex. E, Diana Williams Dep. 113:8-13, 122:9-11]

61. Chris Williams followed the police cruiser to Precinct 122, where he was joined by David Rivera. [Rozynski Decl., Ex. D, Chris Williams Dep. 99:17-100:3, 104:9-13; Rozynski Decl., Ex. G, Rivera Dep. 105:7-106:6]

62. Chris Williams and David Rivera each made separate written requests for an interpreter for Diana Williams at the precinct front desk, but both were ignored. [Rozynski Decl., Ex. D, Chris Williams Dep. 102:5-20, 105:15-106:3; Rozynski Decl., Ex. G, Rivera Dep. 107:22-25]

63. David Rivera texted his friend, Wes Whelan, who drove from the Bronx to Precinct 122 to offer himself as an interpreter, since he interprets for his profession; however, the officers at Precinct 122 did not allow him to interpret. [Rozynski Decl., Ex. D, Chris Williams Dep. 106:21-107:5, 107:18-23; Rozynski Decl., Ex. G, Rivera Dep. 109:10-110:1, 111:11-25]

64. After over an hour at Precinct 122, Chris Williams, David Rivera, and Wes Whelan were told by an officer to leave, or else they would be arrested, at which point they did leave. [Rozynski Decl., Ex. D, Chris Williams Dep. 108:17-109:5; Rozynski Decl., Ex. G, Rivera Dep. 112:1-10]

65. While in her cell, Diana Williams was assaulted by a police officer, who pushed her against the wall, causing her to hit her head. [Rozynski Decl., Ex. E, Diana Williams Dep. 106:21-25, 108:21-109:6]

66. Officer Justin Meehan testified that, while at Precinct 120, Ms. Williams appeared stressed and anxious in her cell, that he believed she was crying while in the cell, and admitted that he and other officers were unable to communicate with her. [Rozynski Decl., Ex. O, Meehan Dep. 42:15-43:25, 51:6-17]

67. At no time did any police officer in Precinct 122 communicate with Diana Williams about the reason for her arrest, nor did any officer attempt to procure an American Sign Language interpreter for her. [Rozynski Decl., Ex. E, Diana Williams Dep. 121:23-122:5]

68. At approximately 6:00pm, Diana Williams was taken out of the cell and moved outside, at which point, in an effort to communicate her need for medical care due to anxiety and panic, and while still handcuffed, she wrote the letters "H-O-S-P" on the hood of a dirty police car. [Rozynski Decl., Ex. E, Diana Williams Dep. 119:13-120:22]

69. Diana Williams and Lorena White were then transported, together in the back of a police vehicle, to Precinct 120. [Rozynski Decl., Ex. E, Diana Williams Dep. 123:11-14]

70. At Precinct 120, Diana Williams continued to gesture for help, and the officer who saw her write "H-O-S-P" on the police car recognized that she needed medical help. [Rozynski Decl., Ex. E, Diana Williams Dep. 125:19-126:12]

71. Diana Williams was then taken to an ambulance and transported to Richmond University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 127:12-128:5; Rozynski Decl., Ex. U, Maximos Dep. 19:6-9]

72. At the hospital, Diana Williams' admission form stated "Req. interpreter" on it. [Rozynski Decl., Ex. U, Maximos Dep. 20:4-7]

73. The hospital provided Diana Williams with an interpreter, and she was diagnosed with "anxiety and stress reaction" and panic attack, and was treated with an oral dose of Azprazolam. [Rozynski Decl., Ex. U, Maximos Dep. 32:1-9, 36:10-14, 50:10-16, 68:3-8; Rozynski Decl., Ex. E, Diana Williams Dep. 128:8-129:4]

74. Hospital records indicate that Diana Williams had a "superficial wound to the face, the left side of the mouth," but do not mention any other irregularities with her skin, including bruising. [Rozynski Decl., Ex. U, Maximos Dep. 64:6-19; Rozynski Decl., Ex. V, Hospital Record, NYC000195]

75. While at the hospital, Diana Williams told the hospital interpreter that she needed an interpreter to communicate with the police, and the hospital interpreter conveyed her request to the officers that accompanied Diana Williams to the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 128:6-129:12, 129:21-130:6]

76. Diana Williams was then taken back to Precinct 120 and immediately placed back in a cell. [Rozynski Decl., Ex. E, Diana Williams Dep. 132:7-22, 163:1-6]

77. Because there was no interpreter at the precinct, Diana Williams continued to experience severe anxiety and panic, and again gestured for an interpreter; when police officers did not respond, she then gestured to be taken to the hospital, whereupon she was taken back to Richmond University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 137:3-139:17, 143:2-12, 144:4-6]

78. Diana Williams states that no interpreter was present the second time she was at the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 144:18-145:1]

79. During this second trip to the hospital, Diana Williams was treated with an intramuscular injection of Lorazepam for anxiety [Rozynski Decl., Ex. E, Diana Williams Dep. 145:1-6; Rozynski Decl., Ex. U, Maximos Dep. 70:25, 78:9-79:21]

80. This injection caused Diana Williams to pass out, and when she awoke the next morning, she was taken back to Precinct 120 and placed in her cell. [Rozynski Decl., Ex. E, Diana Williams Dep. 145:6-23]

81. At no time did any police officer in Precinct 120 communicate with Diana Williams about the reason for her arrest, nor did any officer attempt to procure an American Sign Language interpreter for her. [Rozynski Decl., Ex. E, Diana Williams Dep. 136:1-14, 143:2-5; 146:12]

82. After an indeterminate amount of time, an officer led Diana Williams out of her cell and to a white truck, which she entered, and which transported her elsewhere. [Rozynski Decl., Ex. E, Diana Williams Dep. 146:11-147:19]

83. After arriving at a new location, which appeared to be a prison, police officers escorted Diana Williams down a hallway and eventually into a room, where she was shown a form and asked to read it. [Rozynski Decl., Ex. E, Diana Williams Dep. 147:20-149:17]

84. This form was a 343 form, indicating that Diana Williams wanted to drop the charges against Lorena White; Diana Williams signed this form without knowledge of its contents because she was not able to read it. [Rozynski Decl., Ex. E, Diana Williams Dep. 149:13-17, Rozynski Decl., Ex. P, 343 Form, D4018]

85. Officer Romano was apparently present when Diana Williams signed the 343 form, and stated that he explained to her "verbally" what the contents of the form entailed; but he never confirmed that Diana Williams was able to read the form. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 58:16-60:8, 88:20-89:9; Rozynski Decl., Ex. L, Romano Day 2 Dep. 39:18-40:7]

86. Diana Williams was then led out of the building and released to her husband, Chris Williams, still in a state of extreme emotional distress. [Rozynski Decl., Ex. E, Diana Williams Dep. 150:1-13; Rozynski Decl., Ex. D, Chris Williams Dep. 112:5-22]

D. ACCOMMODATION:

87. Sergeant Christopher Maki stated that, based on his impression and personal observation, Diana Williams could not communicate vocally without an interpreter. [Rozynski Decl., Ex. W, Maki Dep. 23:5-12]

88. Dr. Judy Kegl, a linguistics expert and an expert in American Sign Language, examined Ms. Williams to determine her ability to communicate in English and her need for interpreting services. [Rozynski Decl., Ex. Q, Kegl Report at 1-2]

89. According to Dr. Judy Kegl, "Ms. Williams' proficiency in English contrasts sharply with her proficiency in ASL. In English, she presents as a fossilized language learner . . . . A fossilized language is one that is learned incompletely by its user. Ms. Williams can advocate for herself in a law enforcement encounter as a mature, articulate, adult when allowed to communicate in ASL. In English, however, her ability to communicate is severely limited." [Rozynski Decl., Ex. Q, Kegl Report at 58]

90. According to Dr. Judy Kegl, "Ms. Williams' lipreading skills are insufficient to support her communicative needs in even the simplest situations. In her emotionally charged state during her arrest and incarceration, they would have been even more compromised." [Rozynski Decl., Ex. Q, Kegl Report at 59]

91. According to Dr. Judy Kegl, "Ms. Williams was only able to read reliably at the second-grade level." [Rozynski Decl., Ex. Q, Kegl Report at 68]

92. According to Dr. Judy Kegl, "Ms. Williams is clearly a native signer of ASL and a fossilized user of English. There is no comparison between the nuanced communication she can produce in ASL and what she is relegated to produce using what she knows of English. Her English writing is that of a 7-8 year old. Her English speech is virtually nonexistent. The stress of producing speech makes constructing a story in spoken English a daunting task." [Rozynski Decl., Ex. Q, Kegl Report at 74].

93. Dr. Judy Kegl concluded: "In my expert opinion, Ms. Williams does not have the English skills in any modality—auditory, spoken, written, or via lip-reading—to cope on her own

in a law enforcement context. Her only access to communication is via ASL and therefore via a qualified . . . interpreter." [Rozynski Decl., Ex. Q, Kegl Report at 75]

E.  INJURIES:

94. Prior to the incident of 9/11/11, Diana Williams did not suffer from any psychological illnesses or conditions. [Rozynski Decl., Ex. E, Diana Williams Dep. 55:1-3]

95. Subsequent to the incident of 9/11/11, and because of the traumatic nature of that incident and her confinement, Diana Williams began to suffer psychological illness. [Rozynski Decl., Ex. E, Diana Williams Dep. 55:4-13]

96. Diana Williams suffers from anxiety of enclosed spaces or confinement that prevents her from riding in the back seat of a car, riding in an elevator, or riding a roller coaster. [Rozynski Decl., Ex. E, Diana Williams Dep. 57:2-60:19]

97. Diana Williams was diagnosed with post traumatic stress disorder by Dr. Lisa Kornberg, a therapist fluent in ASL with whom Ms. Williams has been treating since October 3, 2012. [Rozynski Decl., Ex. E, Diana Williams Dep. 65:15-20, Rozynski Decl., Ex. X, Kornberg Records at 1-2]

98. Diana Williams currently takes anti-depressant and anti-anxiety medications to treat psychological illness caused by the incident of 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 13:16-17, 14:2-5]

99. Dr. Sandra Mays Clough is a clinical psychologist who examined Ms. Williams on September 23, 2014. [Rozynski Decl., Ex. Y, Clough Report at 1]

100. Based on her examination of Ms. Williams, Dr. Clough concluded: "After evaluation and review, it is this psychologist's professional opinion that Mrs. Williams currently meets criteria, for Post Traumatic Stress Disorder, with panic attacks (309.81) and Other

Specified Depressive Disorder, Depressive episodes with insufficient symptoms (311) according to the DSM 5. As symptoms of PTSD and depression began shortly after her traumatic experiences on September 11, 2011 (i.e. within 3 months), it is this psychologist's professional judgment that these symptoms developed in direct response to the specific traumatic experiences of September 11, 2011. Given that Mrs. Williams continues to report significant symptomatology three years after her traumatic experiences, it is this psychologist's professional opinion and judgment that remediation of these reactions will require continued talk therapy and continued medication for a significant period of time. Additionally, while symptoms may decrease in intensity and frequency, it is not uncommon for these reactions to recur and intensify in reaction to ongoing life stressors and reminders of her traumatic experience." [Rozynski Decl., Ex. Y, Clough Report at 8]

F.  NYPD TRAINING:

101. On November 18, 2009, the NYPD entered into a Settlement Agreement with the United States of America, in which the NYPD agreed to comply with the provisions of the ADA as applied to deaf individuals and to train its officers accordingly. [Rozynski Decl., Ex. B, Settlement Agreement]

102. It is the policy of the NYPD to handcuff all arrestees with their hands behind their backs, and there are no exceptions to this policy. [Rozynski Decl., Ex. A, Roberson Dep. 91:15-92:4; Rozynski Decl., Ex. K, Romano Day 1 Dep. 85:20-86:5]

103. Carol Ann Roberson has been the Assistant New York City Commissioner of Training for the NYPD for approximately thirteen (13) years, during which time she has been responsible for developing and presenting training to officers. [Rozynski Decl., Ex. A, Roberson Dep. 9:4-12, 10:6-13]

104. Carol Ann Roberson stated that the NYPD took no steps in response to the Settlement Agreement between the United States of America and the City of New York. [Rozynski Decl., Ex. A, Roberson Dep. 35:3-5]

105. Carol Ann Roberson stated that the NYPD considered sign language interpreters to be qualified if they self-identified as being able to converse in ASL and obtained certification through the Lexington School for the Deaf. [Rozynski Decl., Ex. A, Roberson Dep. 39:11-17, 40:13-17]

106. According to Professor Geoffrey Poor, an expert in American Sign Language interpreting, the NYPD's procedure for certifying interpreters as qualified is "emphatically ***not*** an appropriate tool for measuring interpreting." [Rozynski Decl., Ex. Z, Poor Report at 1]

107. Carol Ann Roberson stated that she had never seen provision of an auxiliary aide reflected in an officer's memo book or in a sergeant's log, even though procedure requires it. [Rozynski Decl., Ex. A, Roberson Dep. 41:17-42:2]

108. Officer Romano stated that, at the time of the arrest, he was not aware of the procedure for getting an interpreter for a deaf person. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 16:22-17:2]

109. Officer Romano, as of the date of his deposition, could not recall receiving any training on the Americans with Disabilities Act or on how to communicate effectively with deaf people. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 23:15-18]

110. Officer Costanzo stated that he had never provided auxiliary aid or accommodation to someone with a disability during his entire career as a police officer. [Rozynski Decl., Ex. J, Costanzo Dep. 17:15-19:13]

111. Sergeant Christopher Maki stated that he could not recall being trained on or reading any documents about interacting with deaf individuals. [Rozynski Decl., Ex. W, Maki Dep. 35:2-36:20]

112. Lieutenant John Montaperto stated that he had "possibly" seen training documents referring to accommodating deaf or otherwise disabled individuals pursuant to the ADA, but could not remember details of such documents. [Rozynski Decl., Ex. AA, Montaperto Dep. 68:19-70:25]

113. Lieutenant John Montaperto stated that he did not know whether it was police procedure to ascertain whether a person needs an interpreter. [Rozynski Decl., Ex. AA, Montaperto Dep. 82:14-18]

114. Sergeant Martin Williams stated that the first time he had ever reviewed NYPD training materials, including an interim order and patrol guide procedure, was in preparation for his deposition. **[**Rozynski Decl., Ex. AB, Martin Williams Dep. 7:11-8:20]

115. Officer Patrick Volgende, when presented at his deposition with five NYPD documents discussing how to interact with deaf or hearing impaired persons, stated that he had only reviewed one of them in a context not related to his deposition. [Rozynski Decl., Ex. AC, Volgende Dep. 25:3-27:9]

116. Ms. Williams brings this case for damages and equitable relief under 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131 ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New York Human Rights Law, N.Y. Executive Law §§ 290, et seq. ("NYHRL"); and the New York City Human Rights Law N.Y.C. Admin. Code §§ 8-101 et. seq. ("NYCHRL"); alleging that the NYPD failed to accommodate her disability, maintained discriminatory policies, failed to train its officers,

and unconstitutionally arrested her without probable cause, depriving her of liberty without due process of law. [See generally Amended Complaint, Dkt. No. 14]

Dated:          New York, New York
                February 13, 2015

                                        Respectfully submitted,

                                        EISENBERG & BAUM, LLP

                                        By: _____
                                        Andrew Rozynski, Esq.
                                        Attorneys for Plaintiff