UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
DIANA WILLIAMS,                               :
                                              :
                          Plaintiff,          :
                                              :
          - against -                         :                12 Civ. 6805 (VEC)
                                              :
THE CITY OF NEW YORK,                         :
                                              :
                          Defendant.          :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033
Email: david.kennedy2@usdoj.gov

DAVID J. KENNEDY
Assistant United States Attorney
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

STATUTORY AND REGULATORY BACKGROUND..............................................3

A.      Title II of the ADA .......................................................................................3

B.      The DOJ Regulations Implementing Title II of the ADA ....................................5

C.      The NYPD's Prior Agreement with the United States to Provide Auxiliary
        Aids and Services to People With Hearing Impairments.....................................7

STATEMENT OF FACTS .................................................................................10

ARGUMENT...................................................................................................11

THE ADA APPLIES TO LAW ENFORCEMENT ACTIVITIES,
INCLUDING ARRESTS, AND REQUIRES THAT OFFICERS COMMUNICATE
EFFECTIVELY WITH PEOPLE WITH DISABILITIES .........................................11

        A.      Title II Applies To All Law Enforcement Activities,
                Including Arrests....................................................................................11

                1.      The Language of the Statute, and the Department of Justice
                        Regulations and Guidance, Make Plain That Title II
                        Applies to Arrests .......................................................................11

                2.      Defendant's Assertion that Arrests Do Not Fall Within
                        the Scope of Title II Is Clearly Erroneous ..................................15

        B.      Title II Requires Law Enforcement Entities To Provide Effective
                Communication When Arresting An Individual With a Disability ......................18

                1.      The Language of the Statute, and the Department of Justice
                        Regulations and Guidance, as Well as the Settlement Agreement,
                        Require the Provision of Effective Communication  ................................18

                2.      Defendant's Argument That A Categorical Exclusion
                        Exists for "Exigent Circumstances" Is Incorrect  ......................................21

        C.      Because There Are Genuine Issues of Material Fact,
                Summary Judgment Should be Denied .................................................22

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**CASES**            **PAGE**

*ABF Freight Sys., Inc. v. NLRB*,
    510 U.S. 317 (1994)....................................................................................14

*Bircoll v. Miami-Dade Cnty.*,
    480 F.3d 1072 (11th Cir. 2007) .........................................................19, 21, 22

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)............................................................................5, 12, 14

*Brooklyn Center for Independence of Disabled v. Bloomberg*,
    980 F. Supp. 2d 588 (S.D.N.Y. 2013)................................................................1

*Calloway v. Boro of Glassboro Dep't of Police*,
    89 F. Supp. 2d 543 (D.N.J. 2000) ..............................................................17, 18

*Camarillo v. Carrols Corp.*,
    518 F.3d 153 (2d Cir. 2008)........................................................................17

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)...............................................................................5, 14

*Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*,
    915 F. Supp. 622 (S.D.N.Y. 1996).................................................................5

*Crocker v. Lewiston Police Dep't*,
    No. 00-13-PC, 2001 WL 114977 (D. Me. Feb. 9, 2001)...........................16, 17

*Disabled in Action v. Board of Elections of the City of New York*,
    752 F.3d 189 (2d Cir. 2014)........................................................................1, 4

*Gohier v. Enright*,
    186 F.3d 1216 (10th Cir. 1999) ...................................................................16

*Gorman v. Bartch*,
    152 F.3d 907 (8th Cir. 1998) ......................................................................18

*Hainze v. Richards*,
    207 F.3d 795 (5th Cir. 2000) ...................................................................21, 22

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003)..................................................................3, 4, 15

*Innovative Health System, Inc. v. City of White Plains,*
    931 F. Supp. 222 (S.D.N.Y. 1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997) ...................3

*Johnson v. City of Saline,*
    151 F.3d 564 (6th Cir. 1998) ........................................................14

*K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.,*
    381 F. Supp. 2d 343 (S.D.N.Y. 2005)..............................................4

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999).......................................................................5

*Patrice v. Murphy,*
    43 F. Supp. 2d 1156 (W.D. Wash. 1999)...................................16, 17

*Paulone v. City of Frederick,*
    787 F. Supp. 2d 360 (D. Md. 2011) ...............................................16

*Pennsylvania Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998).............................................................2, 11, 12

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001)........................................................................3

*Regional Economic Cmty. Action Program ("RECAP") v. City of Middletown,*
    294 F.3d 35 (2d Cir. 2002).........................................................3, 15

*Rosen v. Montgomery County Maryland,*
    121 F.3d 154 (4th Cir. 1997) ........................................................16

*Ryan v. Vermont State Police,*
    667 F. Supp. 2d 378 (D. Vt. 2009)........................................15, 23, 24

*Schorr v. Borough of Lemoyne,*
    243 F. Supp. 2d 232 (M.D. Pa. 2003) ........................................16, 19

*Seremeth v. Board of County Cmssrs. Frederick Cty.,*
    673 F.3d 333 (4th Cir. 2012) ...............................................17, 19, 21

*Taylor v. City of Mason,*
    970 F. Supp. 2d 776 (S.D. Ohio 2013) ......................................16, 23

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967).......................................................................3

*Tennessee v. Lane*,
    541 U.S. 509 (2004).......................................................................4

*Tucker v. Tennessee*,
    539 F.3d 526 (6th Cir. 2008) ...................................................21

*United States v. Gonzales*,
    520 U.S. 1 (1997)............................................................................4

*U.S. Airways v. Barnett*,
    535 U.S. 391 (2002)......................................................................20

*Valanzuolo v. City of New Haven*,
    972 F. Supp. 2d 263 (D. Conn. 2013) ...............................15, 23

*Waller v. City of Danville*, 556 F.3d 171
    (4th Cir. 2009)..............................................................................16

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001).........................................................3

**FEDERAL STATUTES AND REGULATIONS**

28 U.S.C. § 517.....................................................................................1

29 U.S.C. § 701..........................................................................1, 4, 12

29 U.S.C. § 794..........................................................................1, 4, 12

42 U.S.C. § 12101.................................................................................1

42 U.S.C. § 12101(b) ...........................................................................3

42 U.S.C. § 12131.................................................................................4

42 U.S.C. § 12132...........................................................2, 4, 6, 11, 12

42 U.S.C. § 12134.................................................................................4

42 U.S.C. § 12201(a) ........................................................................12

42 U.S.C. § 12206 ................................................................................6

28 C.F.R. § 35.103(a).........................................................................4

28 C.F.R. § 35.104.............................................................................20

28 C.F.R. § 35.130(a) .................................................................................6

28 C.F.R. § 35.130(b) ..............................................................................6, 18

28 C.F.R. § 35.130(d) .................................................................................5

28 C.F.R. § 35.130(h) ................................................................................20

28 C.F.R. § 35.139 ....................................................................................20

28 C.F.R. § 35.160(a) ................................................................................18

28 C.F.R. § 35.190(a) .................................................................................6

28 C.F.R. § 35.190(b) ................................................................................13

## LEGISLATIVE HISTORY

H.R. Rep. No. 101-485 (II) (1990), *reprinted in* 1990 U.S.C.C.A.N. 303 ................................3, 13

136 Cong. Rec. 11,461 (daily ed. June 13, 1990) .........................................13

56 Fed. Reg. 35,703 (July 26, 1991) ..........................................................13

## OTHER AUTHORITIES

*The Random House Dictionary of the English Language* (2d ed. 1987) .......................................12

*Webster's Third New International Dictionary* (1986) ................................................................12

The United States, by its attorney, Preet Bharara, United States Attorney for the Southern

District of New York, respectfully submits this Statement of Interest, pursuant to 28 U.S.C.

§ 517,[1] in support of Plaintiff Diana Williams ("Williams"), regarding the applicability of the

Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. § 12101, *et seq*., and

Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, *et seq.*, in the

context of an arrest of a person with a disability.

## PRELIMINARY STATEMENT

The Justice Department has responsibility for the implementation and enforcement of

Title II of the ADA, and the Department has issued regulations and interpretive guidance

articulating the scope of the ADA's application. As set forth in those regulations and

interpretative guidance, and consistent with controlling decisions of the Supreme Court, Title II

of the ADA applies to all law enforcement activities, including arrests. Title II broadly covers all

public entities and prohibits disability discrimination with respect to all of their services,

---

[1] 28 U.S.C. § 517 states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

The United States frequently files Statements of Interest in the district court, and *amicus* briefs in the Second Circuit, in cases concerning the applicability and interpretation of the ADA. *See, e.g.*, *Brooklyn Center for Independence of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 n.9 (S.D.N.Y. 2013) (noting statement of interest filed in ADA Title II challenge to NYC emergency planning procedures); *see also Disabled in Action v. Board of Elections of the City of New York*, 752 F.3d 189, 194-95 (2d Cir. 2014) (noting appearance of United States to propose remedial plan to address lack of accessible election facilities in ADA Title II case).

In addition, the Solicitor General of the United States has filed an *amicus* brief with the United States Supreme Court in *City and County of San Francisco v. Sheehan*, No. 13-1412, which addresses the scope of Title II's reasonable modification obligation during the arrest of an individual with a disability who is armed and violent. *Sheehan* is awaiting argument. The parties in *Sheehan* agree that Title II applies to arrests. (*See* Petitioner's Br., 2015 WL 254639, at 34 ("There is no claim that an arrest is not one of the 'services, programs, or activities' of a public entity under [Title II].… The only ADA issue here is what Title II requires of individual officers who are facing an armed and dangerous suspect.").)

programs, and activities. *See* 42 U.S.C. § 12132; *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998). By its plain terms, therefore, Title II of the ADA extends to arrests. The ADA's legislative history and the Justice Department's implementing regulations and interpretive guidance, moreover, confirm this reading. Consequently, the first argument made by Defendant in its moving papers, that "on the street" police encounters are not "services, programs, or activities" covered by Title II of the ADA (Def. Br. at 10), is clearly erroneous.

 To comply with Title II during an arrest, public entities such as the NYPD must provide auxiliary aids and services and make reasonable modifications to accommodate an individual's disability. The exigencies surrounding police activity can play a significant role in determining whether a modification is reasonable; if objective evidence demonstrates that a modification raises a significant risk of substantial harm, that modification may not qualify as reasonable and so would not to be provided under the ADA. However, the second argument made by Defendant in its moving papers, that there is a categorical exception to Title II of the ADA where there are "exigent circumstances" surrounding the arrest (Def. Br. at 11), misstates the law.

 Applying this framework to this case, there appear to be auxiliary aids and services that the arresting officers should have provided and reasonable modifications that the arresting officers should have offered; at the very least, there are genuine issues of material fact regarding the circumstances of the arrest that preclude summary judgment for Defendant. Defendant's motion should therefore be denied.

## STATUTORY AND REGULATORY BACKGROUND

Two decades ago, Congress determined that there was a "compelling need" to remedy widespread discrimination against individuals with disabilities through a "clear and comprehensive national mandate." H.R. Rep. No. 101-485 (II), at 50 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 332. In 1990, Congress enacted the ADA to implement that broad mandate. *See* 42 U.S.C. § 12101(b). The ADA has a "sweeping purpose," and "forbids discrimination against disabled individuals in major areas of public life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). As a remedial statute, moreover, the ADA "should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003). Indeed, the ADA's "comprehensive character" is one of its "most impressive strengths." *See PGA Tour*, 532 U.S. at 675 (quoting the Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess., 197 (1989) (statement of the Attorney General)).

## A.     Title II of the ADA

Title II of the ADA prohibits "all discrimination based on disability by public entities." *Regional Economic Cmty. Action Program ("RECAP") v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002); *see also Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 232 (S.D.N.Y. 1996) (Title II reaches "all actions by public entities"), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997), *superseded by rule change on other grounds as noted in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001). Subtitle A of Title II provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The term "public entity" means "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131.[2] Responsibility for implementing regulations necessary for carrying out Subtitle A is vested in the Department of Justice. 42 U.S.C. § 12134.[3]

Courts interpreting the non-discrimination mandate of Title II have explained in more detail what public entities must do to comply with the statute. The "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004); 28 C.F.R. § 35.130(b)(7). At a minimum, therefore, a public entity must ensure that individuals with disabilities are afforded "meaningful access" to that entity's publicly offered services, benefits, and activities. *See, e.g.*, *Disabled in Action*, 752 F.3d at 197.[4] A public entity will frequently have to make modifications to its policies, practices, and procedures in order to avoid discriminating against individuals with disabilities, and to truly afford them "meaningful access." *Id.*

---

[2] The United States is not aware of any claim in this case that plaintiff is not a "qualified individual," or that the defendant is not a "public entity" within the meaning of Subtitle A of Title II and its implementing regulations.

[3] Title II extended the protections of Section 504, which prohibits discrimination under, exclusion from participation in, and the denial of benefits of "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a), to all state and local government programs, services, and activities. The provisions of Title II can provide no lesser protection than that afforded by Section 504, but the Title II implementing regulations do not prevent Title II from providing greater protection to persons with disabilities than Section 504. *See* 28 C.F.R. § 35.103(a). Apart from these distinctions, and in all ways relevant to this discussion, the ADA and Section 504 are generally construed to impose the same or similar requirements. *See, e.g.*, *Henrietta D.*, 331 F.3d at 272; *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357 (S.D.N.Y. 2005). Therefore, this Statement of Interest will not separately discuss the City's compliance or lack thereof with Section 504, but will solely address Title II and its implementing regulations.

[4] This "meaningful access" standard was formulated under Section 504 before Title II was enacted, and several years before the promulgation of the DOJ Regulations.

**B.      The DOJ Regulations Implementing Title II of the ADA**

The DOJ Regulations implementing Title II are codified at 28 C.F.R. Part 35.    As interpretations of the meaning and scope of Title II, the DOJ Regulations are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *see also Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (applying *Chevron* deference to DOJ's interpretation of ADA Title III); *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 915 F. Supp. 622, 635 (S.D.N.Y. 1996) (opining that the regulations implementing Title II "must be given legislative and hence controlling weight unless they are arbitrary, capricious, or clearly contrary to the statute," and ultimately concluding that a municipal plan to remove alarm boxes from city streets violated the ADA and Section 504) (citation and internal quotation marks omitted).  In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court, in upholding a challenge by individuals with disabilities to their confinement in segregated environments, credited DOJ's interpretation of Title II as implemented through the Part 35 regulations requiring services to individuals with disabilities to be provided in an integrated setting.  *See id.* at 596-98; *see also* 28 C.F.R. § 35.130(d).  The Court wrote that because DOJ "is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect. . . . [I]t is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Id.* at 597-98 (citations and internal quotation marks omitted).  Here, this Court should accord the DOJ Regulations "legislative and controlling weight."

The DOJ Regulations are generally divided into several parts, two of which are most relevant here:  (1) general prohibitions against discrimination (Subpart B); and (2) prohibitions against inaccessible communications (Subpart E).  With respect to the general prohibitions, the regulations mirror the statutory mandate against discrimination set forth in 42 U.S.C. § 12132.  *See* 28 C.F.R. § 35.130(a).  Furthermore, a public entity may not provide an individual with a disability an opportunity to participate in or benefit from a service that is not equal to that afforded to others, or provide a service that is not as effective in affording equal opportunity to obtain the same result as that provided to others.  28 C.F.R. § 35.130(b)(1)(i)-(iii).  The regulations also require a public entity to make reasonable modifications to policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can prove such modifications would fundamentally alter the nature of the service.  28 C.F.R. § 35.130(b)(7).  Finally, the regulations require public entities' communications with individuals with disabilities to be as effective as the entities' communications with others.  28 C.F.R. § 35.160(a)(1).  This requirement includes providing auxiliary aids and services, accessible emergency telephone services, and appropriate signage, and ensuring that interested persons can obtain information as to the existence and location of accessible services.  28 C.F.R. §§ 35.160-35.163.

DOJ is also specifically authorized to issue technical assistance and policy guidance under Title II, to ensure consistent interpretation of the statute and to aid public entities in complying with Title II's requirements.  *See* 42 U.S.C. § 12206(a)(1), (c)(1), (c)(2)(B)(i), (c)(3) (among other things, directing DOJ to assist entities covered under the ADA in "understanding the responsibility of such entities . . . under this chapter," and to provide technical assistance manuals to those entities); *see also* 28 C.F.R. § 35.190(a).  Pursuant to this directive, DOJ

developed an ADA Title II Tool Kit "designed to teach state and local government officials how to identify and fix problems that prevent people with disabilities from gaining equal access to state and local government programs, services, and activities." *See* "ADA Best Practices Tool Kit for State and Local Governments" ("DOJ Tool Kit"), *available at* http://www.ada.gov/pcatoolkit/toolkitmain.htm. (For the Court's ease of reference, a copy of the relevant chapter of the Tool Kit is attached to the Declaration of David J. Kennedy, Feb. 24, 2015 ("Kennedy Decl."), as Exhibit A.) Chapter 3 of the DOJ Tool Kit, "General Effective Communication Requirements Under Title II of the ADA," is relevant to the general obligations of law enforcement entities to provide auxiliary aids and services, and refers at one point to planning ahead to have a contract in place for interpretive services for those time-sensitive situations in which it is necessary to communicate with a person with a hearing disability "who is *arrested*, injured, hospitalized, or involved in some other emergency." *Id.* at 9 (emphasis added).

C.     **The NYPD's Prior Agreement with the United States to Provide Auxiliary Aids and Services to People Who Are Deaf and Have Hearing Impairments**

Consistent with its statutory and regulatory authority, this Office previously took enforcement action against the NYPD after having received multiple complaints of the NYPD's failure to communicate effectively with arrestees who are deaf or hard of hearing. The investigation resolved in the form of a Settlement Agreement on November 18, 2009. (A copy of the Settlement Agreement with exhibits is attached as Exhibit B to the Kennedy Decl. (the "Agreement").) As the Agreement recites, the United States conducted an investigation into complaints filed pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, that NYPD officers did not effectively communicate with people with hearing impairments, including arrestees – the same subject matter of this case.

To resolve the investigation, the NYPD agreed to take a number of steps to ensure that NYPD officers would in the future effectively communicate with people with hearing impairments, including arrestees, by adopting an Interim Order on "Interaction with Hearing Impaired Persons" (the "Interim Order") (Agreement ¶ 3); committing to ensure that NYPD's "services, programs and activities are accessible to qualified individuals with hearing impairments" (Agreement ¶ 5a); "[c]ontinu[ing] to provide, at no cost to the qualified individual with a hearing impairment, appropriate auxiliary aids and services, including, but not limited to, qualified interpreters" (Agreement ¶ 5b); and "train[ing] all new recruits, supervisory personnel, and executive level staff in the Department regarding the NYPD's policies and procedures concerning qualified individuals with hearing impairments" (Agreement ¶ 9). That training includes, among other things, review of the Interim Order, review of a grievance procedure for members of the public with disabilities, and a pamphlet entitled "Communicating With People Who Are Deaf or Hard of Hearing" (the "Pamphlet") (Agreement ¶ 9c). The Pamphlet gives specific examples and descriptions of situations requiring an interpreter: "[L]engthy or complex transactions," including interviewing victims, suspects, or arrestees, require an interpreter "if the person being interviewed normally relies on sign language or speech reading to understand what others are saying." Simple transactions (*i.e.*, checking a driver's license), emergencies, and hot pursuit situations are the exceptions to the requirement for an interpreter. *Id.* The Agreement notes that the United States specifically refrained from filing a civil suit in consideration for the NYPD's performance of its obligations under the Agreement. (Agreement ¶ 2.)

Under the Agreement, officer interactions with impaired individuals are guided by NYPD Interim Order 31: Interacting with Hearing Impaired Persons (incorporated into the Agreement

as Exhibit A), which delineates the procedure an officer should follow when dealing with a

victim, witness, suspect, or arrestee:

1. Ascertain from the person with the hearing impairment the type of auxiliary aid required.
2. Utilize appropriate auxiliary aids to facilitate communication.
3. Contact the desk officer if the services of a qualified sign language interpreter are needed.
4. Follow P.G. 208-03, "Arrests -- General Processing" when probable cause has been established.

   *Note: In cases where probable cause has been developed, the arrest of a hearing impaired person shall proceed in accordance with standard arrest and safety procedure. Should communication with a hearing-impaired suspect be necessary to establish probable cause, or for a pre-arrest interview, etc., the appropriate auxiliary aid should be employed. When dealing with hearing impaired arrestees, auxiliary aids will be used to communicate with the arrestee (e.g. informing arrestee of charges and nature of the offense, interrogation, etc.)*

5. Document in detail any auxiliary aids utilized in Activity Log (PD112-145).

(Kennedy Decl. Exh. B (Agreement Exh. A), at 2.) Pursuant to the Agreement, the NYPD must

"[c]ontinue to ensure that its services, programs and activities are accessible to qualified

individuals," (Agreement ¶ 5a), to "[c]ontinue to provide, at no cost to the qualified individual

with a hearing impairment, appropriate auxiliary aids and services," (*id*. at ¶ 5c) and to "train all

new recruits, supervisory personnel, and executive level staff in the Department regarding the

NYPD's policies and procedures concerning qualified individuals with hearing impairments."

(*Id*. at ¶ 9).

The term of the Agreement was for three years from its Effective Date of November 18,

2009 (*i.e.*, through November 18, 2012).  The incident involving Williams occurred on

September 11, 2011, during the term of the Agreement. The United States has requested

information from the NYPD to assess whether this case, and NYPD's training generally, would

constitute a breach of the Agreement, but has made no final determination.

## STATEMENT OF FACTS

The circumstances that led to Williams's arrest arose out a landlord-tenant dispute on September 11, 2011, in which Williams and her husband were the landlords evicting a tenant who lived in the same building. (Def. Stat. ¶¶ 1-3; Pl. Resp. ¶¶ 1-3.) Williams is deaf and communicates primarily in American Sign Language; Williams's husband is also deaf, but considers himself capable of communicating in written English. (Def. Stat. ¶ 11; Pl. Resp. ¶ 11; Pl. Stat. ¶¶ 1, 3-4.) The tenant who moved out of the building on September 11, 2011, is also deaf, and cannot speak English. (Pl. Stat. ¶ 7.) While there is no dispute that during the eviction the tenant threatened Williams, it is disputed whether the tenant and Williams ever touched one another. (Def. Stat. ¶¶ 24-25; Pl. Resp. ¶¶ 24-25.) At some point, however, the tenant's boyfriend arrived, pushed Williams's husband, and put his hand into the shape of a gun and threatened to shoot him, prompting Williams's husband to call the police. (Def. Stat. ¶¶ 35-39, 42; Pl. Resp. ¶¶ 35-39, 42.) NYPD officers Romano and Costanzo (the "NYPD Officers") arrived on the scene a few minutes later. (Def. Stat. ¶ 46; Pl. Resp. ¶ 46.)

The plaintiff makes a series of allegations that the NYPD Officers failed to accommodate her disability. According to Williams, her husband repeatedly sought to communicate with the NYPD Officers by showing them a copy of the lease, but the NYPD Officers ignored him, preferring instead to speak to the tenant's friend and boyfriend, who were both able to speak. (Pl. Stat. ¶¶ 35-36.) Williams, her husband, and her brother made repeated requests for an interpreter, but the NYPD Officers ignored them and failed to provide any auxiliary aids or services. (Pl. Stat. ¶¶ 37-39.) The arresting officer, Officer Romano, gave conflicting testimony at his deposition as to whether he spoke with Williams and how he communicated with her; indeed, he stated at his second deposition that he did not consider Williams, who is deaf, to be

disabled. (Pl. Stat. ¶¶ 40-42, 51 (citing Romano Dep. 47:25 – 49:8).) Officer Romano then

arrested the tenant and Williams, without providing Williams with *Miranda* warnings or the

reason for her arrest.  (Pl. Stat. ¶¶ 48-49, 52.) Williams was handcuffed with her hands behind

her back, preventing her from signing or using a pad and pen to communicate. (Pl. Stat. ¶ 48.)[5]

## ARGUMENT

### THE ADA APPLIES TO LAW ENFORCEMENT ACTIVITIES, INCLUDING ARRESTS, AND REQUIRES THAT OFFICERS COMMUNICATE EFFECTIVELY WITH PEOPLE WITH DISABILITIES

Consistent with the statutory and regulatory provisions described above, the ADA

requires arresting officers to provide auxiliary aids and services necessary to communicate

effectively with people with disabilities in the conduct of arrests.

**A.      Title II Applies To All Law Enforcement Activities, Including Arrests**

**1.      The Language of the Statute, and the Department of Justice Regulations and Guidance, Make Plain That Title II Applies to Arrests**

The starting point in determining the ADA's applicability to law enforcement operations

is the statutory text. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998)

(ruling that state prisons "fall squarely within the statutory definition of 'public entity'" in Title

II of the ADA). Title II's antidiscrimination provision provides that no individual with a

disability "shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132.  By its plain terms, Title II applies to all

---

[5] After she was arrested, Williams was brought to a cell at the 122nd Precinct. (Pl. Stat. ¶¶ 60-61.) At no point during her time at the 122nd Precinct was Williams provided with an interpreter, despite numerous requests, and at no point was the reason for her arrest explained to her. (Pl. Stat. ¶¶ 62-63, 66-67.) Williams was ultimately released, on September 12, 2011, without charges being filed against her. (Def. Stat. ¶ 63; Pl. Resp. Stat. ¶ 63.) Notably, Defendant is not seeking summary judgment on Williams's claims relating to her treatment at the 122nd Precinct. (Def. Br. at 1, 12, 23.)

governmental entities, including law enforcement agencies. Title II uses the term "any" in its ordinary "expansive" sense, *i.e.*, "one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted). Moreover, the statutory text contains no "exception that could cast the coverage of " law enforcement entities "into doubt." *Yeskey*, 524 U.S. at 209. Accordingly, law enforcement agencies fall within the ADA's comprehensive definition of a public entity.

The statutory text further demonstrates that law enforcement entities are subject to Title II's antidiscrimination mandate with respect to all of their operations, including arrests. The reference to "services, programs, or activities," 42 U.S.C. § 12132, is an all-inclusive phrase that covers everything a public entity does. *See, e.g.*, *The Random House Dictionary of the English Language* 20 (2d ed. 1987) (defining "activity" as "a specific deed, action, function, or sphere of action"); *Webster's Third New International Dictionary* 1812 (1986) (defining "program" as "a plan of procedure: a schedule or system under which action may be taken toward a desired goal"). Notably, Congress expressly defined the term "[p]rogram or activity" in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, which served as the model for Title II, to "mean[ ] all of the operations of " a covered entity. *See* 29 U.S.C. § 794(b). Because Congress directed that Title II should not "be construed to apply a lesser standard than the standards applied under" Section 504, 42 U.S.C. § 12201(a), the phrase "service, programs, or activities" carries a similarly broad meaning under the ADA. *See Bragdon*, 524 U.S. at 631-32. The statute further protects individuals with disabilities from being "subjected to discrimination," 42 U.S.C. § 12132, which can occur during any aspect of an individual's interaction with a public entity. The statute therefore extends to all law enforcement operations, including arrests.

The legislative history confirms that Congress contemplated that Title II would apply to law enforcement operations generally, and to arrests in particular. The House Report specified that Title II's anti-discrimination mandate would "extend[ ] . . . to *all* actions of state and local governments." H.R. Rep. No. 101-485 (II), at 84 (1990) (emphasis added). The Report further singled out arrests as an example of an activity where "discriminatory treatment based on disability can be avoided by proper training." *Id.* Pt. 3, at 50. In addition, legislators emphasized that Title II would address discrimination in law enforcement, including the arrest of individuals with disabilities. *See, e.g.*, 136 Cong. Rec. 11,461 (1990) ("Many times, deaf persons who are arrested are put in handcuffs. But many deaf persons use their hands to communicate. . . . [T]hese mistakes . . . constitute discrimination."); *id.* at E1913, E1916 (daily ed. June 13, 1990) ("[P]ersons who have epilepsy are sometimes inappropriately arrested because police officers have not received proper training to recognize seizures and to respond to them."). Congress thus expected and intended Title II to cover all law enforcement operations in accordance with the statute's plain text.

The administrative implementation of Title II also demonstrates that Title II of the ADA applies to arrests. The Department of Justice has construed Title II to "appl[y] to anything a public entity does." 28 C.F.R. Pt. 35, App. B; *see id.* ("All governmental activities of public entities are covered."). In particular, the Department oversees the implementation of Title II with respect to "[a]ll programs, services, and regulatory activities relating to law enforcement." 28 C.F.R. § 35.190(b)(6). And the Department has further stated that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 56 Fed. Reg. 35,703 (July 26, 1991).

Consistent with this interpretation, the Department has repeatedly issued guidance to assist law enforcement entities in complying with the ADA, including in the context of arrests. For example, the Department's Title II Technical Assistance Manual states that "[a] municipal police department encounters many situations where effective communication with members of the public who are deaf or hard of hearing is critical," including "interviewing suspects prior to arrest," and "interrogating arrestees." U.S. Dep't of Justice, *Americans with Disabilities Act: Title II Technical Assistance Manual Covering State and Local Government Programs and Services* § II- 7.1000(B), illus. 3, at 3 (Nov. 1993 & Supp. 1994), available at http://www.ada.gov/taman2up.html.   (A copy of this document is attached as Exhibit C to the Kennedy Decl. ("*Title II Technical Assistance*").) In addition, 2006 guidance states that "[t]he ADA affects virtually everything that officers and deputies do," including "arresting, booking, and holding suspects." U.S. Dep't of Justice, *Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement* § I, question 2 (Apr. 4, 2006). (A copy of this document is attached as Exhibit D to the Kennedy Decl. ("*2006 Guidance*").) Because Congress expressly vested the Department with authority to implement the ADA through regulations and technical assistance, the Department's interpretation of Title II must be accorded "controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994) (quoting *Chevron*, 467 U.S. at 844); *see Bragdon*, 524 U.S. at 646 (recognizing that "the Department's views are entitled to deference"); *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998) (granting deference to *Title II Technical Assistance*). The Department's conclusion that Title II extends to all law enforcement activities follows from the text and history of the statute and definitively establishes that Title II applies to arrests.

2.      **Defendant's Assertion that Arrests Do Not Fall Within the Scope of Title II Is Clearly Erroneous**

The Second Circuit has yet to address the question of whether Title II's antidiscrimination mandate applies to arrests. *See Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 273 (D. Conn. 2013) (noting that the Second Circuit has not decided the issue); *Ryan v. Vermont State Police*, 667 F. Supp. 2d 378, 386 (D. Vt. 2009) (same). That said, the Second Circuit has generally read the ADA broadly, *see, e.g.*, *Henrietta D.*, 331 F.3d at 279, and specifically interpreted Title II to reach "*all* discrimination based on disability by public entities." *RECAP*, 294 F.3d at 45 (emphasis added). Consistent with these principles, the court in *Valanzuolo* concluded that the arresting officers had provided reasonable modifications to their practices by communicating with the plaintiff using pad and pencil, and giving the plaintiff an opportunity to read the arrest warrant. Thus, the court noted, "while there are times when a sign language interpreter is necessary to establish effective communication with a hearing-impaired arrestee . . . it is clear that effective communication occurred at the time of plaintiff's arrest." *Valanzuolo*, 972 F. Supp. 2d at 279.  The court in *Ryan* declined to decide whether Title II applied at the time of arrest, although assumed *arguendo* that it did, and granted summary judgment on other grounds. *See Ryan*, 667 F. Supp. 2d at 386-87. However, the *Ryan* court squarely ruled that "[t]he ADA does impose a duty on law enforcement to provide arrestees who are disabled with reasonable accommodations once an arrest of a disabled person has been accomplished." *Id.* at 389.  In this case, by contrast, there is no evidence of any reasonable modification provided to Williams at any point during her interactions with the NYPD Officers.

Defendant contends that "[s]ome courts have simply found that such street encounters are not covered 'services, programs or activities' under the ADA." (Def. Br. at 10.) As the authority cited above demonstrates, however, the statute applies to "all discrimination," *RECAP*, 294 F.3d

at 45, the legislative history expressly mentions arrests, and the Department of Justice, entrusted by Congress to interpret the statute and provide guidance, has noted on multiple occasions that the statute applies to arrestees. Many courts have also rejected the very claim Defendant now makes. *See, e.g.*, *Waller v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (recognizing under ADA Title II, theory of "reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees"); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law."); *Taylor v. City of Mason*, 970 F. Supp. 2d 776, 782 (S.D. Ohio 2013)("When initiating communication with [deaf plaintiff], the police should have provided him the opportunity to communicate as effectively as a non-disabled person under the circumstances."); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235-38 (M.D. Pa. 2003) (relying on *Yeskey*, Department of Justice regulations, and legislative history to conclude that ADA Title II applies to arrests, in context of municipal failure-to-train claim).

The authority upon which Defendant relies is widely considered erroneous. (*See* Def. Br. at 10 (citing *Rosen v. Montgomery County Maryland*, 121 F.3d 154, 158 (4th Cir. 1997), *Crocker v. Lewiston Police Dep't*, No. 00-13-PC, 2001 WL 114977 (D. Me. Feb. 9, 2001), and *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1160 (W.D. Wash. 1999)). The Supreme Court in *Yeskey* curtailed the scope of *Rosen* the year after *Rosen* was decided. *Yeskey* ruled that Title II of the ADA applied to state prisons, notwithstanding the involuntary nature of participation in the "services . . . programs or activities" of a correctional institution. *See Yeskey*, 524 U.S. at 209-10. As a result, *Rosen*, which exempted arrests from Title II based on the involuntary nature of the interaction, is widely described as "discredited" for the very point upon which Defendant relies.

*See, e.g.*, *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 379-80 (D. Md. 2011) (noting in 2011 that "*Rosen*'s continued vitality is uncertain" because *Yeskey* "invalidated the reasoning of . . . *Rosen*"); *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 556 (D.N.J. 2000) ("the rationale of *Rosen* [is] suspect following the Supreme Court's ruling in *Yeskey*"). Indeed, the Fourth Circuit itself recognized in 2012 that its own precedent in *Rosen* is not good law on this point, explaining that "[c]ourts across the country have called *Rosen*'s holding into question in light of the Supreme Court's decision" in *Yeskey*. *Seremeth v. Board of County Cmssrs. Frederick Cty.*, 673 F.3d 333, 337 (4th Cir. 2012); *see also id.* at 338 (noting *Waller*'s holding that "the ADA applies to police interrogations").[6] The other cases upon which Defendant relies both note the existence of contrary authority, but ultimately decide to follow *Rosen*, a choice that was plainly incorrect. *See Patrice*, 43 F. Supp. 2d at 1158-61 (rejecting legislative history and caselaw in favor of *Rosen* and "policy reasons"); *Crocker*, 2001 WL 114977, at *7 n.9 (noting contrary authority, but following *Rosen* and *Patrice* on the point upon which the Supreme Court curtailed *Rosen*).

The Court should decline Defendant's request to rely upon a case that has been limited by the Supreme Court, the very court that decided it, and multiple other courts, and that is flatly inconsistent with the plain language of the statute, the implementing regulations, and authoritative guidance.

---

[6] The *Seremeth* court explained that *Rosen* is still precedential on "the subject of what constitutes an injury under the ADA." *Seremeth*, 673 F.3d at 338 n.2. That issue is not relevant to this case. In this Circuit, to suffer discrimination prohibited by the ADA is itself an injury. *See, e.g.*, *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (reversing district court grant of summary judgment where plaintiff alleged she could not read the text of fast-food restaurant menus and no accommodation was provided; while plaintiff was permitted to eat, she had suffered injury based on "defendants' discriminatory failure to ensure effective communication of their menu items").

**B.      Title II Requires Law Enforcement Entities To Provide Effective Communication When Arresting An Individual With A Disability**

**1.      The Language of the Statute, and the Department of Justice Regulations and Guidance, as Well as the Settlement Agreement, Require the Provision of Effective Communication**

Because law enforcement entities are subject to Title II, they must first "take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).  Law enforcement entities must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *Title II Technical Assistance* § II-3.6100, at 14. That requirement extends to the arrest of an individual with a disability. For example, Title II may require a police department to "modif[y] its regular practice of handcuffing arrestees behind their backs, and instead handcuff[ ] deaf individuals in front in order for the person to sign or write notes." *2006 Guidance* § V. In addition, "an interpreter may be needed in lengthy or complex transactions" involving a deaf arrestee. U.S. Dep't of Justice, *Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers* (Jan. 2006) (under "What Situations *Require* An Interpreter?"). (A copy of this document is attached as Exhibit D to the Agreement, which is Kennedy Decl. A ("*ADA Law Enforcement Guide*")); *see Calloway*, 89 F. Supp. 2d at 555-56, 556 n.20 (recognizing that ADA may require modification to police practices to enable "a hearing impaired individual to participate in the specific police activity in an appropriate manner," but expressing no view as to whether auxiliary aids or services required at interrogation outside police station). The ADA also requires law enforcement entities to make reasonable modifications when transporting arrestees with mobility disabilities. *See Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (ADA is "applicab[le] to transportation of arrestees.").

To defeat a motion for summary judgment, a plaintiff raising a failure-to-accommodate claim must show that, under the circumstances, a reasonable accommodation for his or her disability should have been made. *Seremeth*, 673 U.S. at 340. A plaintiff raising an effective communication claim must show that the auxiliary aid or service was needed in order to make the covered entity's communication with the plaintiff as effective as communication with persons without disabilities in similar circumstances. A covered entity may then show that the auxiliary aid or service would constitute a fundamental alteration or undue burden. While the exigencies surrounding police activity may play a role in determining whether a modification is reasonable, law enforcement entities enjoy no categorical immunity from the ADA when arresting an individual with a disability. *See, e.g., id.* at 339 ("Most importantly, nothing in the text of the ADA suggests that a separate exigent-circumstances inquiry is appropriate."); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084-86 (11th Cir. 2007) ("The reasonable-modification inquiry in Title II--ADA cases is 'a highly fact-specific inquiry.'") (additional citation omitted). A public entity may not, moreover, rely on exigent circumstances to defend against an ADA claim premised on the failure to properly train law enforcement officers in recognizing and accommodating disabilities. A failure-to-train claim is unaffected by any on-the-ground exigencies surrounding an arrest because "[t]he alleged non-compliance with the training requirements of the ADA" occurs not at the moment of the arrest, but at an earlier time when "policy makers fail[ ] to institute policies to accommodate disabled individuals . . . by giving the officers the tools and resources to handle the situation peacefully." *Schorr*, 243 F. Supp. 2d at 238.

However, police officers do not need to modify their procedures or provide an auxiliary aid or service if the modification or aid would interfere with their ability to address a safety

threat, so long as the risk posed by the modification is significant and based on objective

evidence. 28 C.F.R. § 35.139(a). Any such risk must be significant, the expected harm must be

substantial, and the risk must be based on objective evidence. *Cf. Bragdon*, 524 U.S. at 649

(observing that the ADA does "not ask whether a risk exists, but whether it is significant").[7] For

example, when responding to "a violent crime in progress or a similar urgent situation involving

a person who is deaf," an "officer's immediate priority is to stabilize the situation," and the

officer is permitted to "make an arrest" without the aid of an interpreter. *2006 Guidance* § III;

*see ADA Law Enforcement Guide* (advising that if deaf suspect's "behavior is threatening,"

police officers "can make an arrest and call for an interpreter to be available later at the booking

station"). Under a "practical view of the statute," *U.S. Airways v. Barnett*, 535 U.S. 391, 402

(2002), a modification that raises significant safety concerns will not be reasonable.[8]

---

[7] Notably, there is no allegation in this case that the plaintiff was armed or violent or that there was any significant threat to the officers on the scene. Where an arrestee is armed and violent, an accommodation may not be reasonable in the run of cases because a deviation from ordinary police procedures generally will involve a significant threat to the officers or others on the scene. Even in circumstances involving an armed and violent arrestee, however, a plaintiff should "nonetheless remain[ ] free to show that special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts." *U.S. Airways v. Barnett*, 535 U.S. 391, 405 (2002). If a plaintiff points to special circumstances showing that an accommodation was reasonable on the particular facts despite the presence of a weapon and violent behavior during an arrest, a law enforcement entity will not be entitled to summary judgment on that issue.

[8] Safety concerns also may obviate the need to provide an accommodation in other circumstances. For example, Title II "does not require a public entity to permit an individual to participate in . . . services, programs, or activities . . . when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). Because the Department's regulations define "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification," 28 C.F.R. § 35.104, a public entity that seeks to avoid ADA liability on this ground must demonstrate that reasonable modifications could not eliminate the threat or reduce it to an acceptable level. *See Title II Technical Assistance* § II-2.8000, at 8. In addition, a public entity "may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities" so long as the "safety requirements are based on actual risks." 28 C.F.R. § 35.130(h). Finally, even if a plaintiff carries her threshold burden of

## 2. Defendant's Argument That A Categorical Exclusion Exists for "Exigent Circumstances" Is Incorrect

Defendant maintains that "[o]ther courts have used an 'exigent circumstances' analysis in determining whether there has been a covered 'government activity' and in denying coverage in this circumstance." (Def. Br. at 11 (citing *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008), *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1086 (11th Cir. 2007), *Hainze v. Richards*, 207 F.3d 795, 801-02 (5th Cir. 2000).) This argument misstates the law.

It is plainly wrong to contend that there is an "exigent circumstances" exception to Title II of the ADA, as the statute says nothing of the sort. Instead, whether there are exigent circumstances is part of the general fact-based determination as to whether a reasonable modification or auxiliary aid was available under the circumstances. As the Fourth Circuit has explained: "We find that while there is no separate exigent-circumstances inquiry, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation." *Seremeth*, 673 F.3d at 339. The cases that Defendant cites on this point are consistent with this analysis. In *Tucker*, the Sixth Circuit affirmed the district court because it applied a "fact specific" analysis, 539 F.3d at 534, not because it found some categorical "exigent circumstances" exception to Title II. And the facts of *Tucker* are a far cry from the facts here – in *Tucker*, one of the officers personally observed one disputant strike another, and then physically assault one officer and threaten to assault another. *See id.* at 529. *Bircoll*, too, explicitly required a "'highly fact-specific inquiry,'" which rested in part upon "the exigent circumstances of a DUI stop on the side of a highway" where "the danger to human life is high."

---

identifying a reasonable accommodation or auxiliary aid, a public entity will not be liable if it "can demonstrate that making the modification[ ] would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also* 28 C.F.R. § 35.164 (adopting similar analysis applied to obligation to provide effective communication).

*Bircoll*, 480 F.3d at 1085-86. In *Hainze*, the police officers responded to a request to take a mentally ill individual to a hospital. *See* 207 F.3d at 797. When the officers arrived at the scene, however, the individual began to advance upon the officers with a knife in his hand. *See id.* There is an obvious and striking difference, in any event, between reasonably modifying practices where officers and civilians are being assaulted (*Tucker*), a drunk driver is barreling down the highway at 3:00 a.m. (*Bircoll*), or a mentally disabled man is about to attack officers with a knife (*Hainze*), and the situation here, where the NYPD Officers entered a private home where there had been a verbal altercation, but the situation had settled such that the officers could speak to the non-deaf witnesses for fifteen to twenty minutes without incident.

Put another way, Defendant is taking cases in which the district court conducted a fact-based analysis of all of the circumstances, considered the possibility of reasonable modifications, and found that specific exigent circumstances did not require them, to somehow create a rule in which the mere invocation of the "exigent circumstances" inherent in police work – regardless of the facts – suffices to exempt the interaction from Title II of the ADA. This is not the law.

**C.     Because There Are Genuine Issues of Material Fact at Issue, Summary Judgment Should be Denied**

Applying the legal framework set forth above, there are genuine and significant issues of fact as to whether there were effective communication techniques available to the arresting officers that were not provided, and there were reasonable modifications to NYPD policies, practices, and procedures that should have been provided, to Williams.

Although Defendant devotes little attention to the interaction between Williams and the NYPD Officers, Williams's statement of material facts as to which there is no genuine dispute points to numerous occasions where the NYPD Officers should have used auxiliary aids and services, yet failed to do so. Williams is entitled to show at trial that there were effective

communication techniques that were available to the NYPD Officers and reasonable modifications that the NYPD Officers could have provided from the time they arrived at the scene to the point where they removed Williams from the scene. Once the NYPD Officers arrived, it was unreasonable for them to rely primarily upon the statements of the non-deaf individuals on the scene, as the tenant's friend and boyfriend were obviously partial to one side of the dispute. Nor has there been any showing of such urgency to justify the failure to call an interpreter to the scene – particularly given that three of the witnesses were deaf. In *Taylor*, for example, the court held that based on the record before the court, the facts "do not demonstrate that the circumstances changed during the encounter with police such that the police should not have been required to wait for the independent interpreter to arrive at the scene." *Taylor*, 970 F. Supp. 2d at 782.  Particularly relevant to the court's analysis in *Taylor* was that the plaintiff had been the one to call the officers to the scene, just as Williams's husband did here. *See id.* at 781.

Even if the NYPD Officers were justified in placing Williams in handcuffs, they should have reasonably modified their procedures to place Williams' hands in front, or handcuff Williams only partially, so that she could continue to sign. In *Valanzuolo*, by way of example, the arresting officers provided reasonable modifications by communicating with the plaintiff in a manner that was effective (pad and pencil) and by giving the plaintiff an opportunity to read the arrest warrant. *See Valanzuolo*, 972 F. Supp. 2d at 278-79. In *Ryan*, the court found that the arresting officers had provided a reasonable accommodation when they arrested the plaintiff, an amputee who could not walk without a cane, by permitting him to walk to the police cruiser without handcuffing him completely, to sit down without being handcuffed, and then driven to the police barracks with his hands cuffed in front. *See Ryan*, 667 F. Supp. 2d at 389. The NYPD Officers in this case, by contrast, provided no reasonable modifications.

The NYPD Officers may have had the ability to arrest Williams without providing an interpreter, but to meet its burden Defendant must show that it was not possible to provide a reasonable modification to its procedures or that effective communication was not possible. The request for appropriate auxiliary aids and services had been made and any attendant reasonable modifications requested here were modest – a request that the NYPD Officers summon a sign language interpreter to assist at the scene, which they are obliged to do under Interim Order 31. (Kennedy Decl. Exh. B.)  The situation, moreover, did not appear to be threatening to the safety of any officer or civilian, based at least on the parties' summary judgment submissions.  The NYPD Officers were on the scene talking to witnesses for fifteen to twenty minutes (Def. Stat. ¶ 47; Pl. Resp. ¶ 47), although there was the threat of a gun, there was no allegation that Williams was ever armed and no gun was ever apparent on the scene (Def. Stat. ¶ 49; Pl. Resp. ¶ 49), and the record is entirely devoid of any threats of violence or harm to either individuals on the scene or the NYPD Officers. Defendant relies heavily on Williams's husband's use of the use of word "chaotic" in describing the scene (Def. Br. at 12), but in the range of circumstances that police confront, to arrive on the scene to find several people engaged in a disagreement without any violence or weapons – some of whom then spend fifteen to twenty minutes in discussions with the NYPD Officers – is not "chaotic" in the usual sense.  While the NYPD Officers are entitled to demonstrate at trial that the circumstances of the arrest prevented them from employing effective communication techniques or reasonably modifying their practices, the facts that would support such a showing are disputed.  Defendant's motion should be denied.[9]

---

[9] Defendant also moves for summary judgment with respect to plaintiff's claim under New York Human Rights Law and New York City Human Rights Law (Def. Br. at 12-13), as well as plaintiff's claims for false arrest (Def. Br. at 13-16), assault and battery (Def. Br. at 16-17), intentional infliction of emotional harm (Def. Br. at 17-18), and negligent hiring (Def. Br. at 18-20). The United States takes no position on these issues.

## CONCLUSION

Accordingly, the Court should deny the Defendant's motion for summary judgment with respect to the ADA Title II claim.


Dated:      New York, New York
            February 25, 2015

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States


           _/s/ David J. Kennedy_____
By:   DAVID J. KENNEDY
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033
david.kennedy2@usdoj.gov