**SETTLEMENT AGREEMENT**
**BETWEEN**
**THE UNITED STATES OF AMERICA**
**AND**
**THE NEW YORK CITY POLICE DEPARTMENT**

WHEREAS, this matter was initiated by complaints filed pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, alleging, *inter alia*, that New York City Police Department ("NYPD" or the "Department") employees, including police officers, did not effectively communicate with people with hearing impairments in violation of Title II of the ADA;

WHEREAS, the NYPD does not admit and denies any and all liability arising out of the allegations contained in these complaints;

WHEREAS, one of the individual complainants has reached a separate agreement releasing the NYPD in consideration for a payment that the complainant has received from the NYPD;

WHEREAS, the United States of America, through the United States Department of Justice, United States Attorney's Office, Southern District of New York, (the "United States") is authorized under 28 C.F.R. Part 35 to investigate whether the NYPD is in compliance with Title II of the ADA;

WHEREAS, the NYPD is an agency of the City of New York, a "public entity" for purposes of 42 U.S.C. § 12132 and the implementing regulations, 28 C.F.R. § 35.104, *et seq.*, and the United States Department of Justice is the "designated agency" responsible for investigating the complaint, 28 C.F.R. § 35.190(b)(6);

WHEREAS, the United States is authorized to investigate the facts, issue findings and, where appropriate, attempt informal resolution of such complaints, *see* 28 C.F.R. § 35.170-172;

WHEREAS, the United States and the NYPD have the mutual goal of ensuring that the NYPD complies with the requirements of Title II of the ADA;

IT IS HEREBY AGREED between the NYPD and the United States:

1.      This Settlement Agreement (the "Agreement") is entered into pursuant to 28 C.F.R. § 35.172.

2.      In consideration for the NYPD's performance of its obligations under this Agreement, the United States agrees to refrain from undertaking further investigation or from filing a civil suit based on the complaints described above.

POLICY AND DEFINITIONS

3.     The NYPD has adopted the Interim Order to the NYPD's Patrol Guide entitled "Interaction with Hearing Impaired Persons." A copy of the Interim Order is attached as Exhibit A. This Interim Order has been made available to all members of the Police Department.

4.     In order to comply with the ADA, the NYPD must continue to take appropriate steps to ensure that its communication with qualified individuals with a disability, consisting of a hearing impairment (hereafter "qualified individual(s) with hearing impairments" or "qualified individual(s)") is effective communication.  The parties agree and stipulate that certain terms will be defined for purposes of this Agreement:

     A.     "Auxiliary aids and services" will mean qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, Telecommunications Devices for the Deaf (TDDs), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. *See* 28 C.F.R. § 35.104.

     B.     "Disability" and "Qualified individuals with a disability" will be defined as they are in the ADA, 42 U.S.C. § 12102(2), and 42 U.S.C. § 12131(2), respectively.

     C.     "Qualified interpreter" will mean and refer to a sign language or oral interpreter who is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Accordingly, an interpreter must be able to sign to the deaf individual (or interpret orally to the person who does not use sign language) what is being said by the hearing person and to voice to the hearing person what is being signed or said by the deaf individual. The interpreter must be able to interpret in the language the deaf person uses (*e.g.*, American Sign Language or Signed English) and must be familiar with terms and phrases commonly used during booking and detention. Additionally, although a qualified interpreter may be certified, a certified interpreter is not necessarily qualified, if he or she is not a good communications match for the deaf person (*e.g.*, where the deaf person uses Signed English and the interpreter uses American Sign Language) or the situation (*e.g.*, where the interpreter is unfamiliar with the necessary specialized vocabulary).

     D.     "Effective communication" will mean communication with persons with disabilities that is as effective as communication with others. Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford qualified individuals with a disability an equal opportunity to participate in or benefit from the services, programs, or activities of a public entity.

5.     In order to ensure the continued effective communication with qualified individuals with hearing impairments in the NYPD's programs, activities and services, the NYPD will:

      a.      Continue to ensure that its services, programs and activities are accessible to qualified individuals with hearing impairments, as required by 28 C.F.R. § 35.161, through the use of appropriate auxiliary aids and services, including, but not limited to, the City of New York's "311" non-emergency system (TTY No. 212-504-4115), via the nationwide Telecommunications Relay Service "711", or qualified sign language interpreters. In a situation where the NYPD would allow a person access to a telephone, the NYPD shall provide qualified individuals with hearing impairments the opportunity to place calls through the use of appropriate auxiliary aids and services, including, but not limited to, qualified sign language interpreters.

      b.      Continue to provide, at no cost to the qualified individual with a hearing impairment, appropriate auxiliary aids and services, including, but not limited to, qualified interpreters, when necessary to provide effective communication to qualified individuals with hearing impairments. *See* Exhibit A. In determining whether a qualified interpreter is required, consideration should be given to the nature and importance of the communication at issue, the complexity or length of the communication, and such other factors as are appropriate within the discretion of the NYPD. The NYPD shall continue to maintain a list of "on-call" qualified sign language interpreters who are available 24 hours a day. The NYPD shall provide a qualified sign language interpreter within a reasonable time after the request is made. Sign language services, whether through use of the NYPD's "on-call" list or though the New York Citywide Contract, shall be available 24 hours a day.

      c.      Give primary consideration to the requests of qualified individuals with hearing impairments in determining what type of auxiliary aid or service is necessary. "Primary consideration" means that the NYPD will defer to the individual's request, consistent with the NYPD's duties pursuant to 28 C.F.R. § 35.164.

      d.      The NYPD will provide notice of the availability of auxiliary aids and services for qualified individuals with hearing impairments through the distribution of pamphlets, posters or other appropriate means, including, but not limited to "The Americans with Disabilities Act What You Should Know," attached hereto as Exhibit B.

ADA COORDINATOR

6.      The NYPD's ADA Coordinator is the Deputy Commissioner, Equal Employment Opportunity. The ADA Coordinator (or her designee) shall:

      a.      Be familiar with the process for requesting a qualified sign language interpreter;

      b.      Annually either attend a seminar concerning a public entity's obligations under Title II of the ADA, or view an educational video concerning a public entity's obligations under Title II of the ADA. The United States shall provide a list of seminars and videos which shall be acceptable to the United States, which list shall include the video program entitled "Police Response to People With Disabilities," available online at: www.ada.gov/policeinfo.htm.

This list shall be provided to the NYPD, attention the Deputy Commissioner, Equal Employment Opportunity within thirty (30) days of the execution of this Agreement and annually thereafter.

## GRIEVANCES

7.     The NYPD has adopted the Administrative Guide Procedure No. 308-06: Grievance Procedure for Members of the Public with Disabilities, attached hereto as Exhibit C, as amended, in connection with this Agreement (the "ADA Grievance Procedure"). The NYPD has published this procedure and amendment. Within thirty (30) days of the effective date of this Agreement, the NYPD will post a copy of the Notice entitled "The Americans with Disabilities Act What You Should Know," attached hereto as Exhibit B in those places where notices to the public, employees and job applicants are normally posted. A copy of Exhibit B will also be provided to any person upon request. If a qualified individual with a hearing impairment files a written grievance with the NYPD's ADA Coordinator, in accordance with the ADA Grievance Procedure, the ADA Coordinator will attempt to resolve the grievance according to the procedures set forth in the ADA Grievance Procedure.

8.     For a period of three (3) years from the effective date of this Agreement, the NYPD shall send the United States, on an annual basis, a letter containing the following information:

  a.     The number of written grievances that have been filed during the relevant reporting period with the ADA Coordinator pursuant to the ADA Grievance Procedure, by persons with hearing impairments in regard to the availability of auxiliary aids and services for qualified individuals with hearing impairments;

  b.     A brief, general description of the nature of each grievance; and

  c.     A brief, general description of the nature of how each grievance was resolved.

## TRAINING

9.     The NYPD shall continue to train all new recruits, supervisory personnel, and executive level staff in the Department regarding the NYPD's policies and procedures concerning qualified individuals with hearing impairments.  Beginning with the next recruit or promotional classes following the effective date of this Agreement, the training shall include:

  a.     The Interim Order entitled "Interaction With Hearing Impaired Persons," attached hereto as Exhibit A and all other Patrol Guide procedures cross-referenced therein;

  b.     The Administrative Guide Procedure No. 308-06: Grievance Procedure for Members of the Public With Disabilities, attached hereto as Exhibit C;

  c.     The Pamphlet entitled "Communicating With People Who Are Deaf or

Hard of Hearing," attached hereto as Exhibit D;

      d.    The Student Assessment Guide, entitled, "The Americans with Disabilities Act and Law Enforcement," attached hereto as Exhibit E.

ENFORCEMENT

10.    The NYPD will report annually to the United States on compliance with this Agreement in accordance with the provisions of paragraph 8, herein.  If the United States believes that this Agreement or any portion of it has been violated, within four months of receiving notice of an alleged violation, the United States will notify the undersigned counsel in writing and provide the basis and evidence for the claim of noncompliance.  Within thirty (30) days of such notice, counsel for the parties shall meet and confer in an attempt to resolve the issue or issues in good faith. The United States will give the NYPD forty-five (45) days from the date that it notifies the NYPD of any breach of this Agreement to cure that breach, prior to instituting court action, if any.  This forty-five (45) day period may be extended by agreement of the parties.  If the parties are unable to reach a satisfactory resolution of the issue or issues raised, the United States may, if necessary, take steps to enforce the terms of this Agreement, and the NYPD may oppose.

11.    This Agreement is neither an admission by the NYPD of any violation of the ADA, nor an admission by the United States of the merits of any of the NYPD's potential defenses.

12.    The NYPD shall not discriminate or retaliate against any person because of his or her participation in this matter.

13.    This Agreement is a public document.

14.    The Effective Date of this Agreement is the date of the last signature on the Agreement.

15.    The term of this Agreement is three (3) years from the Effective Date.

16.    The individuals signing this Agreement represent that they are authorized to bind the parties to this Agreement.

17.    Failure by the United States to enforce the entire Agreement with regard to any deadline or any other provision of the Agreement, shall not be construed as a waiver of its right to enforce other deadlines or provisions of the Agreement.

18.    This Agreement constitutes the entire agreement between the parties relating to the complaints, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this Agreement, shall be enforceable.

For the United States:

      PREET BHARARA
      United States Attorney for the
      Southern District of New York

By: _____      Date: _____11/18/09_____
      SARAH E. LIGHT
      Assistant United States Attorney
      Southern District of New York
      86 Chambers Street, 3rd Floor
      New York, NY 10007


For the NYPD:

By: _____      Date: _____11/18/09_____
      DEBORAH ZOLAND
      Assistant Deputy Commissioner, Legal Matters
      New York City Police Department
      1 Police Plaza
      New York, NY

EXHIBIT A



# INTERIM ORDER

| SUBJECT: **INTERACTION WITH HEARING IMPAIRED PERSONS** | | |
|---|---|---|
| DATE ISSUED: | REFERENCE: | NUMBER: |
| **05-29-09** | **\*\*P.G. 212 SERIES, P.G. 208-03 AND A.G. 308-06** | **31** |

1.    In order to ensure the Department provides a consistently high level of service to all community members, including those with hearing impairments, and to facilitate the process of communicating with such individuals, the following procedure has been established:

**PURPOSE**         To facilitate the process of effective communication with members of the public who are hearing impaired, including aided cases, crime victims, witnesses, suspects or arrestees, and to obtain information from such individuals, through the use of sign language interpreters or other auxiliary aids and services.

**SCOPE**         The Americans with Disabilities Act, state and local law, in addition to Department policy and procedure, requires that the Department maintain effective services, practices and policies to ensure that the needs of hearing impaired individuals are protected.

**DEFINITIONS**     HEARING IMPAIRED – A person who possesses hearing abilities that are limited to the extent that it constitutes a substantial limitation of an individual's activities. The impairment is to such a degree that it will be readily apparent to a member of the service that the individual has difficulty understanding what is communicated orally.

AUXILIARY AIDS – In addition to the services of a qualified sign language interpreter, the use of gestures or visual aids to supplement oral communication, use of a notepad and pen/pencil to exchange written notes, use of an assistive listening system or device to amplify sound or other effective methods of delivering information or communicating with an individual who is hearing impaired. Auxiliary aids may also include the use of text telephones or other devices, accessed via use of a Telecommunications Relay Service (TRS), or an individual's personal communication device (such as a personal digital assistant [PDA], telephone with text capability, etc.).

*NOTE*         *The type of aid that will be required for effective communication will depend on the hearing impaired person's usual method of communication. To serve each individual effectively, primary consideration should be given to providing the type of communication aid or service requested by the individual. Persons with hearing impairments must not be charged for the cost of an auxiliary aid or service which is needed for effective communication.*

QUALIFIED SIGN LANGUAGE INTERPRETER – A qualified sign language interpreter is one who is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary. A qualified interpreter must be able to interpret impartially, therefore, under some circumstances (e.g., a domestic dispute, etc.), a family member, child or friend of the individual with a hearing impairment may not be qualified to render the necessary interpretation.

**NOTE**    *Every effort should be made to have a person not connected with the incident serve as an interpreter. In exigent circumstances, the need to immediately communicate may take precedence over the effort to secure an interpreter not involved in the incident.*

**DEFINITIONS (continued)**    TELECOMMUNICATIONS RELAY SERVICE (TRS) – The Federal Communications Commission (FCC) has adopted use of the "711" dialing code for access to TRS. This permits persons with a hearing or speech disability to use the telephone system via a telephone typewriter (TTY) or other device to call persons with or without such disabilities. Conversely, voice users can also dial "711" to be connected to a TRS operator, who will then relay the message to a person with a hearing or speech disability via a TTY or other device.

311 SYSTEM FOR INDIVIDUALS WITH HEARING IMPAIRMENTS – The City of New York also maintains a "311" non-emergency system for individuals with hearing impairments. Persons with hearing impairments who wish to inquire about City services or make complaints regarding a specific City agency or service, can be directed to TTY number (212) 504-4115. The "311" operator will then direct the inquiry/complaint to the appropriate City agency.

**PROCEDURE**    When a member of the service has cause to interact with an individual who is hearing impaired:

**MEMBER OF THE SERVICE**
1.   Ascertain from the person with the hearing impairment the type of auxiliary aid or services he/she requires.
2.   Utilize appropriate auxiliary aids to facilitate communication.
3.   Contact the desk officer if the services of a qualified sign language interpreter are needed.
4.   Follow *P.G. 208-03, "Arrests – General Processing"* in arrest situations where probable cause has been established.

**NOTE**    *In cases where probable cause has been developed, the arrest of a hearing impaired person shall proceed in accordance with standard arrest and safety procedures. Should communication with a hearing impaired suspect be necessary to establish probable cause, or for a pre-arrest interview, etc., the appropriate auxiliary aid should be employed. When dealing with hearing impaired arrestees, auxiliary aids will be used to communicate with the arrestee (e.g., informing arrestee of charges and nature of the offense, interrogation, etc.). In situations where an arrestee would be permitted use of a telephone, a qualified sign language interpreter can be used to communicate for a hearing impaired arrestee, and the use of the TRS can be employed where the recipient of a call uses a TTY.*

5.   Document in detail any auxiliary aids utilized in **ACTIVITY LOG (PD112-145)**.

**DESK OFFICER**
6.   Ensure that auxiliary aids are utilized, if necessary.
7.   Evaluate whether the services of a qualified sign language interpreter are necessary.

INTERIM ORDER NO. **31**

**NOTE**  *In cases where the services of a qualified sign language interpreter are needed, the Operations Unit should be contacted at (646) 610-5580.*

**DESK OFFICER** 8. Make entry in the Command Log regarding:
  a.  Type of auxiliary aid used; or
  b.  Reason(s) for not using auxiliary aid(s) (i.e., qualified sign language interpreter, etc.).

**RELATED PROCEDURES**  *Preliminary Investigation of Complaints (Other than Vice Related or Narcotics Complaints) (P.G. 207-07)*
*Arrests – General Processing (P.G. 208-03)*
*Rights of Persons Taken into Custody (P.G. 208-09)*
*Volunteer Language Program/Language Line (P.G. 212-90)*
*Grievance Procedure for Members of the Public with Disabilities (A.G. 308-06)*

**FORMS AND REPORTS**  *ACTIVITY LOG (PD112-145)*

  2.  Furthermore, Patrol Guide 208-03, "Arrests – General Processing" is amended as follows:

  a.  **ADD** subdivision "**b**", under step "**15**", opposite actor "ARRESTING OFFICER", on page "**5**" to read:

**"ARRESTING OFFICER**  **b.**  **Make telephone calls, or request other appropriate auxiliary aids (including use of a qualified sign language interpreter or a Telecommunication Relay Service [TRS]) to assist the prisoner in making phone calls if the prisoner is unable to use a telephone due to speech or hearing impairment.  Should the prisoner request to telephone an individual with a hearing or speech disability, dial "711" for the Telecommunications Relay Service operator and be instructed accordingly."**

  b.  **REVISE** current "NOTE", following step "**17**", on page "**5**" to read:

  "***NOTE***  *If the prisoner appears to have a disability, which may affect mobility, speech, hearing or mental ability, appropriate auxiliary aids to facilitate communication shall be used.  In addition, a reasonable attempt shall be made to notify a relative or friend.  All such attempts will be documented by the arresting or investigating uniformed member of the service.*"

**INTERIM ORDER NO.  31**

3.      In addition, Administrative Guide 308-06, "Grievance Procedure for Members of the Public with Disabilities" is amended as follows:

   a.      **ADD** new subdivision **"b"**, under step **"7"**, opposite actor "AMERICANS WITH DISABILITIES ACT COORDINATOR", on page **"2"** to read:

| **"AMERICANS WITH DISABILITIES ACT COORDINATOR** | **b.** | **Such resolution shall be consistent with the procedures of the Office of Equal Employment Opportunity."** |
|---|---|---|

4.      Any provisions of the Department Manual or any other Department directive in conflict with the contents of this Order are suspended.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

**INTERIM ORDER NO.  31**

**4 of 4**

EXHIBIT B

## THE AMERICANS WITH DISABILITIES ACT
## WHAT YOU SHOULD KNOW

Under the Americans with Disabilities Act of 1990 (the "ADA"), the New York City Police Department ("NYPD") does not discriminate on the basis of disability in the operations of its programs, services, or activities.  Moreover, the NYPD does not discriminate on the basis of disability in its hiring or employment practices.

Here are some specific ways the NYPD is implementing the ADA:

\*      The NYPD operates its programs so that they are readily accessible to and usable by individuals with disabilities.

\*      When a person with a hearing or vision impairment needs an auxiliary aid to make communication effective, the NYPD gives primary consideration to the person's choice of auxiliary aid.

\*      The NYPD ensures that its services, programs and activities are accessible to qualified individuals with hearing impairments through the use of appropriate auxiliary aids and services including, but not limited to: the City of New York's "311" non-emergency system (TTY No. 212-504-4115): the nationwide Telecommunications Relay Service "711; and/or qualified sign language interpreters.

\*      The NYPD maintains a list of qualified interpreters who are available to provide assistance.

Questions, concerns, grievances, or requests for additional information regarding the ADA may be forwarded to the NYPD's ADA Compliance Coordinator, who is the Deputy Commissioner for Equal Employment Opportunity.  You can reach the NYPD's ADA Compliance Coordinator by calling (646) 610-5330 (voice) or by dialing 711 for the Telecommunications Relay Service, or by writing to the Deputy Commissioner, Equal Employment Opportunity, One Police Plaza, Room 1204, New York, New York  10038.

Individuals who need auxiliary aids for effective communication in programs and services are invited to make their needs and preferences known to the ADA Compliance Coordinator.

For further information on the ADA, call the Department of Justice's ADA Information Line at 1-800-514-0301 (voice) or 1-800-514-0383 (TDD).

EXHIBIT C

# ADMINISTRATIVE GUIDE



| Section: Complaints | Procedure No: 308-06 |
|---|---|

## GRIEVANCE PROCEDURE FOR MEMBERS OF THE PUBLIC WITH DISABILITIES

| DATE ISSUED: 07/24/09 | DATE EFFECTIVE: 07/31/09 | REVISION NUMBER: 09-01 | PAGE: 1 of 2 |
|---|---|---|---|

**PURPOSE**    To process and resolve all public complaints of discrimination under Title II of the Americans with Disabilities Act (ADA).

**PROCEDURE**    When a member of the public states that they have been subjected to discrimination by this Department, (i.e., denial of services, programs or activities) due to their disability:

**MEMBER OF THE SERVICE**    1.    Attempt to accommodate grievant and provide requested service.

<u>IF GRIEVANT IS NOT SATISFIED WITH MEMBER'S ACTIONS OR IF ACTION BEYOND THE MEMBER'S CAPABILITIES IS NECESSARY TO ADDRESS THE COMPLAINT</u>:

**MEMBER OF THE SERVICE**    2.    Advise complainant to forward grievance in writing to:
> Deputy Commissioner, Equal Employment Opportunity
> One Police Plaza, Room 1204
> New York, N.Y. 10038

*NOTE*    *The Deputy Commissioner, Equal Employment Opportunity has been designated to coordinate Americans with Disabilities Act (ADA) compliance efforts for the New York City Police Department.*

3.    Assist in filing complaint for any person who needs a reasonable accommodation due to disability or any other reason.
    a.    Complaint must include the name and address of the person filing it, and a brief description of the alleged violation.

*NOTE*    *A complaint must be in writing and filed within thirty (30) days after the complainant becomes aware of the alleged violation. Processing of allegations of discrimination which occurred before this grievance procedure was in place will be considered on a case by case basis.*

4.    Deliver original to desk officer.
    a.    Provide photocopy to grievant.

**DESK OFFICER**    5.    Make a Command Log entry regarding complainant and grievance.
    6.    Forward grievance to Deputy Commissioner, Equal Employment Opportunity - ADA Coordinator, via Department mail.

# NEW • YORK • CITY • POLICE • DEPARTMENT

## ADMINISTRATIVE GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 308-06 | 07/31/09 | 09-01 | 2 of 2 |

| | | |
|---|---|---|
| **AMERICANS WITH DISABILITIES ACT COORDINATOR** | 7. | Attempt, in appropriate cases, to resolve the complaint on an informal basis with the goal of reaching a solution that is satisfactory to both the complainant and the Department. |
| | | a. Where necessary, conduct or supervise an investigation of the complaint. |
| | | b. Such resolution shall be consistent with the procedures of the Office of Equal Employment Opportunity. |

<u>IF THE COMPLAINT HAS NOT BEEN RESOLVED INFORMALLY</u>:

| | | |
|---|---|---|
| **AMERICANS WITH DISABILITIES ACT COORDINATOR** | 8. | Submit a confidential written report to the Police Commissioner with proposed findings as to whether Department policy or action which is the subject of the complaint is consistent with the Americans with Disabilities Act (ADA). |
| | | a. If the ADA Coordinator believes that the Department's policy or action is not consistent with the Act, the report shall also recommend corrective action. |
| **POLICE COMMISSIONER** | 9. | Review the ADA Coordinator's report and: |
| | | a. Determine any appropriate corrective action. |
| | | b. Advise ADA Coordinator regarding decision via endorsement of report. |
| **AMERICANS WITH DISABILITIES ACT COORDINATOR** | 10. | Institute corrective action at direction of Police Commissioner, if necessary. |
| | 11. | Advise the complaining party of any action taken with respect to the grievance. |
| | 12. | Maintain files and records of the Department relating to the complaints filed. |

| | |
|---|---|
| ***ADDITIONAL DATA*** | *The complainant's right to a prompt and equitable resolution of the complaint filed in accordance with this grievance procedure shall not be impaired by that person's pursuit of other remedies, such as the filing of an Americans with Disabilities Act complaint with the responsible federal department or agency. Use of this grievance procedure is not a prerequisite to the pursuit of other remedies available under the Americans with Disabilities Act.* |
| ***RELATED PROCEDURES*** | *Employment Discrimination (P.G. 205-36)* |

**NEW • YORK • CITY • POLICE • DEPARTMENT**

EXHIBIT D

U.S. Department of Justice
Civil Rights Division
Disability Rights Section



# Communicating with People Who Are Deaf or Hard of Hearing

## ADA Guide for Law Enforcement Officers



A driver who is deaf writes on a pad of paper to communicate with an officer.

As a law enforcement officer, you can expect to come into contact with people who are deaf or hard of hearing. It is estimated that up to nine percent of the population has some degree of hearing loss, and this percentage will increase as the population ages.

Under the Americans with Disabilities Act (ADA), people who are deaf or hard of hearing are entitled to the same services law enforcement provides to anyone else. They may not be excluded or segregated from services, be denied services, or otherwise be treated differently than other people. Law enforcement agencies must make efforts to ensure that their personnel communicate effectively with people whose disability affects hearing. This applies to both sworn and civilian personnel.

List your agency's contact information for obtaining an interpreter, an assistive listening device, or other communication aid or service here.

**For further information on the Americans with Disabilities Act contact:**

**ADA Website**
www.ada.gov

**ADA Information Line**
800-514-0301 (voice)
800-514-0383 (TTY)

This pamphlet was developed by the U.S. Department of Justice for law enforcement personnel. **Reproduction is encouraged.**

January 2006

## What Situations *Require an Interpreter?*

Generally, interpreter services are not required for simple transactions – such as checking a license or giving directions to a location – or for urgent situations – such as responding to a violent crime in progress.

**Example:** An officer clocks a car on the highway going 15 miles per hour above the speed limit. The driver, who is deaf, is pulled over and is issued a noncriminal citation. The individual is able to understand the reason for the citation because the officer points out relevant information printed on the citation or written by the officer.

**Example:** An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf. Because the officer has probable cause to make a felony arrest without an interrogation, an interpreter is not necessary to carry out the arrest.

**Example:** An officer responds to the scene of a domestic disturbance. The husband says the wife has been beating their children and he has been trying to restrain her. The wife is deaf. The officer begins questioning her by writing notes, but her response indicates a lack of comprehension. She requests a sign language interpreter. In this situation an interpreter should be called. If the woman's behavior is threatening, the officer can make an arrest and call for an interpreter to be available later at the booking station.

It is inappropriate to ask a family member or companion to interpret in a situation like this because emotional ties may interfere with the ability to interpret impartially.

**Example:** An officer responds to the scene of a car accident where a man has been seriously injured. The man is conscious, but is unable to comprehend the officer's questions because he is deaf. A family member who is present begins interpreting what the officer is saying.

A family member or companion may be used to interpret in a case like this, where the parties are willing, the need for information is urgent, and the questions are basic and uncomplicated. However, in general, do not expect or demand that a deaf person provide his or her own interpreter. As a rule, when interpreter service is needed, it must be provided by the agency.

However, an interpreter may be needed in lengthy or complex transactions – such as interviewing a victim, witness, suspect, or arrestee – if the person being interviewed normally relies on sign language or speech reading to understand what others are saying.

Your agency has adopted a specific policy regarding communicating with people who are deaf or hard of hearing.  It is important to become familiar with this policy.

## Requirements for Effective Communication

The ADA requires that . . .

- Law enforcement agencies must provide the communication aids and services needed to communicate effectively with people who are deaf or hard of hearing, except when a particular aid or service would result in an undue burden or a fundamental change in the nature of the law enforcement services being provided.

- Agencies must give primary consideration to providing the aid or service requested by the person with the hearing disability.

- Agencies do *not* have to provide personally prescribed devices such as hearing aids.

- When interpreters are needed, agencies must provide interpreters who can interpret effectively, accurately, and impartially.

- Agencies cannot charge the person for the communication aids or services provided.

- Only the head of the agency or his or her designee can make the determination that a particular aid or service would cause an undue burden or a fundamental change in the nature of the law enforcement services being provided.

Your agency's policy explains how to obtain interpreters or other communication aids and services when needed.

## Communicating with People Who are Deaf or Hard of Hearing

- Officers may find a variety of communication aids and services useful in different situations.

- Speech supplemented by gestures and visual aids can be used in some cases.

- A pad and pencil, a word processor, or a typewriter can be used to exchange written notes.

- Do not cover your mouth or chew gum.

- Try to converse in a well-lit area.

- A teletypewriter (TTY, also known as a TDD) can be used to exchange written messages over the telephone.

- An assistive listening system or device to amplify sound can be used when speaking with a person who is hard of hearing.

- A sign language interpreter can be used when speaking with a person who knows sign language.

- An oral interpreter can be used when speaking with a person who has been trained to speech read (read lips). **Note:** Do *not* assume that speech reading will be effective in most situations. On average, only about one third of spoken words can be understood by speech reading.

- The type of situation, as well as the individual's abilities, will determine which aid or service is needed to communicate effectively.

## Practical Suggestions for Communicating Effectively

- Before speaking, get the person's attention with a wave of the hand or a gentle tap on the shoulder.

- Face the person and do not turn away while speaking.

- If you are communicating orally, speak slowly and distinctly. Use gestures and facial expressions to reinforce what you are saying.

- Minimize background noise and other distractions whenever possible.

- If a person is wearing a hearing aid, do not assume the individual can hear you.

- When you are interviewing a witness or a suspect or engaging in any complex conversation with a person whose primary language is sign language, a qualified interpreter is usually needed to ensure effective communication.

- When using an interpreter, look at and speak directly to the deaf person, not to the interpreter.

- Talk at your normal rate, or slightly slower if you normally speak very fast.

- Only one person should speak at a time.

- Remember that only about one third of spoken words can be understood by speech reading.

- Use visual aids when possible, such as pointing to printed information on a citation or other document.

- When communicating by writing notes, keep in mind that some individuals who use sign language may lack good English reading and writing skills.

- Use short sentences and simple words.

- Do not use family members or children as interpreters. They may lack the vocabulary or the impartiality needed to interpret effectively.

- If someone with a hearing disability cannot understand you, write a note to ask him or her what communication aid or service is needed.

- If a sign language interpreter is requested, be sure to ask which language the person uses. American Sign Language (ASL) and Signed English are the most common.

EXHIBIT E



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
## AND LAW ENFORCEMENT



The following document was duplicated from the U.S. Department of Justice online question and answer document on the Americans with Disabilities Act and law enforcement (with minor modifications to conform to NYPD regulations).

### Why Is It Important For Police Officers to Know About The Americans with Disabilities Act?

Police officers have always interacted with persons with disabilities and, for many officers, the Americans with Disabilities Act (ADA) may mean few changes in the way they respond to the public. To respond to questions that may arise, this document offers common sense suggestions to assist law enforcement agencies in complying with the ADA. The examples presented are extracted from the U.S. Department of Justice documentation and are drawn from real-life situations as described by police officers or encountered by the Department of Justice in its enforcement of the ADA.

## THE AMERICANS WITH DISABILITIES ACT

The Americans with Disabilities Act (ADA) is a Federal civil rights law. It gives Federal civil rights protections to individuals with disabilities similar to those provided to individuals on the basis of race, color, sex, national origin, age, and religion. It guarantees equal opportunity for individuals with disabilities in State and local government services, public accommodations, employment, transportation, and telecommunications.

### How does the ADA affect my law enforcement duties?

Title II of the ADA prohibits discrimination against people with disabilities in State and local government's services, programs, and employment. Law enforcement agencies are covered because they are programs of State or local governments, regardless of whether they receive Federal grants or other Federal funds. The ADA affects virtually everything that officers do, for example:

- receiving citizen complaints;
- interrogating witnesses;
- arresting, booking, and holding suspects;
- operating telephone (911) emergency centers;
- providing emergency medical services;
- enforcing laws;

### POLICE DEPARTMENT CITY OF NEW YORK
CURRICULUM DEVELOPMENT UNIT- JULY 2004



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



### Who does the ADA protect?

The ADA covers a wide range of individuals with disabilities. An individual is considered to have a "disability" if he or she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such impairment. Major life activities, include such things as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. To be substantially limited means that such activities are restricted in the manner, condition, or duration in which they are performed in comparison with most people.

**Note:** The ADA also protects people who are discriminated against because of their association with a person with a disability.

**Example:** Police receive a call from a woman who complains that someone has broken into her residence. The police department keeps a list of dwellings where people with AIDS are known to reside. The woman's residence is on the list because her son has AIDS. Police fail to respond to her call, because they fear catching the HIV virus. The officers have discriminated against the woman on the basis of her association with an individual who has AIDS.

### What about someone who uses illegal drugs?

Nothing in the ADA prevents officers and deputies from enforcing criminal laws relating to an individual's current use or possession of illegal drugs.

## INTERACTING WITH PEOPLE WITH DISABILITIES

### What are some common problems that people with disabilities have with law enforcement?

Unexpected actions taken by some individuals with disabilities may be misconstrued by officers as suspicious or illegal activity or uncooperative behavior.

**Example:** An officer approaches a vehicle and asks the driver to step out of the car. The driver, who has a mobility disability,

 

# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
## AND LAW ENFORCEMENT

reaches behind the seat to retrieve her assistive device for walking. This appears suspicious to the officer.

Individuals who are deaf or hard of hearing, or who have speech disabilities or mental retardation, or who are blind or visually impaired may not recognize or be able to respond to police directions. These individuals may erroneously be perceived as uncooperative.

> **Example:** An officer yells, "Police, Don't Move!" to an individual who is running from an area in which a crime has been reported. The individual, who is deaf, cannot hear the officer and continues to run. The officer mistakenly believes that the individual is fleeing from the scene. Similarly, ordering a suspect who is visually impaired to get over "there" is likely to lead to confusion and misunderstanding, because the suspect may have no idea where the officer is pointing.

Some people with disabilities may have a staggering gait or slurred speech related to their disabilities or the medications they take. These characteristics, which can be associated with neurological disabilities, mental/emotional disturbance, or hypoglycemia, may be misperceived as intoxication.

> **Example:** An officer observes a vehicle with one working headlight and pulls the vehicle over. When the driver hands the registration to the officer, the officer notices that the driver's hand is trembling and her speech is slurred. The officer concludes that the individual is under the influence of alcohol, when in fact the symptoms are caused by a neurological disability.

> **Example:** A call comes in from a local restaurant that a customer is causing a disturbance. When the responding officer arrives at the scene, she discovers a 25-year-old man swaying on his feet and grimacing. He has pulled the table cloth from the table. The officer believes that the man has had too much to drink and is behaving aggressively, when in fact he is having a seizure.

### What can be done to avoid these situations?

Training, sensitivity, and awareness will help to ensure equitable treatment of individuals with disabilities as well as effective law enforcement. The following suggestions will help you to properly perform your duties in accordance with the ADA:

NOV-22-2005  13:16       NYPD LEGAL BUREAU



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
## AND LAW ENFORCEMENT



- When approaching a car with visible signs that a person with a disability may be driving (such as a designated license plate or a hand control), the police officer should be aware that the driver might reach for a mobility device.

- Using hand signals, or calling to people in a crowd to signal for a person to stop, may be effective ways for an officer to get the attention of a deaf individual.

- When speaking, enunciate clearly and slowly to ensure that the individual understands what is being said.

- Typical tests for intoxication, such as walking a straight line, will be ineffective for individuals whose disabilities cause unsteady gait. Other tests, like breathalyzers, will provide more accurate results and reduce the possibility of false arrest.

### What if someone is demonstrating threatening behavior because of his or her disability?

Police officers may, of course, respond appropriately to real threats to health or safety, even if an individual's actions are a result of her or his disability. But it is important that police officers distinguish behaviors that pose a real risk from behaviors that do not, and recognize when an individual, such as someone who is having a seizure or exhibiting signs of psychotic crisis, needs medical attention. It is also important that behaviors resulting from a disability not be criminalized where no crime has been committed. *Avoid* these scenarios:

- A storeowner calls to report that an apparently homeless person has been in front of the store for an hour, and customers are complaining that he appears to be talking to himself. The individual, who has mental illness, is violating no loitering or panhandling laws. Officers arriving on the scene arrest him even though he is violating no laws.

- Police receive a call in the middle of the night about a teenager with mental illness who is beyond the control of her parents. All attempts to get services for the teenager at that hour fail, so the responding officer arrests her until he can get her into treatment. She ends up with a record, even though she committed no offense.

POLICE DEPARTMENT CITY OF NEW YORK
CURRICULUM DEVELOPMENT UNIT- JULY 2004

NOV-22-2005  13:16          NYPD LEGAL BUREAU



# STUDENT ASSESSMENT GUIDE
### THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



**What procedures should officers follow to arrest and transport a person who uses a wheelchair?**

Standard transport practices may be dangerous for many people with mobility disabilities. Officers should use caution not to harm an individual or damage his or her wheelchair. The best approach is to ask the person what type of transportation he or she can use, and how to lift or assist him or her in transferring into and out of the vehicle.

> **Example:** An individual with a disability is removed from his wheelchair and placed on a bench in a paddy wagon. He is precariously strapped to the bench with his own belt. When the vehicle begins to move, he falls off of the bench and is thrown to the floor of the vehicle where he remains until arriving at the station.

Some individuals who use assistive devices like crutches, braces, or even manual wheelchairs might be safely transported in patrol cars. Safe transport of other individuals who use manual or power wheelchairs might require the use of lift-equipped vans or buses. Police officers may consider other community resources (e.g., accessible taxi services).

**What steps should officers follow to communicate effectively with an individual who is blind or visually impaired?**

It is important for officers to identify themselves and to state clearly and completely any directions or instructions -- including any information that is posted visually. Officers must read out loud in full any documents that a person who is blind or visually impaired needs to sign. Before taking photos or fingerprints, it is a good idea to describe the procedures in advance so that the individual will know what to expect.

**Do police personnel need to take special precautions when providing emergency medical services to someone who has HIV or AIDS?**

Persons with HIV or AIDS should be treated just like any other person requiring medical attention. In fact, emergency medical service providers are required routinely to treat *all* persons as if they are infectious for HIV, Hepatitis B, or other blood borne pathogens, by practicing universal precautions. Many people do not know that they are infected with a blood borne pathogen, and there are special privacy considerations that may cause those who know they are infected not to disclose their infectious status.

NOV-22-2005  13:22                    1212 374 0276                              P.06



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



Universal precautions for emergency service providers include the wearing of gloves, a mask, and protective eyewear, and, where appropriate, the proper disinfection or disposal of contaminated medical equipment. Protective barriers like gloves should be used whenever service providers are exposed to blood.

**Example:** Police are called to a shopping mall to assist a teenager who has cut his hand and is bleeding profusely. As long as the attending officers wear protective gloves, they will not be at risk of acquiring HIV, Hepatitis B, or any other blood borne pathogen, while treating the teenager.

**Note:** Refusing to provide medical assistance to a person because he or she has, or is suspected of having, HIV or AIDS is discrimination.

**Example:** Police are called to a shopping mall, where an individual is lying on the ground with chest pains. The responding officer asks the individual whether she is currently taking any medications. She responds that she is taking AZT, a medication commonly prescribed for individuals who are HIV-positive or have AIDS. The officer announces to his colleagues that the individual has AIDS and refuses to provide care. This refusal violates the ADA.

## EFFECTIVE COMMUNICATION

Police officers are required by the ADA to ensure effective communication with individuals who are deaf or hard of hearing. Whether a qualified sign language interpreter or other communication aid is required will depend on the nature of the communication and the needs of the requesting individual. For example, some people who are deaf do not use sign language for communication and may need to use a different communication aid or rely on lip-reading. In one-on-one communication with an individual who lip-reads, an officer should face the individual directly, and should ensure that the communication takes place in a well-lighted area.

Examples of other communication aids, called "auxiliary aids and services" in the ADA, that assist people who are deaf or hard of hearing include the exchange of written notes, telecommunications devices for the deaf (TDD's) (also called text telephones (TT's) or teletypewriters (TTY's)),



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



telephone handset amplifiers, assistive listening systems, and videotext displays.

The ADA requires that the expressed choice of the individual with the disability, who is in the best position to know her or his needs, should be given primary consideration in determining which communication aid to provide. *Police officers should generally not rely on family members, who are frequently emotionally involved, to provide sign language interpreting.*

> **Example:** A deaf mother calls police to report a crime in which the child's father abused her hearing child. Because it is not in the best interests of the mother or the child for the child to hear all of the details of a very sensitive, emotional situation, the mother specifically requests that the police officers procure a qualified sign language interpreter to facilitate taking the report. Officers ignore her request and do not secure the services of an interpreter. They instead communicate with the hearing child, who then signs to the mother. The police officer in this example has violated the ADA because he ignored the mother's request and inappropriately relied on a family member to interpret.

In some *limited circumstances* a family member may be relied upon to interpret. A family member may interpret in an *emergency,* when the safety or welfare of the public or the person with the disability is of paramount importance. For example, emergency personnel responding to a car accident may need to rely on a family member to interpret in order to evaluate the physical condition of an individual who is deaf. Likewise, it may be appropriate to rely on a family member to interpret when a deaf individual has been robbed and an officer in hot pursuit needs information about the suspect.

A family member may interpret for the sake of convenience in circumstances where an interpreter is *not* required by the ADA, such as in situations where exchanging written notes would be effective. For example, it would be appropriate to rely on a passenger who is a family member to interpret when an individual who is deaf is asking an officer for traffic directions, or is stopped for a traffic violation.



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



### Communication that require an interpreter

The length, importance, or complexity of the communication will help determine whether an interpreter is necessary for effective communication. In a simple encounter, such as checking a driver's license or giving street directions, a notepad and pencil normally will be sufficient.

During interrogations and arrests, a sign language interpreter will often be necessary to effectively communicate with an individual who uses sign language. If the legality of a conversation will be questioned in court, such as where **Miranda warnings** are issued, a sign language interpreter may be necessary. Police officers should be careful about miscommunication in the absence of a qualified interpreter- a nod of the head may be an attempt to appear cooperative in the midst of misunderstanding, rather than consent or a confession of wrongdoing.

> **Note:** An officer's immediate priority is to stabilize the situation. If the person being arrested is deaf, the officer can make an arrest and call the **Operations Unit** for an interpreter to be available later at the station house.

In general, if an individual, who has a hearing disability, is subjected to police action **without interrogation**, an interpreter will not be required, unless one is necessary to explain the action being taken.

> **Example:** An officer clocks a car on the highway driving 15 miles above the speed limit. The driver, who is deaf, is pulled over and issued a summons. The individual is able to understand the reasons for the citation, because the officer exchanges written notes with the individual and points to information on the citation. In this case, a sign language interpreter is not needed.

> **Example:** An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf, but the officer has probable cause to make a felony arrest without an interrogation. In this case, an interpreter is not necessary to carry out the arrest.

NOV-22-2005  13:23                    1212 374 0276                         P.09



# STUDENT ASSESSMENT GUIDE
## THE AMERICANS WITH DISABILITIES ACT
### AND LAW ENFORCEMENT



### Crime reporting and report preparation

If a person reporting a crime has a vision disability, a learning disability, mental retardation, or some other disability that may prevent the person from filling out a form, assist the person in reading and filling out the form. The form itself could also be provided in an alternative format. Providing a copy of the form in large print (which is usually as simple as using a copy machine or computer to increase type size) will make the form accessible to many individuals with moderate vision disabilities.

### Resources

The Department of Justice's toll-free ADA Information Line answers questions and offers free publications about the ADA. The telephone numbers are: 800-514-0301 (voice) or 800-514-0383 (TTY). Publications are also available from the ADA Website www.ada.gov.

### Reference

U.S. Department of Justice. (2003, December). *Commonly asked questions about the Americans with Disabilities Act and law enforcement.* Retrieved September 23, 2004, from: http://www.ada.gov/q%26a_law.htm