**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



# COMMONLY ASKED QUESTIONS

# ABOUT THE AMERICANS WITH DISABILITIES ACT

# AND LAW ENFORCEMENT

## I. Introduction

Police officers, sheriff's deputies, and other law enforcement personnel have always interacted with persons with disabilities and, for many officers and deputies, the Americans with Disabilities Act (ADA) may mean few changes in the way they respond to the public. To respond to questions that may arise, this document offers common sense suggestions to assist law enforcement agencies in complying with the ADA. The examples presented are drawn from real-life situations as described by police officers or encountered by the Department of Justice in its enforcement of the ADA.

**1. Q: What is the ADA?**

> **A:** The Americans with Disabilities Act (ADA) is a Federal civil rights law. It gives Federal civil rights protections to individuals with disabilities similar to those provided to individuals on the basis of race, color, sex, national origin, age, and religion. It guarantees equal opportunity for individuals with disabilities in State and local government services, public accommodations, employment, transportation, and telecommunications.

**2. Q: How does the ADA affect my law enforcement duties?**

> **A:** Title II of the ADA prohibits discrimination against people with disabilities in State and local governments services, programs, and employment. Law enforcement agencies are covered because they are programs of State or local governments, regardless of whether they receive Federal grants or other Federal funds. The ADA affects virtually everything that officers and deputies do, for example:
> 
> - receiving citizen complaints;
> - interrogating witnesses;
> - arresting, booking, and holding suspects;
> - operating telephone (*911*) emergency centers;
> - providing emergency medical services;
> - enforcing laws;
> - and other duties.

**3. Q: Who does the ADA protect?**

**A:** The ADA covers a wide range of individuals with disabilities. An individual is considered to have a "disability" if he or she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

Major life activities include such things as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. To be substantially limited means that such activities are restricted in the manner, condition, or duration in which they are performed in comparison with most people.

- The ADA also protects people who are discriminated against because of their association with a person with a disability.

**Example:** Police receive a call from a woman who complains that someone has broken into her residence. The police department keeps a list of dwellings where people with AIDS are known to reside. The woman's residence is on the list because her son has AIDS. Police fail to respond to her call, because they fear catching the HIV virus. The officers have discriminated against the woman on the basis of her association with an individual who has AIDS.

### 4. Q: What about someone who uses illegal drugs?

**A:** Nothing in the ADA prevents officers and deputies from enforcing criminal laws relating to an individuals current use or possession of illegal drugs.

## II. Interacting with People with Disabilities

### 5. Q: What are some common problems that people with disabilities have with law enforcement?

**A:** Unexpected actions taken by some individuals with disabilities may be misconstrued by officers or deputies as suspicious or illegal activity or uncooperative behavior.

**Example:** An officer approaches a vehicle and asks the driver to step out of the car. The driver, who has a mobility disability, reaches behind the seat to retrieve her assistive device for walking. This appears suspicious to the officer.

- Individuals who are deaf or hard of hearing, or who have speech disabilities or mental retardation, or who are blind or visually impaired may not recognize or be able to respond to police directions. These individuals may erroneously be perceived as uncooperative.

**Example:** An officer yells "freeze" to an individual who is running from an area in which a crime has been reported. The individual, who is deaf, cannot hear the officer and continues to run. The officer mistakenly believes that the individual is fleeing from the scene. Similarly, ordering a suspect who is visually impaired to get over "there" is likely to lead to confusion and misunderstanding, because the suspect may have no idea where the officer is pointing.

- Some people with disabilities may have a staggering gait or slurred speech related to their disabilities or the medications they take. These characteristics, which can be associated with neurological disabilities, mental/emotional disturbance, or hypoglycemia, may be misperceived as intoxication.

**Example:** An officer observes a vehicle with one working headlight and pulls the vehicle over. When the driver hands the registration to the officer, the officer notices that the driver's hand is trembling and her speech is slurred. The officer concludes that the individual is under the influence of alcohol, when in fact the symptoms are caused by a neurological disability.

**Example:** A call comes in from a local restaurant that a customer is causing a disturbance. When the responding officer arrives at the scene, she discovers a 25-year-old man swaying on his feet and grimacing. He has pulled the table cloth from the table. The officer believes that the man has had too much to drink

and is behaving aggressively, when in fact he is having a seizure.

*What can be done to avoid these situations?*

Training, sensitivity, and awareness will help to ensure equitable treatment of individuals with disabilities as well as effective law enforcement. For example:

- When approaching a car with visible signs that a person with a disability may be driving (such as a designated license plate or a hand control) , the police officer should be aware that the driver may reach for a mobility device.

- Using hand signals, or calling to people in a crowd to signal for a person to stop, may be effective ways for an officer to get the attention of a deaf individual.

- When speaking, enunciate clearly and slowly to ensure that the individual understands what is being said.

- Finally, typical tests for intoxication, such as walking a straight line, will be ineffective for individuals whose disabilities cause unsteady gait. Other tests, like breathalyzers, will provide more accurate results and reduce the possibility of false arrest.

### 6. Q: What if someone is demonstrating threatening behavior because of his or her disability?

**A:** Police officers may, of course, respond appropriately to real threats to health or safety, even if an individuals actions are a result of her or his disability. But it is important that police officers are trained to distinguish behaviors that pose a real risk from behaviors that do not, and to recognize when an individual, such as someone who is having a seizure or exhibiting signs of psychotic crisis, needs medical attention. It is also important that behaviors resulting from a disability not be criminalized where no crime has been committed. Avoid these scenarios:

- A store owner calls to report that an apparently homeless person has been in front of the store for an hour, and customers are complaining that he appears to be talking to himself. The individual, who has mental illness, is violating no loitering or panhandling laws. Officers arriving on the scene arrest him even though he is violating no laws.

- Police receive a call in the middle of the night about a teenager with mental illness who is beyond the control of her parents. All attempts to get services for the teenager at that hour fail, so the responding officer arrests her until he can get her into treatment. She ends up with a record, even though she committed no offense.

### 7. Q: What procedures should law enforcement officers follow to arrest and transport a person who uses a wheelchair?

**A:** Standard transport practices may be dangerous for many people with mobility disabilities. Officers should use caution not to harm an individual or damage his or her wheelchair. The best approach is to ask the person what type of transportation he or she can use, and how to lift or assist him or her in transferring into and out of the vehicle.

**Example:** An individual with a disability is removed from his wheelchair and placed on a bench in a paddy wagon. He is precariously strapped to the bench with his own belt. When the vehicle begins to move, he falls off of the bench and is thrown to the floor of the vehicle where he remains until arriving at the station.

- Some individuals who use assistive devices like crutches, braces, or even manual wheelchairs might be safely transported in patrol cars.

- Safe transport of other individuals who use manual or power wheelchairs might require departments to make minor modifications to existing cars or vans, or to use lift-equipped vans or buses. Police departments may consider other community resources, e.g., accessible taxi services.

**8. Q: What steps should officers follow to communicate effectively with an individual who is blind or visually impaired?**

> **A:** It is important for officers to identify themselves and to state clearly and completely any directions or instructions -- including any information that is posted viually. Officers must read out loud in full any documents that a person who is blind or visually impaired needs to sign. Before taking photos or fingerprints, it is a good idea to describe the procedures in advance so that the individual will know what to expect.

**9. Q: Do police personnel need to take special precautions when providing emergency medical services to someone who has HIV or AIDS?**

> **A:** Persons with HIV or AIDS should be treated just like any other person requiring medical attention. In fact, emergency medical service providers are required routinely to treat <u>all</u> persons as if they are infectious for HIV, Hepatitis B, or other bloodborne pathogens, by practicing universal precautions. Many people do not know that they are infected with a bloodborne pathogen, and there are special privacy considerations that may cause those who know they are infected not to disclose their infectious status.
>
> - Universal precautions for emergency service providers include the wearing of gloves, a mask, and protective eyewear, and, where appropriate, the proper disinfection or disposal of contaminated medical equipment. Protective barriers like gloves should be used whenever service providers are exposed to blood.
>
> **Example:** Police are called to a shopping mall to assist a teenager who has cut his hand and is bleeding profusely. As long as the attending officers wear protective gloves, they will not be at risk of acquiring HIV, Hepatitis B, or any other bloodborne pathogen, while treating the teenager.
>
> - Refusing to provide medical assistance to a person because he or she has, or is suspected of having, HIV or AIDS is discrimination.
>
> **Example:** Police are called to a shopping mall, where an individual is lying on the ground with chest pains. The responding officer asks the individual whether she is currently taking any medications. She responds that she is taking AZT, a medication commonly prescribed for individuals who are HIV-positive or have AIDS. The officer announces to his colleagues that the individual has AIDS and refuses to provide care. This refusal violates the ADA.

# III. Effective Communication

**10. Q: Do police departments have to arrange for a sign language interpreter every time an officer interacts with a person who is deaf?**

> **A:** No. Police officers are required by the ADA to ensure effective communication with individuals who are deaf or hard of hearing. Whether a qualified sign language interpreter or other communication aid is required will depend on the nature of the communication and the needs of the requesting individual. For example, some people who are deaf do not use sign language for communication and may need to use a different communication aid or rely on lipreading. In one-on-one communication with an individual who lipreads, an officer should face the individual directly, and should ensure that the communication takes place in a well-lighted area.
>
> - Examples of other communication aids, called "auxiliary aids and services" in the ADA, that assist people who are deaf or hard of hearing include the exchange of written notes, telecommunications devices for the deaf (TDD's) (also called text telephones (TT's) or teletypewriters (TTY's)), telephone handset amplifiers, assistive listening systems, and videotext displays.
> - The ADA requires that the expressed choice of the individual with the disability, who is in the best position to know her or his needs, should be given primary consideration in determining which communication aid to provide. The ultimate decision is made by the police department. The

- department should honor the individuals choice unless it can demonstrate that another effective method of communication exists.

- Police officers should generally not rely on family members, who are frequently emotionally involved, to provide sign language interpreting.

**Example:** A deaf mother calls police to report a crime in which her hearing child was abused by the child's father. Because it is not in the best interests of the mother or the child for the child to hear all of the details of a very sensitive, emotional situation, the mother specifically requests that the police officers procure a qualified sign language interpreter to facilitate taking the report. Officers ignore her request and do not secure the services of an interpreter. They instead communicate with the hearing child, who then signs to the mother. The police department in this example has violated the ADA because it ignored the mothers request an inappropriately relied on a family member to interpret.

- In some limited circumstances a family member may be relied upon to interpret.

**Example:** A family member may interpret in an emergency, when the safety or welfare of the public or the person with the disability is of paramount importance. For example, emergency personnel responding to a car accident may need to rely on a family member to interpret in order to evaluate the physical condition of an individual who is deaf. Likewise, it may be appropriate to rely on a family member to interpret when a deaf individual has been robbed and an officer in hot pursuit needs information about the suspect.

**Example:** A family member may interpret for the sake of convenience in circumstances where an interpreter is not required by the ADA, such as in situations where exchanging written notes would be effective. For example, it would be appropriate to rely on a passenger who is a family member to interpret when an individual who is deaf is asking an officer for traffic directions, or is stopped for a traffic violation.

**11. Q: If the person uses sign language, what kinds of communication will require an interpreter?**

**A:** The length, importance, or complexity of the communication will help determine whether an interpreter is necessary for effective communication.

- In a simple encounter, such as checking a driver's license or giving street directions, a notepad and pencil normally will be sufficient.

- During interrogations and arrests, a sign language interpreter will often be necessary to effectively communicate with an individual who uses sign language.

- If the legality of a conversation will be questioned in court, such as where <u>Miranda</u> warnings are issued, a sign language interpreter may be necessary. Police officers should be careful about miscommunication in the absence of a qualified interpreter -- a nod of the head may be an attempt to appear cooperative in the midst of misunderstanding, rather than consentor a confession of wrongdoing.

- In general, if an individual who does not have a hearing disability would be subject to police action without interrogation, then an interpreter will not be required, unless one is necessary to explain the action being taken.

**Example:** An officer clocks a car on the highway driving 15 miles above the speed limit. The driver, who is deaf, is pulled over and issued a noncriminal citation. The individual is able to understand the reasons for the citation, because the officer exchanges written notes with the individual and points to information on the citation. In this case, a sign language interpreter is not needed.

**Example:** An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf, but the officer has probable cause to make a felony arrest without an interrogation. In this case, an interpreter is not necessary to carry out the arrest.

**12. Q: Do I have to take a sign language interpreter to a call about a violent crime in progress or a similar urgent situation involving a person who is deaf?**

**A:** No. An officer's immediate priority is to stabilize the situation. If the person being arrested is deaf, the officer can make an arrest and call for an interpreter to be available later at the booking station.

**13. Q: When a sign language interpreter is needed, where do I find one?**

**A:** Your department should have one or more interpreters available on call. This is generally accomplished through a contract with a sign language interpreter service. Communicating through sign language will not be effective unless the interpreter is familiar with the vocabulary and terminology of law enforcement, so your department should ensure that the interpreters it uses are familiar with law enforcement terms.

**14. Q: Is there any legal limit to how much my department must spend on communication aids like interpreters?**

**A:** Yes. Your department is not required to take any step that would impose undue financial and administrative burdens. The "undue burden" standard is a high one. For example, whether an action would be an undue financial burden is determined by considering all of the resources available to the department. If providing a particular auxiliary aid or service would impose an undue burden, the department must seek alternatives that ensure effective communication to the maximum extent feasible.

**15. Q: When would an officer use an assistive listening device as a communication aid?**

**A:** Assistive listening systems and devices receive and amplify sound and are used for communicating in a group setting with individuals who are hard of hearing.

- At headquarters or a precinct building, if two or more officers are interrogating a witness who is hard of hearing, or in meetings that include an individual who is hard of hearing, an assistive listening device may be needed.

**16. Q: What is a TDD and does every police station have to have one?**

**A:** A telecommunications device for the deaf (TDD) is a device used by individuals with hearing or speech disabilities to communicate on the telephone. A TDD is a keyboard with a display for receiving typed text that can be attached to a telephone. The TDD user types a message that is received by another TDD at the other end of the line.

- Arrestees who are deaf or hard of hearing, or who have speech disabilities, may require a TDD for making outgoing calls. TDD's must be available to inmates with disabilities under the same terms and conditions as telephone privileges are offered to all inmates, and information indicating the availability of the TDD should be provided.

- TDDs typically cost $200-300 each and can be used with a standard telephone. It is unlikely that the cost of purchasing a TDD will be prohibitive. Still, a small department with limited resources could arrange to share a TDD with a local courthouse or other entity, so long as the TDD is immediately available as needed.

**17. Q. What about "911" calls? How are those made accessible to people with speech or hearing disabilities?**

**A:** Individuals with hearing and speech disabilities must have direct access to "911" or similar emergency telephone services, meaning that emergency response centers must be equipped to receive calls from TDD and computer modem users without relying on third parties or state relay services. It is important that operators are trained to use the TDD when the caller is silent, and not only when the operator recognizes the tones of a TDD at the other end of the line. For additional information, please refer to the Department of Justices publication, *Commonly Asked Questions Regarding Telephone Emergency Services*. For

information about how to obtain this and other publications, see the resources section at the end of this document.

**18. Q: Procedures at my office require citizens to fill out forms when reporting crimes. What if the person has a vision disability, a learning disability, mental retardation or some other disability that may prevent the person from filling out a form?**

**A:** The simplest solution is to have an officer or clerk assist the person in reading and filling out the form. Police officers have probably been doing this for years. The form itself could also be provided in an alternative format. Providing a copy of the form in large print (which is usually as simple as using a copy machine or computer to increase type size) will make the form accessible to many individuals with moderate vision disabilities.

## IV. Architectural Access

**19. Q: Does the ADA require all police stations to be accessible to people with disabilities?**

**A:** No. Individuals with disabilities must have equal access to law enforcement services, but the ADA is flexible in how to achieve that goal. The ADA requires programs to be accessible to individuals with disabilities, not necessarily each and every facility. Often, structural alterations to an existing police station or sheriffs office will be necessary to create effective access. In some situations, however, it may be as effective to use alternative methods, such as relocating a service to an accessible building, or providing an officer who goes directly to the individual with the disability. Whatever approach to achieving "program access" is taken, training of officers and deputies, well-developed policies, and clear public notice of the approach will be critical to ensuring successful ADA compliance.

**Example:** A police station in a small town is inaccessible to individuals with mobility disabilities. The department decides that it cannot alter all areas of the station because of insufficient funds. It decides to alter the lobby and restrooms so that the areas the public uses -- for filling out crime reports, obtaining copies of investigative reports for insurance purposes, or seeking referrals to shelter care -- are accessible. Arrangements are made to conduct victim and witness interviews with individuals with disabilities in a private conference room in the local library or other government building, and to use a neighboring department's accessible lock-up for detaining suspects with disabilities. These measures are consistent with the ADA's program accessibility requirements.

**Example:** An individual who uses a wheelchair calls to report a crime, and is told that the police station is inaccessible, but that the police department has a policy whereby a police officer will meet individuals with disabilities in the parking lot. The individual arrives at the parking lot, waits there for three hours, becomes frustrated, and leaves. By neglecting to adequately train officers about its policy, the police department has failed in its obligation to provide equal access to police services, and has lost valuable information necessary for effective law enforcement.

**20. Q: What about holding cells and jails that are not accessible?**

**A:** An arrestee with a mobility disability must have access to the toilet facilities and other amenities provided at the lock-up or jail. A law enforcement agency must make structural changes, if necessary, or arrange to use a nearby accessible facility.

- Structural changes can be undertaken in a manner that ensures officer safety and general security. For example, grab bars in accessible restrooms can be secured so that they are not removable.

- If meeting and/or interrogation rooms are provided, those areas should also be accessible for use by arrestees, family members, or legal counsel who have mobility disabilities.

**21. Q: Is there a limit to the amount of money my agency must spend to alter an existing police facility?**

**A:** Yes. It is the same legal standard of "undue burden" discussed earlier with regard to the provision of communication aids. Your agency is not required to undertake alterations that would impose undue financial and administrative burdens. If an alteration would impose an "undue burden", the agency must chose an alternative that ensures access to its programs and services.

### 22. Q. We are building a new prison. Do we need to make it accessible?

**A:** Yes. All new buildings must be made fully accessible to, and usable by, individuals with disabilities. The ADA provides architectural standards that specify what must be done to create access.

- Either the Uniform Federal Accessibility Standards (UFAS) or the ADA Standards for Accessible Design (without the elevator exemption) (ADA Standards) may be used. UFAS has specific scoping requirements for prisons that require, among other things, that 5% of all cells be made accessible to individuals with mobility disabilities.

- Unlike modifications of existing facilities, there is no undue burden limitation for new construction.

- In addition, if an agency alters an existing facility for any reason -- including reasons unrelated to accessibility -- the altered areas must be made accessible to individuals with disabilities.

# V. Modifications of Policies, Practices, and Procedures

### 23. Q: What types of modifications in law enforcement policies, practices, and procedures does the ADA require?

**A:** The ADA requires law enforcement agencies to make reasonable modifications in their policies, practices, and procedures that are necessary to ensure accessibility for individuals with disabilities, unless making such modifications would fundamentally alter the program or service involved. There are many ways in which a police or sheriffs department might need to modify its normal practices to accommodate a person with a disability.

**Example:** A department modifies a rule that prisoners or detainees are not permitted to have food in their cells excet at scheduled intervals, in order to accommodate an individual with diabetes who uses medication and needs access to carbohydrates or sugar to keep blood sugar at an appropriate level.

**Example:** A department modifies its enforcement of a law requiring a license to use motorized vehicles on the streets, in order to accommodate individuals who use scooters or motorized wheelchairs. Such individuals are pedestrians, but may need to use streets where curb cuts are unavailable.

E**xample:** A department modifies its regular practice of handcuffing arrestees behind their backs, and instead handcuffs deaf individuals in front in order for the person to sign or write notes.

E**xample:** A department modifies its practice of confiscating medications for the period of confinement, in order to permit inmates who have disabilities that require self-medication, such as cardiac conditions or epilepsy, to self-administer medications that do not have abuse potential.

**Example:** A department modifies the procedures for giving Miranda warnings when arresting an individual who has mental retardation. Law enforcement personnel use simple words and ask the individual to repeat each phrase of the warnings in her or his own words. The personnel also check for understanding, by asking the individual such questions as what a lawyer is and how a lawyer might help the individual, or asking the individual for an example of what a right is. Using simple language or pictures and symbols, speaking slowly and clearly, and asking concrete questions, are all ways to communicate with individuals who have mental retardation.

- Informal practices may also need to be modified. Sometimes, because of the demand for police services, third party calls are treated less seriously. Police officers should keep in mind that calling

through a third party may be the only option for individuals with certain types of disabilities.

## VI. Resources

**24. Q: It sounds like awareness and training are critical for effective interaction with individuals with disabilities. How can I find out more about the needs of my local disability community?**

**A:** State and local government entities were required, by January 26, 1993, to conduct a "self-evaluation" reviewing their current services, policies, and practices for compliance with the ADA. Entities employing 50 or more persons were also to develop a "transition plan" identifying structural changes that needed to be made. As part of that process, the ADA encouraged entities to involve individuals with disabilities from their local communities. Continuing this process will promote access solutions that are reasonable and effective. Even though the deadlines for the self-evaluation, transition plan, and completion of structural changes have passed, compliance with the ADA is an ongoing obligation.

**25. Q: Where can I turn for answers to other questions about the ADA?**

**A:** The Department of Justice's toll-free ADA Information Line answers questions and offers free publications about the ADA. The telephone numbers are: 800-514-0301 (voice) or 800-514-0383 (TTY). Publications are also available from the ADA Website www.ada.gov.

**Note: Reproduction of this document is encouraged.**

Last Revised April 4, 2006