UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------x

DIANA WILLIAMS,

                                 Plaintiffs,

                -against-

THE CITY OF NEW YORK,

                                Defendants.

----------------------------------------------------------------------------x

**DEFENDANT'S RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS IN LOCAL RULE 56.1 STATEMENT PURSUANT TO JUDGE CAPRONI'S INDIVIDUAL RULES OF PRACTICE**

**12 CV 6805 (VEC)**

        Defendant City of New York, pursuant to Judge Caproni's Individual Rules of Practice, hereby submits its response to plaintiff's additional facts in her Local Rule 56.1 Statement as follows:

A.    BACKGROUND INFORMATION:

    1.    Plaintiff, Diana Williams, is deaf and primarily communicates in American Sign Language. [Rozynski Decl., Ex. E, Diana Williams Dep. 10:13-12:15; Rozynski Decl., Ex. G, Rivera Dep. 16:9-19]

    **Undisputed**

    2.    Diana Williams cannot speak, read lips, or communicate effectively using written English, as she only has rudimentary knowledge of the English language. [Rozynski Decl., Ex. E, Diana Williams Dep. 10:13-12:1 5; Rozynski Decl., Ex. G, Rivera Dep. 16:9-19; Rozynski Decl., Ex. D, Chris Williams Dep. 20:13-23, 24: 19-25:4; Rozynski Decl., Ex. Q, Kegl Report pp. 58-61, 68, 75]

    **Disputed, and defendant objects to same as vague and as not even being a factual statement. In fact, in plaintiff's own expert report, the Dr. Kegl report at p. 59, Dr. Kegl rates plaintiff's lipreading skills at 41%. Further, Dr. Kegl's**

**report at pp. 60-74 does not support the conclusion that plaintiff cannot "communicate effectively using written English" in all instances. Further, plaintiff's use of the words "effective" and "rudimentary" herein are not factual statements, but rather are opinions and conclusions of an expert witness. (See Declaration of Mark D. Zuckerman, dated February 25, 2014 (hereinafter "Zuckerman Reply Decl.,") Exhibit M, Dr. Kegl Report)**

3. Diana Williams is married to Chris Williams, who is also deaf. [Rozynski Decl., Ex. E, Diana Williams Dep. 27:14-28:11; Rozynski Decl., Ex. D, Chris Williams Dep. 9:13-16, 10:8-25]

**Undisputed that plaintiff and Chris Williams are married. Further undisputed only to the extent that Chris Williams has asserted in this litigation that he deaf, but no proof such as an expert test or opinion has been offered to support his assertion. As such, Chris Williams' assertion that he is deaf or the extent to which he is deaf are not undisputed facts.**

4. Chris Williams, while his primary language is ASL, has some knowledge of the English language and considers himself capable of communicating in written English. [Rozynski Decl., Ex. D, Chris Williams Dep. 12: 10-22, 14:23-15:9]

**Disputed and defendant objects to same as vague and not even being a factual statement. The assertions are also unsupported by competent expert opinion or testing, and as such do not constitute undisputed facts. Further, the expert report of Dr. Kegl at p. 55, reflects that Chris Williams did interpret for plaintiff when both were working for the US Postal Service together. (Zuckerman Reply Decl., Ex. M, Dr. Kegl report at p. 55)**

5. On 9/11/11, Diana Williams was approximately five feet, two inches (5'2") tall, and weighed approximately 137 pounds. [Rozynski Decl., Ex. E, Diana Williams Dep. 23:8-18]

   **Undisputed, though irrelevant.**

6. On 9/11/11, Diana Williams and Chris Williams were renting two upstairs apartments in their jointly-owned property at 265 Hillbrook Drive to Lorena White and Nicole Sabella. [Rozynski Decl., Ex. E, Diana Williams Dep. 35: 15-17; Rozynski Decl., Ex. D, Chris Williams Dep., 25:12-17, 26:14-20]

   **Undisputed**

7. Lorena White is deaf and cannot speak English. [Rozynski Decl., Ex. E, Diana Williams Dep. 37:10-11; Rozynski Decl., Ex. G, Rivera Dep. 35:3-6; Rozynski Decl., Ex. C, Sabella Dep. 23:4-24:2]

   **Disputed, as the assertion that Lorena White is deaf is unsupported by competent evidence supporting same, or as to the extent of any hearing impairment. Further, the assertion that Lorena White "cannot speak English" is also not supported by competent evidence opining as to same, and Chris Williams' testimony (they lived together as landlord-tenant for a period of time) is to the opposite. See Defendant's 56.1 at ¶ 50, citing Zuckerman Decl. in Support of Summary Judgment, C. Williams dep., p. 58, ll. 3-25.**

8. Nicole Sabella is fully hearing (i.e., not deaf or hard-of-hearing), but can speak some American Sign Language, which is how she communicated with Diana and Chris Williams [Rozynski Decl., Ex. E, Diana Williams Dep. 36:24-25; Rozynski Decl., Ex. C, Sabella Dep. 28:3-9, 36:21 -37:10]

**Undisputed that Nicole Sabella is "fully hearing." It is further undisputed only to the extent that Nicole Sabella testified at deposition that she communicates with the Williams' via sign language.**

9. Diana Williams' brother, David Rivera, lives across the street from 265 Hillbrook Drive. [Rozynski Decl., Ex. G, Rivera Dep. 25:21 -23]

   **Undisputed**

10. Because Lorena White had not been paying her rent, Chris Williams had the Williams' attorney send her with a 30-day notice, requiring Lorena White to surrender the apartment and vacate by 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 79: 10-14; Rozynski Decl., Ex. D, Chris Williams Dep. 38:20-40:17, 40:18-21; 8; Rozynski Decl., Ex. C, Sabella Dep. 37:11-20]

    **Undisputed only to the extent that Christopher Williams testified in deposition as to same. The "30 day notice" was never been produced in this litigation, thus, reference to the contents thereof is inadmissible hearsay.**

11. Lorena White was angry at Diana and Chris Williams for sending the letter requiring her to surrender the apartment. [Rozynski Decl., Ex. E, Diana Williams Dep. 98:14-18]

    **Disputed, as unsupported by the referenced deposition testimony. The referenced deposition testimony discusses Lorena White's feelings toward Chris Williams only. Also, Diana Williams was living in Maryland full time during the referenced period of time, thus any such assertion by her is based upon inadmissible hearsay and not upon the requisite personal knowledge. See Defendant's 56.1 at ¶ 10.**

12. Diana Williams was living in Maryland at the time, but had driven to 265 Hillbrook Drive on 9/10/11 to assist with the planned surrender on 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 79: I 0-14]

**Undisputed, though plaintiff's reference to a "planned surrender" is objected to as vague.**

13. Diana and Chris Williams planned to call the police to assist with the surrender to ensure there would be no damage to the property. [Rozynski Decl., Ex. E, Diana Williams Dep. 79: 19-80:2]

**Undisputed only to the extent that this is what plaintiff testified to at deposition.**

B.    ARREST:

14. Diana and Chris Williams did call the police that morning, at approximately 9:15am, using the videophone in the basement of 265 Hillbrook Drive, but the police did not respond to that call. [Rozynski Decl., Ex. E, Diana Williams Dep. 79:19-80:23; Rozynski Decl., Ex. D, Chris Williams Dep. 61:20-62:8, 63: 16-25; Rozynski Decl., Ex. F, SPRINT report]

**Disputed, as POs Romano and Costanzo obviously did respond to the Williams' call(s) to the police. See defendant's 56.1 at ¶ 46.**

15. Sometime after calling the police, Diana Williams went upstairs to ask Nicole Sabella about the location of a missing cutting board from the kitchen. [Rozynski Decl., Ex. E, Diana Williams Dep. 90:5-24; Rozynski Decl., Ex. D, Chris Williams Dep. 65:18-23, 69:6-19; Rozynski Decl., Ex. C, Sabella Dep. 54:4-5]

**Undisputed only to the extent that plaintiff testified as to same at her deposition in this case.**

16. At this time, David Rivera walked from his home across the street to 265 Hillbrook Drive, seeing Lorena White's boyfriend sitting in his car on the street. [Rozynski Decl., Ex. G, Rivera Dep. 51 :21-52: 10]

   **Undisputed only to the extent that plaintiff's brother, David Rivera, testified as to same at his deposition in this case.**

17. Lorena White's boyfriend was named Alendi, and he was fully hearing (i.e. not deaf or hard of hearing). [Rozynski Decl., Ex. C, Sabella Dep. 47: 14-24]

   **Undisputed**

18. While Diana Williams was conversing with Nicole Sabella, and as Chris Williams opened the door to 265 Hillbrook Drive to let David Rivera in, the Williams' dog, named Buddy, ran upstairs and into Lorena White's bedroom. [Rozynski Decl., Ex. E, Diana Williams Dep. 94:25-95:20; Rozynski Decl., Ex. D, Chris Williams Dep. 66:2-13; Rozynski Decl., Ex. G, Rivera Dep. 55: 11-56:7, 63: 12-16)

   **Undisputed only to the extent that the material facts underlying the physical altercation between plaintiff and Lorena White are fully and accurately set forth at ¶¶ 18-32 of Defendant's 56.1.**

19. Buddy was not supposed to go upstairs, out of respect for the tenants' space. [Rozynski Decl., Ex. D, Chris Williams Dep. 49:3-5; Rozynski Decl., Ex. E, Diana Williams Dep. 95: 11 -14; Rozynski Decl., Ex. G, Rivera Dep. 56:21-57:4, 61 :2-17]

   **Undisputed only to the extent that the material facts underlying the physical altercation between plaintiff and Lorena White are fully and accurately set forth at ¶¶ 18-32 of Defendant's 56.1.**

20. Diana Williams walked to the edge of Lorena White's room and picked up Buddy, at which point Lorena White angrily and aggressively approached Diana Williams, causing Diana Williams to back away. [Rozynski Decl., Ex. E, Diana Williams Dep. 95:20-97:25; Rozynski Decl., Ex. G, Rivera Dep. 57:21-59:6]

**Disputed, to the extent that the material facts underlying the physical altercation between plaintiff and Lorena White are fully and accurately fully set forth at ¶¶ 18-32 of Defendant's 56.1, and said assertion contradicts same.**

21. Diana Williams states that Buddy scratched her face when she bent down to pick him up. [Rozynski Decl., Ex. I, Affidavit of Diana Williams]

**Disputed, as plaintiff is improperly attempting use an affidavit to contradict prior deposition testimony. See Defendant's 56.1 at ¶ 27. Neither plaintiff nor her attorneys ever attempted to object to the referenced interpretation at the 50-h deposition or thereafter, despite the fact that, upon information and belief, plaintiff's law firm either has ASL proficient staff members who may have been present at said deposition, or had access to same. The attempt to use an affidavit to contradict deposition testimony three years after a deposition to defeat summary judgment is improper. Finally, plaintiff is not competent to opine on the competency of an interpreter.**

22. David Rivera was going up the stairs to follow the dog as this altercation occurred, and seeing what was happening, he placed himself between Diana Williams and Lorena White and attempted to defuse the situation [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-25; Rozynski Decl., Ex. G, Rivera Dep. 57:21 -59:6; Rozynski Decl., Ex. C, Sabella Dep. 51: 19-52:16]

**Disputed, to the extent that the material facts underlying the physical altercation between plaintiff and Lorena White are fully and accurately fully set forth at ¶¶ 18-32 of Defendant's 56.1, and this assertion contradicts same.**

23.     Diana Williams stated that there was no physical altercation between her and Lorena White, but that she may have touched Lorena White with her outstretched palm in an effort to create distance between them.  [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:20-23, 32:24-33:4; Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-25]

**Disputed, as ¶¶ 18-32 of Defendant's 56.1 demonstrate indisputably that there was a physical altercation between plaintiff and Lorena White.**

24.     Diana Williams denies that Lorena White ever hit her. [Rozynski Decl., Ex. E, Diana Williams Dep. 99:10-11]

**Disputed, as plaintiff admitted at her 50-h deposition that she received a scratch from Lorena White during their physical altercation.  Defendant's 56.1 at ¶ 27.**

25.     Nicole Sabella did not witness the exchange between Diana Williams and Lorena White, as she was in the bathroom. [Rozynski Decl., Ex. C, Sabella Dep. 50:3-7]

**Disputed, as unsupported by the referenced deposition testimony.**

26.     Diana Williams then went downstairs and immediately outside to wait for the police to arrive, while David Rivera stayed upstairs for a moment to attempt to calm Lorena White. [Rozynski  Decl., Ex. E, Diana Williams Dep. 102:10-25; Rozynski  Decl., Ex. G, Rivera Dep. 59:7-21]

**Disputed, to the extent that the material facts underlying the physical altercation between plaintiff and Lorena White are fully and accurately fully set forth at ¶¶ 18-32 of Defendant's 56.1, and this assertion contradicts same.**

27.  Chris Williams then attempted to call the police again from the videophone in the basement, but could not because the internet had been disconnected. [Rozynski Decl., Ex. D, Chris Williams Dep. 77: 1-16]

**Undisputed only to the extent that this is what Chris Williams testified to at his deposition in this matter.**

28.  At this time, Alendi was at the door attempting to enter 265 Hillbrook Drive, but Chris Williams and David Rivera blocked the door to prevent him from entering. [Rozynski Decl., Ex. G, Rivera Dep. 60:2-1 7; Rozynski Decl., Ex. D, Chris Williams Dep. 77: 17-78:4]

**Disputed, to the extent that the material facts underlying the altercation between Chris Williams and "Alendi" are fully and accurately set forth at ¶¶ 35-40 of defendant's 56.1, and this assertion contradicts same.**

29.  Alendi then made a threatening gesture in the shape of a gun with his hand, indicating that he had one with him in his car. [Rozynski Decl., Ex. D, Chris Williams Dep. 78: 14-20; Rozynski Decl., Ex. G, David Rivera Dep. 60: 19]

**Disputed, to the extent that this portion of the incident is more accurately reflected by ¶ 39 of defendant's 56.1.**

30.  At approximately 10:20 am, Chris Williams and David Rivera went, together, to David Rivera's home across the street, where Chris Williams used David Rivera's videophone to call the police again, and told the police that a man was threatening

them with a gun.  [Rozynski Decl., Ex. G, David Rivera Dep. 65:25-66:14, 67: 17-23; Rozynski Decl., Ex. D, Chris Williams Dep. 78:2 1 -25, 79:1-11]

**Undisputed only to the extent that this is what was testified to by plaintiff's husband, Chris Williams, and her brother, David Rivera, at their depositions in this case.**

31.  The NYPD's SPRINT report evidencing the calls to the 911 operator shows that over one hour elapsed between the first time Diana Williams and Chris Williams called the police from the basement of 265 Hillbrook Drive, and the second time when Chris Williams and David Rivera called the police from David Rivera's home across the street.  [Rozynski Decl., Ex. F, SPRINT Report]

**Undisputed**

32.  The NYPD's SPRINT report further indicates that the call was identified as coming through a Sorensen Relay Service, and refers to a deaf family requesting police assistance ("DEAF FML THAT NEEDS PD"). [Rozynski Decl., Ex. F, SPRINT Report]

**Undisputed only to the extent that the words on the referenced SPRINT report speak for themselves.**

33.  NYPD officers Christopher Romano and Gillio Costanzo arrived at the scene about five minutes after Chris Williams and David Rivera called, and when they arrived, they saw a group of people "waiting outside."  [Rozynski Decl., Ex. K, Romano Day 1 Dep. 34:7-19; Rozynski Decl., Ex. J, Costanzo Dep. 28:2-10; Rozynski Decl., Ex. D, Chris Williams Dep. 83: 11-17]

**Undisputed, though this assertion does not set forth fully what the officers observed when they arrived nor event attempts to do so.**

34. When the police arrived, the following people were waiting outside of 265 Hillbrook Avenue: Diana Williams, Chris Williams, David Rivera, Lorena White, and Alendi. [Rozynski Decl., Ex. E, Diana Williams Dep. 83: 10-25; Rozynski Decl., Ex. G, Rivera Dep. 79:2-12; Rozynski Decl., Ex. C, Sabella Dep. 60:25-61 :24]

    **Disputed, to the extent that the cited deposition testimony of Nicole Sabella doesn't support the factual assertion that she and David Rivera were outside of 265 Hillbrook Drive when P.O.s Romano and Costanzo arrived. (See cited Sabella dep. at p. 61, ll. 2-4)**

35. Chris Williams attempted to communicate with the police by showing them a copy of the lease, but the police ignored Chris Williams. [Rozynski Decl., Ex. E, Diana Williams Dep. 85:14-86: 1]

    **Disputed, as the cited deposition testimony certainly does not support the assertion that the "police ignored Chris Williams." Also, P.O. Romano testified at his deposition that he communicated with plaintiff's husband, Chris Williams, at the scene of the incident. (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 39, ll. 9-14)**

36. Diana Williams, Chris Williams, and David Rivera gestured to indicate to the police that they were deaf, but the officers made no attempt to communicate with them, and instead approached Lorena White and Alendi, since Alendi was able to speak English. [Rozynski Decl., Ex. E, Diana Williams Dep. 84:18-24, 87:8-16, Rozynski

Decl., Ex. G, Rivera Dep. 80:7-23, Rozynski Decl., Ex. D, Chris Williams Dep. 84:2-3; Rozynski Decl., Ex. C, Sabella Dep. 61 :7-62:24]

**Disputed, as P.O. Romano testified at his deposition that he communicated with plaintiff's husband, Chris Williams, at the scene of the incident. (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 39, ll. 9-14)**

37. Diana Williams, Chris Williams, and David Rivera continued to try without success to get the attention of the officers, which is what prompted Chris Williams to describe the situation as "hectic" and "chaotic." [Rozynski Decl., Ex. D, Chris Williams Dep. 84:21 -85:15]

**Disputed, as the cited deposition testimony does not support the factual assertion.**

38. Diana Williams, Chris Williams, and David Rivera were unable to understand the conversation that the police were having with the others, and made repeated requests for an interpreter through signing and writing notes. [Rozynski Decl., Ex. E, Diana Williams Dep. 84:5-9, 87:8-16, 88: 1-90:4; Rozynski Decl., Ex. D, Chris Williams Dep. 89:11-25, 90:10-16]

**Disputed, as P.O. Romano testified at deposition that he was not told that plaintiff needed an interpreter at the scene of the arrest. (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 42, ll. 2-5)**

39. Diana Williams, Chris Williams, and David Rivera continued to attempt to get the officers' attention, both through gesturing and writing notes, to request an interpreter so they could explain the situation, but the officers ignored them. [Rozynski Decl.,

Ex. G, Rivera Dep. 83:23-84:6, 91:14-24, 94:3-8; Rozynski Decl., Ex. D, Chris Williams Dep. 85:9-15, 87:17-22; Rozynski Decl., Ex. C, Sabella Dep. 68:8-12]

**Disputed, as P.O. Romano testified at deposition that he was not told that plaintiff needed an interpreter at the scene of the arrest. (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 42, ll. 2-5) Also, P.O. Romano testified at his deposition that he communicated with plaintiff's husband, Chris Williams, at the scene of the incident, (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 39, ll. 9-14), and the cited deposition testimony does not demonstrate that plaintiff, Chris Williams and David Rivera were "ignored." Further, the report of plaintiff's expert, Dr. Kegl, at p. 55, reflects that Chris Williams has interpreted for plaintiff in the past, when they worked together at the US Postal Service. (Zuckerman Reply Decl., Ex. M, Dr. Kegl report, at p. 55)**

40.  Officer Romano somehow determined that both Diana Williams and Lorena White had assaulted each other. [Rozynski Decl., Ex. K, Romano Day 1 Dep 36:14-37: 18; 40:6-41 :2]

**Disputed as to the characterization that P.O. Romano "somehow determined" that plaintiff and Lorena White had assaulted each other. The assault arrests were the result of the officers' investigation. See Defendant's 56.1 at ¶¶ 46-53.**

41.  Officer Romano stated that he interviewed "one of the women," but not the other woman, without identifying which woman he interviewed; immediately after saying this, he stated that both of them admitted to assaulting each other. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 37:6-19]

**Disputed, as misleading and not complete. The cited deposition testimony also reflects that P.O. Romano communicated with "that gentleman," referring to plaintiff's husband, Chris Williams. (Zuckerman Reply Decl., Ex. N, C. Romano 4/14/14 dep. p. 39, ll. 9-14) Also, a portion of the investigation was conducted by P.O. Romano's partner, P.O. Costanzo. See defendant's 56.1 at ¶ 49.**

42. Officer Romano stated in his first deposition that he did not speak directly with Diana Williams and that Chris Williams was able to interpret for him during his investigation [Rozynski Decl., Ex. K, Romano Day 1 Dep. 39:9-14, 49:16-23, 51:7-15]; but he stated during his second deposition that he was able to "communicate with Diana Williams directly." [Rozynski Decl., Ex. L, Romano Day 2 Dep. 32: 16-33]

**Disputed, and objected to, as the assertion is not a factual statement. Further, P.O. Romano's deposition testimony speaks for itself. See also response to no. 39 above.**

43. Officer Romano later stated that he "believed" the two women had engaged in a physical altercation based only on "physical observation after arriving on a police scene." [Rozynski Decl., Ex. L, Romano Day 2 Dep. 93: 17-95:4]

**Disputed, as not supported by the cited deposition testimony. The officers' investigation is reflected by ¶¶ 46-53 of defendant's 56.1 and corroborated by the events set forth in ¶¶ 18-32 of defendant's 56.1.**

44. In contradiction to Diana Williams' testimony, the arrest sheet filled out by Officer Romano states that Diana Williams told him at the scene that Lorena White hit her with closed fists, causing bruising to her leg, lower lip, and chin area. [Rozynski

Decl., Ex. R, Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039]

**Disputed, and objected to as vague. The factual assertion does not cite to any portion of plaintiff's "testimony," rendering the assertion meaningless. Further, the arrest reports, the second one of which was voided (NYC 037-39), speak for themselves, and plaintiff has not cited any admissible evidence explaining them in a manner as to support plaintiff's assertion.**

45. When asked if he did any further investigation other than speaking with Lorena White and Alendi, Officer Costanzo replied, "No." [Rozynski Decl., Ex. J, Costanzo Dep. 37:3-8]

**Undisputed, as to P.O. Costanzo's own investigation at the scene of the incident only.**

46. At 11:19 am, Officer Romano then arrested Ms. Williams and placed her in a police car, which drove her to Precinct 122. [Rozynski Decl., Ex. E, Diana Williams Dep. 105:20-24, 106:9-11, 112:20-113:3; Rozynski Decl., Ex. R, Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039]

**Undisputed that plaintiff was arrested and transported to the NYPD's 122nd Precinct. However, there is no admissible evidence that plaintiff was placed under arrest precisely at 11:19 a.m.**

47. The NYPD SPRINT report indicates that the officers arrived at the scene sometime around 10:30 am, but they placed Diana Williams under arrest at 11: 19 am, meaning they were on the scene for a total of at least 45 minutes. [Rozynski Decl., Ex. F, SPRINT report]

**Disputed, and objected to as vague, and not supported by admissible evidence. There is not even an entry on the referenced SPRINT report at exactly 10:30 a.m. on the date of the incident.**

48. Diana Williams was handcuffed with her hands behind her back.  [Rozynski Decl., Ex. K, Romano Day 1 Dep. 85:20-86:5]

    **Undisputed**

49. Officer Romano did not attempt to explain to Ms. Williams her Miranda rights or the reason for her arrest.  [Rozynski Decl., Ex. G, Rivera Dep. 85:23-86:9; Rozynski Decl., Ex. K, Romano Day 1 Dep. 51 : 20-52: 13]

    **Disputed, as the referenced deposition testimony of P.O. Romano only references that he didn't tell plaintiff her "rights."**

50. Diana Williams was in a state of panic, as she had no idea why she had been arrested.  [Rozynski  Decl., Ex. D, Chris Williams Dep. 94:24-96: 18; Rozynski  Decl., Ex. C, Sabella Dep. 50: 13-51:8]

    **Disputed, as Chris Williams and Nicole Sabella have no foundation to testify as to plaintiff's state of mind when she was arrested.**

51. Officer Romano stated in his first deposition that he observed and was aware, at the time he arrested Diana Williams, that Diana Williams was having problems hearing and communicating [Rozynski  Decl., Ex. K, Romano Day 1 Dep. 41:10-15]; despite this, he stated in his second deposition that he did not consider her to be disabled and did not think she needed an interpreter.  [Rozynski Decl., Ex. L, Romano Day 2 Dep. 47:25-49:8]

**Disputed, and objected to, as the assertion is not a factual statement and P.O. Romano's deposition testimony speaks for itself.**

52. Officer Romano also arrested Lorena White, for the stated reason that Diana Williams had injuries that he determined were the result of an assault; but he did not confirm through other witnesses that a physical altercation had happened. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 43:5-44:16]

**Disputed, as the cited deposition testimony reflects P.O. Romano's communications with plaintiff's husband concerning the physical altercation between plaintiff and Lorena White. The officers' investigation that resulted in both arrests is reflected by ¶¶ 46-53 of defendant's 56.1 and corroborated by the events set forth in ¶ 18-32 of defendant's 56.1 and further dispute plaintiff's factual assertion.**

53. Two additional police officers, Sergeant Daniel Watson and Steven Zielinski, were called to the scene to transport one of the arrestees, so each was transported to Precinct 122 in a different vehicle. [Rozynski Decl., Ex. S, Watson Dep. 14:11- 14, 18:12- 19:3, 24:5-8, 27:15-19; Rozynski Decl., Ex. J, Costanzo Dep. 88: 15-23]

**Undisputed, though the cited deposition testimony doesn't reflect plaintiff's conclusion that both plaintiff and Lorena White were transported to the NYPD's 122nd Precinct solely because the additional officers arrived.**

54. Officer Romano believed, at the time of the arrest, that Lorena White and Diana Williams had gotten into a fight, which produced injuries to both; but he admitted that he did not see the fight. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 90:22- 95:4]

**Undisputed that P.O. Romano did not personally witness the physical altercation between plaintiff and Lorena White. The officers' investigation that resulted in both arrests is reflected by ¶¶ 46-53 of defendant's 56.1 and corroborated by the events set forth in ¶ 18-32 of defendant's 56.1 and further dispute plaintiff's factual assertion.**

55. Officer Romano testified that Diana Williams complained of bruising on her arm, and recorded on both arrest sheets that both Diana Williams and Lorena White suffered bruising. [Rozynski Decl., Ex. L, Romano Day 2 Dep. 17:15-19; Rozynski Decl., Ex. R, Diana Williams Arrest Sheets, NYC000212-NYC000213, NYC000037-NYC000039; Rozynski Decl., Ex. T, Lorena White Arrest Sheets, D4034-D4036]

    **Undisputed, though this is not a factual assertion and P.O. Romano's deposition testimony speaks for itself.**

56. Diana Williams repeatedly denies that any physical altercation took place, and states that she had no injuries that were caused by Lorena White. [Rozynski Decl., Ex. H, Diana Williams 50-H 17:14-21, 18:24-19:4, 32:24-33:4; Rozynski Decl., Ex. E Diana Williams Dep. 90:5-9, 99:10-20]

    **Disputed. Plaintiff testified at her 50-h deposition to the opposite. See Defendant's 56.1 at ¶ 27.**

57. Chris Williams, David Rivera and Nicole Sabella state that neither Diana Williams nor Lorena White had any visible physical injuries at the time of the arrests. [Rozynski Decl., Ex. G, Rivera Dep. 87:3-5, 90:2-3; Rozynski Decl., Ex. C Sabella Dep. 66:9-17; Rozynski Decl., Ex. D Chris Williams Dep. 98:21 -23]

**Disputed, as plaintiff's 50-h testimony and the photograph taken of her face belie such testimony by plaintiff's husband, brother and tenant. See Defendant's 56.1 at ¶ 27.**

58. Numerous pictures were taken of Diana Williams and Lorena White after they were taken into custody, and none of them demonstrate visible physical injuries. [Rozynski Decl., Ex. N, Pictures of Diana Williams and Lorena White, D4038-4046, D4216, NYC000214]

**Disputed. See defendant's 56.1 at ¶ 49 and Exs. E and F to Zuckerman Decl., submitted in support of defendant's motion for partial summary judgment.**

59. Officer Costanzo stated in his deposition that he "really did not deal with [Diana] Williams at all" at the scene of the arrest, and that he spent his entire time interviewing Lorena White and Alendi. [Rozynski Decl., Ex. J, Costanzo Dep. 28:8-10, 33:10-23, 42:19-43:8]

**Disputed, to the extent that the cited deposition testimony does not support plaintiff's factual assertion and said deposition testimony speaks for itself.**

C. CUSTODY:

60. Upon arrival at the precinct, Diana Williams was placed in a cell and handcuffed to a bar. [Rozynski Decl., Ex. E, Diana Williams Dep. 113:8-13, 122:9-11]

**Disputed, and irrelevant to defendant's motion for partial summary judgment. Plaintiff was not handcuffed to a bar in a cell. She was handcuffed to a bench bar for a short period of time and when in a cell was not handcuffed. Zuckerman Reply Decl., Ex. O, C. Romano 10/9/14 dep. p. 89, l. 12-p. 90, l. 12)**

61. Chris Williams followed the police cruiser to Precinct 122, where he was joined by David Rivera. [Rozynski Decl., Ex. D, Chris Williams Dep. 99:1 7-100:3, 104:9-13; Rozynski Decl., Ex. G, Rivera Dep. 105:7-106:6]

**Undisputed only to the extent that Christopher Williams and David Rivera, plaintiff's husband and brother, testified as to same in their depositions in this case.**

62. Chris Williams and David Rivera each made separate written requests for an interpreter for Diana Williams at the precinct front desk, but both were ignored. [Rozynski Decl., Ex. D, Chris Williams Dep. 102:5-20, 105:15-106:3; Rozynski Decl., Ex. G, Rivera Dep. 107:22-25]

**Undisputed only to the extent that Christopher Williams and David Rivera, plaintiff's husband and brother, testified as to same in their depositions in this case. However, this factual assertion is irrelevant to defendant's motion for partial summary judgment.**

63. David Rivera texted his friend, Wes Whelan, who drove from the Bronx to Precinct 122 to offer himself as an interpreter, since he interprets for his profession; however, the officers at Precinct 122 did not allow him to interpret. [Rozynski Decl., Ex. D, Chris Williams Dep. 106:21-107:5, 107: 18-23; Rozynski Decl., Ex. G, Rivera Dep. 109: 10-110:1, 1ll: 11-25]

**Undisputed only to the extent that Christopher Williams and David Rivera, plaintiff's husband and brother, testified as to same in their depositions in this case. However, this factual assertion is irrelevant to defendant's motion for partial summary judgment.**

64.	After over an hour at Precinct 122, Chris Williams, David Rivera, and Wes Whelan were told by an officer to leave, or else they would be arrested, at which point they did leave.  [Rozynski Decl., Ex. D, Chris Williams Dep. 108: 17-109:5; Rozynski Decl., Ex. G, Rivera Dep. 11 2: 1-10]

**Undisputed only to the extent that Christopher Williams and David Rivera, plaintiff's husband and brother, testified as to same in depositions in this case. However, this factual assertion is irrelevant to defendant's motion for partial summary judgment.**

65.	While in her cell, Diana Williams was assaulted by a police officer, who pushed her against the wall, causing her to hit her head.  [Rozynski Decl., Ex. E, Diana Williams Dep. 106:21-25, 108:21-109:6]

**Disputed.  Plaintiff's deposition testimony is uncorroborated by physical evidence or injury, and she never identified the officer who allegedly assaulted her.  Additionally, the alleged assault was never pled.  So, defendant disputes that this ever happened.  (Zuckerman Reply Decl., Ex. P, D. Williams dep., p. 107, l. 1-108, l. 19 and Amended Complaint)**

66.	Officer Justin Meehan testified that, while at Precinct 120, Ms. Williams appeared stressed and anxious in her cell, that he believed she was crying while in the cell, and admitted that he and other officers were unable to communicate with her.  [Rozynski Decl., Ex. O, Meehan Dep. 42:15-43:25, 51:6-17]

**Undisputed only to the extent that P.O. Meehan's cited deposition testimony speaks for itself and is not a factual assertion.  In any event, this deposition testimony is completely irrelevant to defendant's motion for partial summary**

**judgment as the cited events occurred at Staten Island Central Booking well after plaintiff was escorted from the scene of her arrest.**

67. At no time did any police officer in Precinct 122 communicate with Diana Williams about the reason for her arrest, nor did any officer attempt to procure an American Sign Language interpreter for her. [Rozynski Decl., Ex. E, Diana Williams Dep. 121:23-122:5]

   **Undisputed only to the extent that during her detention, an American Sign Language interpreter was only obtained for plaintiff while hospitalized at the Richmond University Medical Center. Defendant's 56.1 at ¶ 57. Defendant disputes the remainder of the factual assertion as not supported by the cited deposition testimony.**

68. At approximately 6:00pm, Diana Williams was taken out of the cell and moved outside, at which point, in an effort to communicate her need for medical care due to anxiety and panic, and while still handcuffed, she wrote the letters "H-O-S-P" on the hood of a dirty police car. [Rozynski Decl., Ex. E, Diana Williams Dep. 119:13-120:22]

   **Disputed. P.O. Justin Meehan, who was with plaintiff at that time, denies that it happened. (Zuckerman Reply Decl., Meehan Dep., Ex. Q, p. 99, ll. 19-22). Such assertion is also completely irrelevant to defendant's motion for partial summary judgment.**

69. Diana Williams and Lorena White were then transported, together in the back of a police vehicle, to Precinct 120. [Rozynski Decl., Ex. E, Diana Williams Dep. 123:11-14]

**Undisputed that plaintiff and Lorena White were transported to Staten Island Central Booking at the NYPD's 120th Precinct from the NYPD's 122nd Precinct together in the back of a police vehicle, but plaintiff's use of the word "then" is vague and objected to as to the sequence of events asserted.**

70.  At Precinct 120, Diana Williams continued to gesture for help, and the officer who saw her write "H-O-S-P" on the police car recognized that she needed medical help. [Rozynski Decl., Ex. E, Diana Williams Dep. 125:19-126:12]

**Disputed. P.O. Justin Meehan, who was with plaintiff at that time, denies that it happened. (Zuckerman Reply Decl., Ex. Q, p. 99, ll. 19-22). Such assertion is also completely irrelevant to defendant's motion for partial summary judgment. However, plaintiff was hospitalized upon her request. Defendant's 56.1 at ¶ 56.**

71.  Diana Williams was then taken to an ambulance and transported to Richmond University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 127: 12-128:5; Rozynski Decl., Ex. U, Maximos Dep. 19:6-9]

**Disputed, as plaintiff's use of the word "then" is vague and objected to as to the asserted sequence of events. However, plaintiff was hospitalized upon her request. Defendant's 56.1 at ¶ 56.**

72.  At the hospital, Diana Williams' admission form stated "Reg. interpreter" on it. [Rozynski Decl., Ex. U, Maximos Dep. 20:4-7]

**Disputed, as the admission form said "Req. interpreter," according to Dr. Maximos' cited deposition testimony.**

73.  The hospital provided Diana Williams with an interpreter, and she was diagnosed with "anxiety and stress reaction" and panic attack, and was treated with an oral dose

of Azprazolam. [Rozynski Decl., Ex. U, Maximos Dep. 32:1-9, 36:10-14, 50:10-16, 68:3-8; Rozynski Decl., Ex. E, Diana Williams Dep. 128:8-129:4]

**Undisputed that the Richmond University Medical Center Rule 30(b)(6) designee in this case testified to the asserted diagnosis and undisputed that plaintiff was provided an American Sign Language interpreter at the Hospital. See Defendant's 56.1 at ¶ 57 as to the interpreter being provided. Plaintiff's hospital diagnosis, however, is irrelevant to defendant's motion for partial summary judgment.**

74. Hospital records indicate that Diana Williams had a "superficial wound to the face, the left side of the mouth," but do not mention any other irregularities with her skin, including bruising. [Rozynski Decl., Ex. U, Maximos Dep. 64:6-19; Rozynski Decl., Ex. V, Hospital Record, NYC000195]

**Disputed, to the extent that plaintiff has not accurately cited to Dr. Maximos' deposition testimony. The referenced medical record, as testified to by Dr. Maximos at his deposition, also reflects an "abrasion to the left side of the mouth" of plaintiff.**

75. While at the hospital, Diana Williams told the hospital interpreter that she needed an interpreter to communicate with the police, and the hospital interpreter conveyed her request to the officers that accompanied Diana Williams to the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 128:6-129:12, 129:21-130:6]

**Disputed, as what the hospital interpreter told the police officers, if anything, is inadmissible hearsay and without foundation since plaintiff purports to be deaf.**

**As to the remainder of the factual assertion, undisputed only to the extent that this is what plaintiff testified to at her deposition in this matter.**

76. Diana Williams was then taken back to Precinct 120 and immediately placed back in a cell. [Rozynski Decl., Ex. E, Diana Williams Dep. 132:7-22, 163:1-6]

**Undisputed only to the extent that plaintiff was taken back to the 120nd Precinct (Staten Island Central Booking) from the Richmond University Medical Center. The use of the word "immediately" as to plaintiff being placed into a cell is not a factual assertion, but rather a term that is open to differing interpretations.**

77. Because there was no interpreter at the precinct, Diana Williams continued to experience severe anxiety and panic, and again gestured for an interpreter; when police officers did not respond, she then gestured to be taken to the hospital, whereupon she was taken back to Richmond University Medical Center. [Rozynski Decl., Ex. E, Diana Williams Dep. 137:3-139:17, 143:2-12, 144:4-6)

**Disputed, as plaintiff is not competent to testify why she "continued to experience severe anxiety and panic," and undisputed only to the extent that plaintiff testified as to same at her deposition in this matter. Undisputed, however, that plaintiff was taken back to the Richmond University Medical Center from Staten Island Central Booking. Defendant's 56.1 at ¶¶ 59-60.**

78. Diana Williams states that no interpreter was present the second time she was at the hospital. [Rozynski Decl., Ex. E, Diana Williams Dep. 144: 18-145: 1]

**Undisputed only to the extent that plaintiff testified at her deposition in this case that no ASL interpreter was provided for her on her second visit to the Richmond University Medical Center. The Hospital's records do not indicate**

**one way or the other whether she was provided one or not. Defendant's 56.1 at ¶ 61.**

79. During this second trip to the hospital, Diana Williams was treated with an intramuscular injection of Lorazepam for anxiety [Rozynski Decl., Ex. E, Diana Williams Dep. 145: 1-6; Rozynski Decl., Ex. U, Maximos Dep. 70:25, 78:9-79:21]

   **Undisputed, to the extent that the Hospital's records reflect said course of treatment. However, this assertion is completely irrelevant to defendant's motion for partial summary judgment.**

80. This injection caused Diana Williams to pass out, and when she awoke the next morning, she was taken back to Precinct 120 and placed in her cell. [Rozynski Decl., Ex. E, Diana Williams Dep. 145:6-23]

   **Disputed, as the Hospital denies that plaintiff "passed out," much less that it was the result of an injection. (Zuckerman Reply Decl., Ex. R, Maximos dep. pp. 106, l. 7- p. 107, l. 8)**

81. At no time did any police officer in Precinct 120 communicate with Diana Williams about the reason for her arrest, nor did any officer attempt to procure an American Sign Language interpreter for her. [Rozynski Decl., Ex. E, Diana Williams Dep. 136:1-14, 143:2-5; 146:12]

   **Disputed, as the cited deposition testimony does not support the assertion that plaintiff was never told about the reason for her arrest by an officer in the 120nd Precinct. Defendant does not dispute that plaintiff only was provided with an American Sign Language interpreter while hospitalized.**

82.  After an indeterminate amount of time, an officer led Diana Williams out of her cell and to a white truck, which she entered, and which transported her elsewhere. [Rozynski Decl., Ex. E, Diana Williams Dep. 146:11-147:19]

**Disputed, and objected to as vague and irrelevant to defendant's motion for partial summary judgment.**

83.  After arriving at a new location, which appeared to be a prison, police officers escorted Diana Williams down a hallway and eventually into a room, where she was shown a form and asked to read it.  [Rozynski Decl., Ex. E, Diana Williams Dep. 147:20-149:17]

**Undisputed only to the extent that on September 12, 2011, plaintiff signed a "343 sheet" at the 120th Precinct agreeing to drop the charges against Lorena White, which Lorena White did as to plaintiff as well.  (Zuckerman Reply Decl., Ex. N, C. Romano 4/4/14 dep. p. 58, l. 19-p. 59, l. 7)**

84.  This form was a 343 form, indicating that Diana Williams wanted to drop the charges against Lorena White; Diana Williams signed this form without knowledge of its contents because she was not able to read it.  [Rozynski Decl., Ex. E, Diana Williams Dep. 149: 13-17, Rozynski Decl., Ex. P, 343 Form, D4018]

**Undisputed only to the extent that plaintiff signed the referenced form.  The referenced deposition testimony certainly does not support the proposition that plaintiff did not understand it, and defendant would dispute plaintiff's self-serving testimony anyway.**

85.  Officer Romano was apparently present when Diana Williams signed the 343 form, and stated that he explained to her "verbally" what the contents of the form entailed;

but he never confirmed that Diana Williams was able to read the form. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 58:16-60:8, 88:20-89:9; Rozynski Decl., Ex. L, Romano Day 2 Dep. 39: 18-40:7]

**Disputed, as the referenced deposition testimony of P.O. Romano confirms that he believed that plaintiff was "reading lips" during their communication regarding the "343 form." This was obviously the "verbal" communication referred to at a later point in P.O. Romano's deposition testimony.**

86. Diana Williams was then led out of the building and released to her husband, Chris Williams, still in a state of extreme emotional distress. [Rozynski Decl., Ex. E, Diana Williams Dep. 150:1-13; Rozynski Decl., Ex. D, Chris Williams Dep. 11 2:5-22]

**Disputed, as self-serving, uncorroborated, without foundation and irrelevant to defendant's motion for partial summary judgment. Plaintiff was released without charges being formally brought on September 12, 2011. See Defendant's 56.1 at ¶ 63.**

D. ACCOMMODATION:

87. Sergeant Christopher Maki stated that, based on his impression and personal observation, Diana Williams could not communicate vocally without an interpreter. [Rozynski Decl., Ex. W, Maki Dep. 23:5-12]

**Disputed, as this is not a factual assertion at all, but undisputed that Sgt. Maki's deposition testimony speaks for itself.**

88. Dr. Judy Kegl, a linguistics expert and an expert in American Sign Language, examined Ms. Williams to determine her ability to communicate in English and her need for interpreting services. [Rozynski Decl., Ex. Q, Kegl Report at 1-2]

**Undisputed only to the extent that Dr. Kegl is plaintiff's expert and purportedly met with plaintiff. However, this is irrelevant to defendant's motion for partial summary judgment.**

89. According to Dr. Judy Kegl, "Ms. Williams' proficiency in English contrasts sharply with her proficiency in ASL. In English, she presents as a fossilized language learner .... A fossilized language is one that is learned incompletely by its user. Ms. Williams can advocate for herself in a law enforcement encounter as a mature, articulate, adult when allowed to communicate in ASL. In English, however, her ability to communicate is severely limited." [Rozynski Decl., Ex. Q, Kegl Report at 58]

   **Disputed, as plaintiff has "cherry picked" from Dr. Kegl's report. Although a partial motion to exclude said report at trial was made by defendant at Docket 64, the entirety of Dr. Kegl's report is annexed to the Zuckerman Reply Decl. as Exhibit M. Additionally, defendant objects to this assertion as not being a factual assertion at all, but rather a partial conclusion and opinion of an expert witness.**

90. According to Dr. Judy Kegl, "Ms. Williams' lipreading skills are insufficient to support her communicative needs in even the simplest situations. In her emotionally charged state during her arrest and incarceration, they would have been even more compromised." [Rozynski Decl., Ex. Q, Kegl Report at 59]

   **Disputed, as plaintiff has "cherry picked" from Dr. Kegl's report. Although a partial motion to exclude said report at trial was made by defendant at Docket 64, the entirety of Dr. Kegl's report is annexed to the Zuckerman Reply Decl. as Exhibit M. Additionally, defendant objects to this assertion as not being a**

factual assertion at all, but rather a partial conclusion and opinion of an expert witness.

91.  According to Dr. Judy Kegl, "Ms. Williams was only able to read reliably at the second-grade level." [Rozynski Decl., Ex. Q, Kegl Report at 68]

**Disputed, as plaintiff has "cherry picked" from Dr. Kegl's report. Although a partial motion to exclude said report at trial was made by defendant at Docket 64, the entirety of Dr. Kegl's report is annexed to the Zuckerman Reply Decl. as Exhibit M. Additionally, defendant objects to this assertion as not being a factual assertion at all, but rather a partial conclusion and opinion of an expert witness.**

92.  According to Dr. Judy Kegl, "Ms. Williams is clearly a native signer of ASL and a fossilized user of English. There is no comparison between the nuanced communication she can produce in ASL and what she is relegated to produce using what she knows of English. Her English writing is that of a 7-8 year old. Her English speech is virtually nonexistent. The stress of producing speech makes constructing a story in spoken English a daunting task." [Rozynski Decl., Ex. Q, Kegl Report at 74].

**Disputed, as plaintiff has "cherry picked" from Dr. Kegl's report. Although a partial motion to exclude said report at trial was made by defendant at Docket 64, the entirety of Dr. Kegl's report is annexed to the Zuckerman Reply Decl. as Exhibit M. Additionally, defendant objects to this assertion as not being a factual assertion at all, but rather a partial conclusion and opinion of an expert witness.**

93. Dr. Judy Kegl concluded: "In my expert opinion, Ms. Williams does not have the English skills in any modality-auditory, spoken, written, or via lip-reading- to cope on her own in a law enforcement context. Her only access to communication is via ASL and therefore via a qualified ... interpreter." [Rozynski Decl., Ex. Q, Kegl Report at 75]

**Disputed, as plaintiff has "cherry picked" from Dr. Kegl's report. Although a partial motion to exclude said report at trial was made by defendant at Docket 64, the entirety of Dr. Kegl's report is annexed to the Zuckerman Reply Decl. as Exhibit M. Additionally, defendant objects to this assertion as not being a factual assertion at all, but rather a partial conclusion and opinion of an expert witness.**

E.    INJURIES:

94. Prior to the incident of 9/11/11, Diana Williams did not suffer from any psychological illnesses or conditions. [Rozynski Decl., Ex. E, Diana Williams Dep. 55: 1 -3]

**Disputed, as plaintiff does not have the foundation to opine as to this assertion. In any event, this assertion is completely irrelevant to defendant's motion for partial summary judgment, and the report of defendant's psychiatric expert, Dr. Steven Fayer, discusses other factors for any "illnesses or conditions" that plaintiff purportedly suffers from at present, including, but not limited to her childhood experiences and education and her present disability due to a back condition. Zuckerman Reply Decl., Ex. S, Report of Dr. Steven Fayer, October 9, 2014, Exhibit 2 to Dr. Fayer's deposition in this case.**

95. Subsequent to the incident of 9/11/11, and because of the traumatic nature of that incident and her confinement, Diana Williams began to suffer psychological illness. [Rozynski Decl., Ex. E, Diana Williams Dep. 55:4-13]

**Disputed, as plaintiff does not have the foundation to opine as to this assertion. In any event, this assertion is completely irrelevant to defendant's motion for partial summary judgment, and the report of defendant's psychiatric expert, Dr. Steven Fayer, discusses other factors for any "illnesses or conditions" that plaintiff purportedly suffers from at present, including, but not limited to her childhood experiences and education and her present disability due to a back condition. Additionally, Dr. Fayer disagrees with any assertion that plaintiff suffers from PTSD or other psychiatric illness, as alleged by plaintiff in this litigation. Zuckerman Reply Decl., Ex. S, Report of Dr. Steven Fayer, October 9, 2014, Exhibit 2 to Dr. Fayer's deposition.**

96. Diana Williams suffers from anxiety of enclosed spaces or confinement that prevents her from riding in the back seat of a car, riding in an elevator, or riding a roller coaster. [Rozynski Decl., Ex. E, Diana Williams Dep. 57:2-60:19]

**Disputed, as plaintiff does not have the foundation to opine as to this assertion. In any event, this assertion is completely irrelevant to defendant's motion for partial summary judgment, and the report of defendant's psychiatric expert, Dr. Steven Fayer, discusses other factors for any "illnesses or conditions" that plaintiff purportedly suffers from at present, including, but not limited to her childhood experiences and education and her present disability due to a back condition. Additionally, Dr. Fayer disagrees with any assertion that plaintiff**

**suffers from the condition alleged by her in this factual assertion. Zuckerman Reply Decl., Ex. S, Report of Dr. Steven Fayer, October 9, 2014, Exhibit 2 to Dr. Fayer's deposition.**

97. Diana Williams was diagnosed with post-traumatic stress disorder by Dr. Lisa Kornberg, a therapist fluent in ASL with whom Ms. Williams has been treating since October 3, 2012. [Rozynski Decl., Ex. E, Diana Williams Dep. 65:15-20, Rozynski Decl., Ex. X, Kornberg Records at 1-2]

**Disputed, as plaintiff has failed to accompany this factual assertion with admissible evidence from Dr. Kornberg supporting such an opinion. In addition, Dr. Fayer, defendant's psychiatric expert, disagrees with any assertion that plaintiff suffers from PTSD, Zuckerman Decl., Ex. S, Exhibit 2 to Dr. Fayer's deposition, and whether plaintiff has PTSD or not is completely irrelevant to defendant's motion for partial summary judgment.**

98. Diana Williams currently takes anti-depressant and anti-anxiety medications to treat psychological illness caused by the incident of 9/11/11. [Rozynski Decl., Ex. E, Diana Williams Dep. 13: 16-17, 14:2-5]

**Disputed, as plaintiff completely lacks foundation to opine as to same. This assertion is also completely irrelevant to defendant's motion for partial summary judgment.**

99. Dr. Sandra Mays Clough is a clinical psychologist who examined Ms. Williams on September 23, 2014. [Rozynski Decl., Ex. Y, Clough Report at 1]

**Admit only to the extent that Dr. Clough is plaintiff's psychological expert in this case, and purportedly met with plaintiff. This assertion is also completely irrelevant to defendant's motion for partial summary judgment.**

100. Based on her examination of Ms. Williams, Dr. Clough concluded: "After evaluation and review, it is this psychologist's professional opinion that Mrs. Williams currently meets criteria, for Post Traumatic Stress Disorder, with panic attacks (309.81) and Other Specified Depressive Disorder, Depressive episodes with insufficient symptoms (311) according to the DSM 5. As symptoms of PTSD and depression began shortly after her traumatic experiences on September 11, 2011 (i.e. within 3 months), it is this psychologist's professional judgment that these symptoms developed in direct response to the specific traumatic experiences of September 11, 2011. Given that Mrs. Williams continues to report significant symptomatology three years after her traumatic experiences, it is this psychologist's professional opinion and judgment that remediation of these reactions will require continued talk therapy and continued medication for a significant period of time. Additionally, while symptoms may decrease in intensity and frequency, it is not uncommon for these reactions to recur and intensify in reaction to ongoing life stressors and reminders of her traumatic experience." [Rozynski Decl., Ex. Y, Clough Report at 8]

**Disputed, as Dr. Clough is plaintiff's psychological expert and the foregoing represents a portion of Dr. Clough's opinions as set forth in her written report. Dr. Fayer, defendant's psychiatric expert, disagrees with any assertion that plaintiff suffers from PTSD, Zuckerman Decl., Ex. S, Exhibit 2 to Dr. Fayer's**

**deposition, and whether plaintiff has PTSD or not is completely irrelevant to defendant's motion for partial summary judgment.**

F.     NYPD TRAINING:

101.   On November 18, 2009, the NYPD entered into a Settlement Agreement with the United States of America, in which the NYPD agreed to comply with the provisions of the ADA as applied to deaf individuals and to train its officers accordingly. [Rozynski Decl., Ex. B, Settlement Agreement]

**Disputed, to the extent that the foregoing "Settlement Agreement" speaks for itself, notwithstanding plaintiff's attempt to interpret it without admissible evidence.**

102.   It is the policy of the NYPD to handcuff all arrestees with their hands behind their backs, and there are no exceptions to this policy. [Rozynski Decl., Ex. A, Roberson Dep. 91: 1 5-92:4; Rozynski Decl., Ex. K, Romano Day 1 Dep. 85:20-86:5]

**Disputed, as the cited deposition testimony certainly does not support such an assertion.**

103.   Carol Ann Roberson has been the Assistant New York City Commissioner of Training for the NYPD for approximately thirteen (13) years, during which time she has been responsible for developing and presenting training to officers. [Rozynski Decl., Ex. A, Roberson Dep. 9:4-12, 10:6-13]

**Undisputed, except to the extent that plaintiff is attempting to assert that Commissioner Roberson is the NYPD's only Assistant Commissioner of Training.**

104. Carol Ann Roberson stated that the NYPD took no steps in response to the Settlement Agreement between the United States of America and the City of New York. [Rozynski Decl., Ex. A, Roberson Dep. 35:3-5]

**Disputed, as the question to which Commissioner Roberson answered "None" to was whether she personally had taken such steps. She was not asked nor answered the question of whether the NYPD had taken any such steps. As such, the assertion is completely unsupported by the cited deposition testimony or other admissible evidence.**

105. Carol Ann Roberson stated that the NYPD considered sign language interpreters to be qualified if they self-identified as being able to converse in ASL and obtained certification through the Lexington School for the Deaf. [Rozynski Decl., Ex. A, Roberson Dep. 39:11-17, 40:13-17]

**Disputed, and objected to as irrelevant to any issue in this case, as plaintiff never had contact with any of the NYPD's sign language linguists. See brief filed by defendant at Docket 64. Additionally, this assertion is not a fact at all, but rather the cited deposition testimony of Commissioner Roberson speaks for itself. Also, Commissioner Roberson's cited testimony refers to the NYPD's linguists on the NYPD's staff only. The NYPD also contracts with outside contractors to provide sign language interpretation on an as needed basis. Zuckerman Reply Decl., Ex. T and U, Roberson Dep., p. 21, ll. 9-23).**

106. According to Professor Geoffrey Poor, an expert in American Sign Language interpreting, the NYPD's procedure for certifying interpreters as qualified is

"emphatically not an appropriate tool for measuring interpreting."  [Rozynski Decl., Ex. Z, Poor Report at 1]

**Disputed, and objected to as irrelevant to any issue in this case.  See brief filed by defendant at Docket 64.  Additionally, this is a portion of an opinion from one of plaintiff's experts, and is not a factual assertion at all.**

107. Carol Ann Roberson stated that she had never seen provision of an auxiliary aide reflected in an officer's memo book or in a sergeant's log, even though procedure requires it.  [Rozynski Decl., Ex. A, Roberson Dep. 41:17-42:2]

**Undisputed only to the extent that Commissioner Roberson's deposition testimony speaks for itself and defendant objects to same as this is not a factual assertion at all.  In any event, this assertion is completely is irrelevant to any issue presented upon defendant's motion for partial summary judgment, and plaintiff cannot even point to any deposition testimony that it is or would have been Commissioner Roberson's job to review such memobook entries or sergeant's logs.  Commissioner Roberson's job responsibilities, as testified to, are that she develops and presents training to police officers as an Assistant Commissioner in the NYPD's Training Bureau.  See Response to No. 103 above.**

108. Officer Romano stated that, at the time of the arrest, he was not aware of the procedure for getting an interpreter for a deaf person.  [Rozynski Decl., Ex. K, Romano Day I Dep. 16:22-17:2]

**Undisputed, only to the extent that P.O. Romano's deposition testimony speaks for itself.  Defendant further objects to same as this is not a factual assertion at all.**

109. Officer Romano, as of the date of his deposition, could not recall receiving any training on the Americans with Disabilities Act or on how to communicate effectively with deaf people. [Rozynski Decl., Ex. K, Romano Day 1 Dep. 23: 15-18]

**Disputed, to the extent that the cited deposition testimony speaks for itself and does not support the full assertion made by plaintiff. Also, the NYPD's records show that P.O. Romano did receive the training alluded to herein that was discussed at length by Commissioner Roberson at her deposition. (Zuckerman Reply Decl., Ex. U, Roberson Dep., p. 11, l. 4-p. 15, l. 24; p. 35, l. 21-p. 36, l. 19 and Ex. U to Zuckerman Reply Decl., Exhibits 11, 14 and 16 to Roberson dep., NYPD Training Materials and Exhibit V to Zuckerman Reply Dep., NYPD record regarding P.O. Romano's training) The NYPD's "Interaction with Hearing Impaired Persons" Patrol Guide Procedure that was in effect at the time of plaintiff's arrest was Exhibit 5 to the Roberson deposition (See Zuckerman Reply Decl., Ex. U, Roberson Dep., pp. 43-p. 44, l. 19 and Ex. 5 to Roberson dep. at Zuckerman Reply Decl., Ex. U).**

110. Officer Costanzo stated that he had never provided auxiliary aid or accommodation to someone with a disability during his entire career as a police officer. [Rozynski Decl., Ex. J, Costanzo Dep. 17:15-19:13]

**Disputed, to the extent that the cited deposition testimony speaks for itself and does not support the full assertion made by plaintiff nor has any relevance to this case.**

111. Sergeant Christopher Maki stated that he could not recall being trained on or reading any documents about interacting with deaf individuals. [Rozynski Decl., Ex. W, Maki Dep. 35:2-36:20]

   **Disputed, as the cited deposition testimony speaks for itself and does not support the assertion made by plaintiff nor has any relevance to this case. For instance, Sgt. Maki's testimony makes reference to knowing the "general idea as to what the Americans with Disabilities Act is," but simply not recalling "being specifically trained," at p. 35, ll. 2-9, meaning only that he may not have recalled the specific training session from when he went through the NYPD Police Academy back in 2005. Zuckerman Reply Decl., Ex. W, Maki Dep., p. 7, ll. 14-17)**

112. Lieutenant John Montaperto stated that he had "possibly" seen training documents referring to accommodating deaf or otherwise disabled individuals pursuant to the ADA, but could not remember details of such documents. [Rozynski Decl., Ex. AA, Montaperto Dep. 68: 19-70:25]

   **Disputed, and objected to as vague, as well as that the cited deposition testimony speaks for itself, does not support the full assertion made by plaintiff and is irrelevant to this case.**

113. Lieutenant John Montaperto stated that he did not know whether it was police procedure to ascertain whether a person needs an interpreter. [Rozynski Decl., Ex. AA, Montaperto Dep. 82: 14-18]

**Disputed, and objected to as vague, as well as that the cited deposition testimony speaks for itself (and the question was objected to at the time of the deposition), does not support the assertion made by plaintiff and is irrelevant to this case.**

114. Sergeant Martin Williams stated that the first time he had ever reviewed NYPD training materials, including an interim order and patrol guide procedure, was in preparation for his deposition. [Rozynski Decl., Ex. AB, Martin Williams Dep. 7: 11-8:20]

**Disputed, and objected to as vague, as well as that the cited deposition testimony speaks for itself, does not support the full assertion made by plaintiff and is irrelevant to this case. In fact, NYPD interim orders and patrol guide procedures are not technically "training materials" as plaintiff tries to assert without any foundation or admissible evidence whatsoever.**

115. Officer Patrick Volgende, when presented at his deposition with five NYPD documents discussing how to interact with deaf or hearing impaired persons, stated that he had only reviewed one of them in a context not related to his deposition. [Rozynski Decl., Ex. AC, Yolgende Dep. 25:3-27:9]

**Disputed, and objected to as vague, as well as that the cited deposition testimony speaks for itself, does not support the full assertion made by plaintiff and is irrelevant to this case.**

116. Ms. Williams brings this case for damages and equitable relief under 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131 ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New York Human Rights Law, N.Y. Executive Law §§ 290, et seq. ("NYHRL"); and the New York City Human Rights

Law N.Y.C. Admin. Code §§ 8-101 et. seq. ("NYCHRL"); alleging that the NYPD failed to accommodate her disability, maintained discriminatory policies, failed to train its officers, and unconstitutionally arrested her without probable cause, depriving her of liberty without due process of law. [See generally Amended Complaint, Dkt. No. 14]

**Undisputed only to the extent that plaintiff purports to proceed as set forth in her Amended Complaint and herein.**

Dated:  New York, New York
        March 17, 2015

ZACHARY W. CARTER
Corporation Counsel of the
 City of New York
Attorney for Defendant City
100 Church Street, Room 3-133b
 New York, New York 10007
(212) 356--3519


By: _____/s/_____
        MARK D. ZUCKERMAN
        Senior Counsel