UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___8/5/2015___

DIANA WILLIAMS,                          :
                                         :
                                         :
                          Plaintiff,     :           12-CV-6805 (VEC)
                                         :
            -against-                    :           OPINION & ORDER
                                         :
CITY OF NEW YORK,                        :
                                         :
                          Defendant.     :
                                         :
-------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

        This case arises from the arrest and overnight detention of a deaf woman by the New

York City Police Department ("NYPD").  New York City takes the extraordinary position that,

even though the Americans with Disabilities Act ("ADA") has been the law of the land for

twenty-five years, it has no obligation to provide any accommodation to the hearing-impaired at

the time of an arrest, even if doing so could easily be accomplished without endangering the

officers or the public safety and without interfering in the lawful execution of the officers' duties.

For the reasons that follow, the Court disagrees that the City's responsibilities to the hearing-

impaired are so limited.

        On September 11, 2011, Plaintiff Diana Williams, who is deaf,[1] was arrested and

detained overnight by the NYPD.  Def. Local Rule 56.1 Statement of Undisputed Material Facts

("Def. 56.1 Stmt.") ¶¶ 1-2, Dkt. 61.  At no time from the police officers' initial on-the-street

interaction with Plaintiff, when they concluded that probable cause existed for her arrest, until

---

[1]        Plaintiff is unable to communicate orally or to write in English.  Rozynski Decl. Ex. E ("D. Williams
Dep.") at 28, Dkt. 66-5.  Although she has some ability to read lips, she communicates almost exclusively using
American Sign Language.  *Id.* at 55.

her release from NYPD custody almost 24 hours later, did the NYPD provide Plaintiff with an American Sign Language ("ASL") interpreter or any auxiliary communication aid.[2] Def. Response to Pl. Local Rule 56.1 Counter-Statement of Facts ("Def. 56.1 Resp.") ¶ 67, Dkt. 77. Plaintiff alleges that the City is liable: pursuant to 42 U.S.C. § 1983 (Count I); for discrimination based on her disability (Count II)[3]; for common law false arrest (Count III); and for common law assault and battery (Count IV). Am. Compl. ¶¶ 29-62.[4] The City moved for summary judgment on all of Plaintiff's claims, "except for her discrimination claims while she was detained at the NYPD's 122nd Precinct and Staten Island Central Booking." Def. Mem. at 1, Dkt. 63. For the reasons the follow, the City's motion is DENIED.

## I.    FACTUAL BACKGROUND

In 2011, Plaintiff and her husband Chris Williams owned property on Staten Island; Mr. Williams resided in the basement, and two upstairs rooms were rented to Lorena White and Nicole Sabella. Pl. Local Rule 56.1 Response to Def. Statement of Facts ("Pl. 56.1 Resp.") ¶¶ 3-4. Mr. Williams, who is deaf and communicates primarily through ASL, can speak and read lips to some degree, and he can read and write English. Rozynski Decl. Ex. D ("C. Williams Dep.") at 10, 12, 14-15, Dkt. 66-4. The tenant Lorena White is also deaf, but she can read and write English. C. Williams Dep. at 59. The other tenant, Nicole Sabella, hears normally and can

---

[2]    Plaintiff was taken to the hospital twice when she displayed extreme signs of anxiety. Def. Resp. to Pl. 56.1 Stmt. ¶¶ 70-71, 78. The only ASL interpreter provided to Plaintiff at any point was by the hospital during the first visit. Pl. Resp. to Def. 56.1 Stmt. ¶ 57.

[3]    Plaintiff alleges that her treatment violated Title II of the Americans with Disability Act, 42 U.S.C. § 12131 *et seq*. ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*., the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL").

[4]    The Court dismissed Plaintiff's claim for injunctive relief (Count VII) by order dated July 22, 2014. Dkt. 34. Plaintiff withdrew her claims for common law intentional infliction of emotional distress (Count V) and negligent supervision and hiring (Count VI) in her response to the City's motion for summary judgment. Pl. Mem. at 17, Dkt. 65.

communicate using ASL. Rozynski Decl. Ex. C ("Sabella Dep.") at 28, Dkt. 66-3; C. Williams Dep. at 38.

When White and Sabella fell behind on their rent, the Williamses notified them by letter that they would have to vacate the property by September 11, 2011. Pl. 56.1 Resp. ¶ 7. White, who had a history of aggressive behavior, responded to the letter with threats to Mr. Williams and made false complaints about him to the police. *Id.* ¶¶ 6, 8. In an attempt to avoid any problems during White's departure, the Williamses, using a video relay service, called the NYPD at 9:15 a.m. on September 11 to request a police presence at the residence. *Id.* ¶¶ 9, 14, 16. The police did not appear as requested. *Id.* ¶ 33.

The Williamses' prediction that White's departure would not be without drama proved accurate, but, by all accounts, it was much ado about nothing. At some point that morning, the Plaintiff's dog ran into White's bedroom, and Plaintiff followed to retrieve him. D. Williams Dep. at 97. She bent down to pick him up, and White was "in [her] face" when she stood. *Id.* Plaintiff's brother, David Rivera, who was also present, said that at that point White "lost her temper." Rozynski Decl. Ex. E ("Rivera Dep.") at 59, Dkt. 66-5.[5] Plaintiff testified that White "got in [her] face," but never touched her. D. Williams Dep. at 99. She said that she reached her hand out toward White to "give [her] some space" and "get [her] balance," and that it was "possible" that she touched White in doing so, but if she did "it was very gently and very fast." *Id.*[6] Rivera testified that he did not see any physical contact between the women. Pl. 56.1 Resp. ¶ 25; Rivera Dep. at 58-59. As Rivera described the scene, White angrily signed at Plaintiff as Plaintiff backed away from White with her dog in her arms before retreating. Rivera Dep. at 59.

---

[5]       Rivera is deaf, can read and write English, and is an ASL instructor. Rivera Dep. at 85, 94, 106.

[6]       White was not deposed because the parties could not locate her.

When the dust settled, Plaintiff had a scratch on her chin, which she attributed to the dog. Rozynski Decl. Ex. I ("D. William Aff.") ¶ 1, Dkt. 66-9. Mr. Williams and Sabella testified that neither Plaintiff nor White had any visible physical injuries, and Rivera testified he did not observe any injuries on Plaintiff. Pl. Local Rule 56.1 Counter-Statement of Facts ("Pl. 56.1 Stmt.") ¶ 57; *accord* Sabella Dep. at 66; Rivera Dep. at 87; C. Williams Dep. at 98.

Shortly thereafter, White went outside to greet her boyfriend, Alendi, who had arrived at the residence. Rivera Dep. at 59.[7] Alendi can hear and communicate orally. Def. 56.1 Resp. ¶ 17. Rivera tried to physically block Alendi from getting inside the house, at which point Alendi made a hand gesture that Rivera and Mr. Williams interpreted to mean that Alendi had a gun. Rivera Dep. at 60; C. Williams Dep. at 78. Rivera and Mr. Williams went across the street to Rivera's house to make a second call to the police. C. Williams Dep. at 78-79; Zukerman Ex. I. Again using a video relay service, Mr. Williams told the dispatcher that a man was chasing him with a gun, and the dispatcher told him that an officer would be right over. C. Williams Dep. at 79.[8] When Mr. Williams and Rivera returned to the Williamses' home, they saw Plaintiff, White, Sabella, and Alendi all outside the residence. *Id.* at 84; Rivera Dep. at 79. Sabella, however, recalled being inside the house when the police arrived. Sabella Dep. at 50.

Officers Christopher Romano and Gillio Costanzo responded to Mr. Williams' "man with a gun" call; the dispatch report showed that incident was reported using a video relay service for the deaf. Pl. 56.1 Stmt. ¶¶ 31-32; Zuckerman Decl. Ex. I, Dkt. 62-9. The officers arrived at the residence approximately five minutes after the call was received. C. Williams Dep. at 83. Both Mr. Williams and Rivera testified that they attempted to convey to the officers that they were the

---

[7] Alendi's last name was unknown to any of the witnesses who were deposed. *See, e.g.*, Sabella Dep. at 47.

[8] Having had his original request for a police presence ignored, Mr. Williams apparently believed (accurately) that hyperbole would accomplish his goal of getting a police officer to respond.

callers who had sought help, but the officers gravitated toward Alendi, who was able to communicate orally. Rivera Dep. at 80; C. Williams Dep. at 87.

Officer Costanzo interviewed White, with whom he communicated through Alendi, but never spoke or interacted with Plaintiff. Rozynski Decl. Ex. J ("Costanzo Dep.") at 12, 41. According to Officer Costanzo, Officer Romano interviewed Plaintiff while he spoke with White. *Id.* at 28, 43. Officer Costanzo recalled that White, through Alendi, told him that she was moving out of the apartment, that there had been an ongoing issue between the landlord and tenant, "[a]nd one way or another, they put hands on each other and they started to fight." *Id.* at 33. Costanzo testified that he remembered that both women were arrested for assault, but he was not "one hundred percent sure" whether White had admitted assaulting Plaintiff. *Id.* at 36. Officer Costanzo described his conversation with Officer Romano about their interviews with the two women as follows: "Well, when I got my side, he got his side. And then, we were just, like, she hit her and they scratched. And that was it." *Id.* at 43. Officer Costanzo did not recall any accusations about a man making threats with a gun or anyone talking about a gun being present at the scene. Costanzo Dep. at 36, 88.

Officer Romano's recollection is, at best, hazy. He remembers speaking to one of the women through her husband, who could communicate orally. Rozynski Decl. Ex. K ("Romano Apr. 4 Dep.") at 34, 39. He recalls that a woman told him that she and the other woman had gotten in a fight, but there was no mention that the woman had been involved in an assault. *Id.* at 36-37, 40. He deduced that by "fight" the woman meant "physical fight" based on his observation of visible injuries. Romano Apr. 4 Dep. at 40, 43. At his first deposition, he could not recall the specific injuries; at his second, he recalled a scratch on Plaintiff's face and that she complained of pain in her arm. Romano Apr. 4 Dep. at 40-41; Rozynski Decl. Ex. L ("Romano

Oct. 9 Dep.") at 17.  Officer Romano concluded that the visible injury was the result of an assault "[b]ecause the husband told me that they were both fighting, so did the other woman and that's really all we need."  Romano Apr. 4 Dep. at 43.  He did not recall "if they informed [him] that they were fighting physically" – his conclusion was based solely on his observations at the scene.  Romano Apr. 4 Dep. at 43-44; Romano Oct. 9 Dep. at 91.  Curiously, Officer Romano testified at his second deposition that he was able to communicate with Plaintiff directly:

> Q:  How were you able to communicate with Diana Williams directly?
>
> A:  I would just speak to her and ask her questions.
>
> Q:  And she would respond to you?
>
> A:  From – I don't recall how she was responding, but to the – to my memory, she responded to any and all information that I needed and long – sorry, go ahead.
>
> Q:  Verbally?
>
> A:  I don't recall.
>
> [Objection to form.]
>
> Q:  So, you recall being able to communicate with Diana Williams just fine?
>
> [Objection to form.]
>
> A:  To the best of my knowledge, I recall, yeah.

Romano Oct. 9 Dep. at 33.  From all of this, Officer Romano concluded that Plaintiff and White had both "committed an arrestable offense [so] they were both arrested."  Romano Apr. 4 Dep. at 36.

Plaintiff, on the other hand, testified that Officer Romano arrested her without making any effort to communicate with her.  D. Williams Dep. at 88-89.  She pleaded for an ASL interpreter, but her pleas were lost without the benefit of an ASL interpreter or other auxiliary aid.  *Id.* at 89.  Rivera and Mr. Williams also testified that Officer Romano approached them and

arrested Plaintiff after speaking to Alendi, Sabella, and White for 15 to 20 minutes. Rivera Dep. at 80; C. Williams Dep. at 87-88. Rivera attempted to request an ASL interpreter in writing, but his requests were ignored. Rivera Dep. at 94. Sabella testified that she was not present when the officers spoke to White and Alendi, and that Plaintiff was already in handcuffs when Sabella exited the house. Sabella Dep. at 68. Sabella also testified that she offered to serve as a translator, but the officers rejected her offer. *Id.*

From the scene of her arrest, Plaintiff was taken to the 122nd Precinct. Pl. 56.1 Resp. ¶ 54. Despite holding her for an extended period (overnight), at no time did the NYPD provide her with an ASL interpreter or any other form of auxiliary aid to inform her why she was under arrest or how long she would be held in police custody. Def. 56.1 Resp. ¶¶ 67, 81. Plaintiff was released the next day without any charges being brought. Pl. 56.1 Resp. ¶ 63.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Sista v. CDC Ixis N. America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In

determining whether there is a genuine issue of material fact, the court must "resolve all ambiguities, and draw all inferences, against the moving party." *Id.* (citation omitted). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)). "The nonmoving party must come forward with specific facts showing that there is a *genuine issue* for trial." *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) (quoting *Matsushita*, 475 U.S. at 586-87). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment must be denied. *Liberty Lobby*, 477 U.S. at 248.

**B.     The ADA, NYSHRL, and NYCHRL Apply to Police Interactions At the Scene of an Arrest**

Title II of the ADA prohibits any public entity from discriminating against "qualified" individuals with disabilities "in the provision or operation of public services, programs, or activities." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).[9] Similarly, Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The anti-discrimination provisions

---

[9]     Title II provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

of Title II of the ADA and Section 504 of the Rehabilitation Act are enforceable through implied private rights of action. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). [10]

To establish a violation of the ADA, the plaintiff must demonstrate (1) that she is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of her disability. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014) (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)). To establish a claim under the Rehabilitation Act, the plaintiff must also demonstrate that the defendant receives federal funding. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

There is no dispute that Plaintiff is a qualified individual with a disability[11] or that the City is a public entity and is subject to the ADA and Rehabilitation Act. The City concedes that NYPD actions fall within the scope of Title II of the ADA and the Rehabilitation Act generally but argues that "on the street" interactions between police officers and "qualified individuals with a disability" are excluded from coverage until the crime scene has been secured and the arrestee has been transported to the stationhouse. Def. Mem. at 9-10. In other words, the City argues that the NYPD bears no burden to provide *any* accommodation to disabled individuals

---

[10]    The "standards adopted by Title II of the ADA and for State and local government services are generally the same as those required under section 504 [of the Rehabilitation Act of 1973 for] federally assisted programs and activities," and claims under the two statutes are generally treated identically. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Protections afforded by the NYSHRL are construed coextensively with the ADA, and interpretations of the federal and state statutes provide the "floor" for claims under the NYCHRL. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277-78 (2d Cir. 2009). If Plaintiff can satisfy her burden under the ADA, she will also satisfy her burden under Section 504, the NYSHRL, and NYCHRL.

[11]    A "qualified individual with a disability" is an individual with a disability "who, with or without reasonable modifications to rules, policies or practices, the removal of . . . communication . . . barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

until after the individual has been arrested and booked.  The City advances two theories to support its position:  first, "on-the-street encounters" are not covered "services, programs, or activities;" and, second, exigent circumstances and overriding public safety concerns make it unreasonable to require police officers to accommodate disabled individuals before making an arrest.  *Id.* at 10-12.  The City's crabbed interpretation of Title II's coverage of police activity simply does not comport with the language of Title II and its implementing regulations, particularly in light of the remedial purpose of the statute and the weight of authority that has considered the issue.[12]

"Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights" and "a pattern of unequal treatment" in a wide range of public services and activities "in the administration of justice."  *Lane*, 541 U.S. at 524-25.  The Department of Justice's implementing regulations for the ADA make clear that, with exceptions not relevant here, Title II of the ADA "applies to all services, programs, and activities provided or made available by public entities," 28 C.F.R. § 35.102(a), and requires public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the required modification would fundamentally alter the nature of the service, program, or activity, 28 C.F.R. § 35.130(b)(7).  The phrase "services, programs, or activities" is "a catch-all phrase" that prohibits all discrimination by a

---

[12]    The Second Circuit has yet to address the question whether and to what extent Title II of the ADA applies during an on-the-street interaction leading to an arrest.  *See Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 273 (D. Conn. 2013).  The Supreme Court granted certiorari in *City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 702 (2014), to consider the question whether Title II of the ADA applies "to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life," 135 S. Ct. 1765, 1773 (2015).  The Court dismissed the question presented as improvidently granted, however, because the petitioner, respondent, and United States as *amicus curiae* all conceded on the merits that 42 U.S.C. § 12132 applies to arrests.  *Id.* at 1774.  The issue, therefore, remains undecided.

public entity.  *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d Cir. 2012)

(quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997),

*recognized as superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7

(2d Cir. 2001)).[13]  As the Second Circuit has explained, the ADA should be "broadly construed

to effectuate its purpose of providing a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities."  *Id.* at 68 (quotation marks

and citation omitted).

     A number of courts have considered whether interactions between law enforcement and

disabled individuals – whether initiated by the disabled individual or the police and whether the

interaction culminates in an arrest  – are "services, programs, or activities" subject to the

requirement of accommodation under Title II of the ADA.  Those courts have generally found

that Title II applies, but the reasonableness of the accommodation required must be assessed in

light of the totality of the circumstances of the particular case.[14]  The City did not explain why

an arrest should not be considered a "service, program, or activity" of the NYPD within the

scope of Title II of the ADA but urged the Court to follow the reasoning of the Fourth Circuit in

---

[13]    Under the Rehabilitation Act, the term "program or activity" includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).  Title II implementing regulations explain that they "shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 791) or the regulations issued by Federal agencies pursuant to that title."  28 C.F.R. § 35.103(a).  Thus, Title II applies to "all of the operations" of the NYPD.

[14]    *See Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *reversed in part on other grounds*, 135 S. Ct. 1765 (2015); *Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085-86 (11th Cir. 2007) ("[T]he question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety. The reasonable-modification inquiry in Title II–ADA cases is 'a highly fact-specific inquiry.'"); *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000) ("[o]nce the area was secure and there was no threat to human safety . . . deputies would have been under a duty to reasonably accommodate Hainze's disability in handling and transporting him to a mental health facility."); *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law.").

*Rosen v. Montgomery County, Md.*, 121 F.3d 154 (4th Cir. 1997), the District of Maine in

*Crocker v. Lewiston Police Department*, 2001 WL 114977 (D. Me. Feb. 9, 2001), and the

Western District of Washington in *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1160 (W.D. Wash.

1999). Def. Mem. at 12. The Court notes that *Patrice* is no longer good law following the Ninth

Circuit's decision in *Sheehan v. City & County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014),

*reversed in part on other grounds*, 135 S. Ct. 1765 (2015), the precedential value of *Rosen* has

been questioned by the Fourth Circuit, and *Crocker* does not support the City's position.[15]

In *Rosen*, the Fourth Circuit evaluated the Title II claim of a deaf plaintiff who was

arrested for drunk driving. 121 F.3d at 157. The court expressed skepticism about "fitting an

arrest into the ADA at all," because "calling a drunk driving arrest a 'program or activity' of the

County, the 'essential eligibility requirements' of which (in this case) are weaving in traffic and

being intoxicated, strikes us as a stretch of the statutory language and of the underlying

legislative intent." *Id.* The plaintiff did "not contend that his consent to the intoxication test was

the product of his inability to understand the police," and, "[a]s far as the police officers were

concerned, Rosen adequately participated in the various tests for intoxication." *Id.* at 158. The

---

[15] In *Crocker*, the plaintiff had been arrested when the police responded to his girlfriend's report that a domestic assault was in progress, and the assault was overheard by the dispatcher during the 911 call. *Cocker*, 2001 WL 114977, at *2, 8. The plaintiff reported his version of the facts to the officer before he was arrested, and the officers communicated to the plaintiff in writing that he was arrested and the reason for his arrest. *Id.* at *2. The district court held that, as a matter of law, the plaintiff was not entitled to relief because he suffered no cognizable injury -- not because Title II did not apply to the arrest.

To the extent that the City reads *Cocker* to stand for the broader proposition that the ADA does not apply at the scene of the arrest (rather than its holding being limited to the facts of the case), the issue does not appear to be settled in the First Circuit. In *Buchanan v. Maine*, 417 F. Supp. 2d 45, 73 (D. Me. 2006), the District of Maine denied a plaintiff's failure-to-accommodate ADA claim at the scene of an arrest because the ADA's reasonable accommodation requirement "does not come into play" until "exigent circumstances have dissipated." The First Circuit reversed that decision, but "bypass[ed] the question of whether Title II of the ADA imposes a duty on a county sheriff's department" to train officers on interacting with disabled individuals at the scene of an arrest because "[w]hether obliged to do so by Title II or not, the County did in fact have such policies and such training." *Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006). Based on the Court's research, the question of how the ADA applies in an arrest situation appears to remain undecided in the First Circuit.

Court noted that if it were to "assume" that "the police were required to provide auxiliary aids at some point in the process, that point certainly cannot be placed before the arrival at the stationhouse." *Id.* The court's holding that the plaintiff could not establish a claim under Title II, however, was based on the fact that the plaintiff "lacked any discernible injury." *Id.* Because the facts forming the basis of the police officer's probable cause determination were observable by the officer and the police were able to communicate well enough to conduct a field sobriety test, the plaintiff could not show any injury. The City points to dicta in the decision stating that the police had no duty to provide auxiliary aids, if at all, until the arrestee arrived at the stationhouse to argue that the NYPD had no duty to provide Plaintiff with auxiliary aids until she arrived at the stationhouse. Def. Mem. at 10.

More recent decisions from the Fourth Circuit have narrowed *Rosen* considerably. In *Seremeth v. Board of County Commissioners of Frederick County*, 673 F.3d 333 (4th Cir. 2012), the Fourth Circuit again considered whether a plaintiff could state a claim under the ADA based on police officers' failure to provide an ASL interpreter to a deaf person during a law enforcement interaction and "concluded that the ADA applies to the investigations of criminal conduct" that do not result in an arrest. *Id.* at 339. In *Seremeth*, the police responded to a domestic disturbance call placed by the mother of the plaintiff's children. *Id.* at 335. The caller, who was deaf, reported that while on a video call she had seen the plaintiff hit their child; she also informed the dispatcher that the entire family is deaf. *Id.* The dispatcher contacted an officer who was ASL trained to respond to the scene, but that officer did not arrive until 45 minutes after the non-ASL-trained officers arrived. *Id.* When the first officers arrived on the scene, they placed the plaintiff in handcuffs and escorted him outside while they interviewed the other witnesses. *Id.* This was consistent with their standard procedure for domestic disturbance

calls. *Id.* An officer waiting with the deaf plaintiff provided him a note stating that an interpreter was being called to the scene and would explain the situation when she arrived. *Id.* at 336. When the interpreter arrived, she could not effectively communicate with the plaintiff. *Id.* Nevertheless, about ten minutes later, without having ever formally arrested the plaintiff, the deputies released him from handcuffs and departed having concluded that no abuse had occurred. *Id.* The court concluded that the officers' accommodations provided were "reasonable under the circumstances" "due to the exigencies inherent in responding to a domestic violence situation," even though the accommodations "were not best practices." *Id.* at 339-40. Rather than announcing a categorical rule, the Fourth Circuit opted for a case-by-case approach to determine whether compliance with the ADA is required during police interactions: "while there is no separate exigent-circumstances inquiry, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation." *Id.* at 339. *Seremeth* recognized that the dicta in *Rosen* has been called into doubt but noted that "*Rosen*'s precedential reach is more properly cast as limited to the injury grounds necessary to reach its conclusion." *Id.* at 337-38.

The Fourth Circuit's approach is not helpful to the City. Unlike *Rosen*, who did not suffer an injury from the alleged failure to accommodate because he was arrested for driving while intoxicated (an arrest that occurred based on objective evidence observed by the police, unrelated to his inability to hear), there is a clear question of fact whether Plaintiff in this case would have been arrested had the police been able to communicate with both participants in, and the witnesses to, the alleged assault.

*Patrice v. Murphy*, the Western District of Washington case cited by the City that held that "an arrest is not the type of service, program, or activity from which a disabled person could

14

be excluded or denied the benefits," 43 F. Supp. 2d at 1160, is no longer good law. The Ninth Circuit abrogated *Patrice* in *Sheehan v. City and County of San Francisco* when it "agree[d] with the majority of circuits to have addressed the question that Title II applies to arrests," and that the terms "services, programs, or activities" under Title II of the ADA "encompass[es] 'anything a public entity does.'" 743 F.3d at 1232. The Ninth Circuit stated that it agreed with the Fourth Circuit and Eleventh Circuit that "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Id.* (citing *Waller*, 556 F.3d at 175; *Gohier*, 186 F.3d at 1221).

The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing "services, programs, or activities" within the scope of Title II. Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers' accommodations were reasonable under the circumstances. *See Waller*, 556 F.3d at 175 ("Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence."); 28 C.F.R. § 35.164. The City's argument that exigent circumstances may excuse law enforcement officers from providing accommodations fits within this standard; its argument that on-the-street interactions are categorically excluded from Title II coverage does not. Def. Mem. at 12.

The City also argued that, even if on-the-street encounters are not categorically exempt from ADA coverage under an exigent circumstance exception, it would have been unreasonable to expect the officers in this case to provide an accommodation for Plaintiff's (and White's) disability before arresting both women. Def. Mem. at 12. The City argues that arresting Plaintiff without calling for an ASL interpreter was, as a matter of law, reasonable because the officers needed to secure the scene in light of Mr. Williams' report that a man was making threats with a

gun and they believed that an assault had occurred prior to their arrival. *Id.* Assuming that the City would be entitled to summary judgment if the record unequivocally demonstrated that providing an accommodation before making the arrest would have posed an unjustifiable risk to public safety, the record in this case does not do so.

Finally, the City argues that it was reasonable to arrest Plaintiff without providing an ASL interpreter because the officers had probable cause for the arrest based on White's alleged report that Plaintiff assaulted her, which would not have been affected by the presence of an interpreter. Def. Mem. at 12. The City's argument proves too much because there is a genuine question of fact whether it was objectively reasonable for Officer Romano to believe that either woman physically assaulted the other. Moreover, probable cause to arrest Plaintiff would establish only that Plaintiff's right to be free from false arrest was not violated; it would not establish that she was not subjected to discrimination by the NYPD on the basis of her disability in its performance of a public service.[16] In this vein, courts have recognized "at least two types of Title II claims applicable to arrests" – one based on false arrest, and the other on failure to accommodate. *Sheehan*, 743 F.3d at 1232. In *Sheehan*, the Ninth Circuit described two fact patterns that may give rise to a Title II claim:

> (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

---

[16] The Court can take judicial notice that the normal police department approach to this sort of call, where no one was seriously injured (if there were in fact any "injuries" at all), would be to talk to each alleged assailant and any eye witnesses before making the judgment that a crime had been committed and, if so, by whom (indeed, that is exactly what the police testified that they did in this case). In this case, where both women were released without being charged, it seems particularly incongruous that they City would argue that having an ASL interpreter on scene would, as a matter of law, have made no difference in the police officers' course of conduct. While the Court is skeptical of that position, ultimately that is a question of fact for the jury to determine.

*Id.* (citing *Waller*, 556 F.3d at 174; *Gohier*, 186 F.3d at 1220-21).

Even assuming that a jury finds that there was probable cause to arrest Plaintiff, the City must establish that providing her an accommodation during the police officers' "investigation" would have been "unreasonable" to rebut Plaintiff's *prima facie* case that an accommodation was available. *See Henrietta D.*, 331 F.3d at 280-81. Given that numerous people were already on the scene who could have served as effective interpreters between the police and Plaintiff, the Court cannot conclude that, as a matter of law, it was reasonable for the police officers not to provide Plaintiff *any* accommodation before placing her under arrest.

For the foregoing reasons, the City's motion for summary judgment on Plaintiff's claims alleging discrimination based on her disability before she arrived at the stationhouse arising under Title II of the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL is DENIED.

### C.     Section 1983 Provides a Remedy for Violations of Title II of the ADA

In addition to seeking a private remedy for the City's alleged disability-based discrimination, Plaintiff also brought a claim under 42 U.S.C. § 1983 to enforce her statutory rights protected by the ADA.[17] In relevant part, § 1983 creates a cause of action to redress the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The City argues that a plaintiff has no remedy under § 1983 for alleged violations of Title II of the ADA because Congress adopted a comprehensive private remedial scheme that displaced private rights of action under § 1983. Def. Supp. Mem. at 3-4. Plaintiff argues that, like the remedial scheme for Title IX of the Education Amendments of 1972, 20

---

[17]     Because the City moved for summary judgment on Plaintiff's claim based on discrimination at the scene of arrest without distinguishing Plaintiff's claim under § 1983 from her Title II ADA claim, the Court *sua sponte* ordered additional briefing to address whether, if the City's motion were denied with respect to Plaintiff's claim under Title II of the ADA and Rehabilitation Act, it should be denied with respect to her claims under § 1983, as well. Dkt. 81.

U.S.C. § 1681(a), Congress did not intend the remedial scheme of Title II of the ADA to preclude actions under 42 U.S.C. § 1983. Pl. Supp. Mem. at 2-3; *see Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).[18] The Court agrees with Plaintiff, and concludes that a private right of action under 42 U.S.C. § 1983 is available to enforce a right created by Title II of the ADA.[19]

A plaintiff does not have a claim under § 1983 for every violation of a right created by federal statute. *See City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005) ("[Section] 1983 does not provide an avenue for relief every time a state actor violates a federal law."). "[T]o sustain a § 1983 action, the plaintiff must demonstrate that the federal statute [allegedly violated] creates an individually enforceable right in the class of beneficiaries to which [she] belongs." *Id.* at 120. "Even after this showing, 'there is only a rebuttable presumption that the right is enforceable under § 1983.'" *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). "The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." *Id.*

The City does not dispute that Plaintiff has individually enforceable rights under Title II of the ADA and the Rehabilitation Act. The issue, then, is whether the City may defeat the presumption that her rights are also enforceable under § 1983 by showing that Congress did not intend that result.

When determining whether a federal statute can be enforced under § 1983, the "primary emphasis [is] on the nature and extent of that statute's remedial scheme." *Fitzgerald*, 555 U.S. at

---

[18]     The United States, by the United States Attorney for the Southern District of New York, submitted a statement of interest pursuant to 28 U.S.C. § 517 in support of Plaintiff's position. *See* Dkt. 84.

[19]     The Court's holding is limited to actions brought under Title II of the ADA. Unlike Title II, Title I of the ADA adopts the remedial scheme of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 12117(a), and Title III of the ADA adopts the remedial scheme of Title II of the Civil Rights Act of 1964, *see* 42 U.S.C. § 12188(a).

253.  "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983."  *Id.* (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 20 (1981)).  In *Fitzgerald*, the Supreme Court held that Title IX's implied private right of action and its express administrative procedure of withdrawing federal funding from non-compliant federally-funded institutions do not demonstrate congressional intent to preclude a private suit under § 1983.  *Id.* at 255-56.  Unlike statutes that "require[] plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit," Title IX "has no administrative exhaustion requirement and no notice provisions."  *Id.* at 254.  Under Title IX's "implied private right of action, plaintiffs can file directly in court, and can obtain the full range of remedies."  *Id.* at 255 (internal citations omitted).  "'[T]he existence of a more restrictive private remedy for statutory violations has been the dividing line between" statutes that preclude an action under § 1983 and those that do not.  *Id.* at 256 (quoting *Rancho Palos Verdes*, 544 U.S. at 121).[20]  The Supreme Court "has never held that an implied right of action," like that of Title IX, "had the effect of precluding suit under § 1983."  *Id.*

---

[20]     All of the cases in this circuit that the City cited as holding that the ADA is not enforceable under § 1983 involved ADA claims brought under provisions that have comprehensive administrative remedies that must be exhausted before bringing claims in federal court.  *See, e.g., Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014) (employment discrimination on the basis of disability in violation of Title I of the ADA); *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 281 (E.D.N.Y. 2014) (employment discrimination on the basis of disability); *M.H. v. Mount Vernon City Sch. Dist.*, 13-CV-3596 (VB), 2014 WL 901578, at *5 (S.D.N.Y. Mar. 3, 2014) (ADA claims covered by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1514, which requires administrative exhaustion before bringing claims in federal court); *E.C. ex rel. R.C. v. Cnty. of Suffolk*, 882 F. Supp. 2d 323, 354-55 (E.D.N.Y. 2012) (claims were covered by the IDEA); *Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, 07-CV-8828 (KMK), 2009 WL 3151200, at *6 (S.D.N.Y. Sept. 28, 2009) (claims covered by the IDEA); *Brown v. Research Foundation of SUNY*, 08-CV-592 (JM), 2009 WL 1504745, at *7 (N.D.N.Y. May 29, 2009) (employment discrimination in violation of Title VII, Title I of the ADA, and the ADEA).  *But see Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 14-CV-1591 (ADS), --- F. Supp. 3d ---, 2015 WL 500871, at *13 (E.D.N.Y. Feb. 6, 2015) (noting that parents' claims against school district for disability discrimination against their child that were "premised upon substantive rights provided by [Title II of] the ADA" were "not actionable under Section 1983").

Title II of the ADA "incorporates the remedial scheme of the Rehabilitation Act of 1973, *see* 29 U.S. C. § 794a(a)(2) (incorporated into Title II by 42 U.S.C. § 12133), which in turn incorporates the remedial scheme of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*" *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 110-11 (2d Cir. 2001); *see also Barnes*, 536 U.S. at 185 ("[T]he remedies for violations of § 202 of the ADA [42 U.S.C. § 12132] and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964." (citing the enforcement provisions of Title II of the ADA, 42 U.S.C. § 12133, and the Rehabilitation Act, 29 U.S.C. § 794a(a)(2))). The Supreme Court also "interpret[s] Title IX consistently with Title VI." *Barnes*, 536 U.S. at 185. In *Fitzgerald*, the Court reasoned that because "Congress modeled Title IX after Title VI of the Civil Rights Act of 1964," and "passed Title IX with the explicit understanding that it would be interpreted as Title VI was," it followed that "Congress intended Title IX to be interpreted . . . to allow for parallel and concurrent § 1983 claims," or, at least, "did not affirmatively intend Title IX to preclude such claims." 555 U.S. at 258-59.

Because the remedial scheme of Title II of the ADA derives from the same source as the remedial scheme of Title IX, the Supreme Court's conclusion that parallel and concurrent § 1983 claims and implied private causes of action are available under Title IX applies with equal force to Title II of the ADA. Accordingly, a plaintiff can bring a cause of action under § 1983 to enforce rights protected by Title II of the ADA.

**D.      There Is A Question of Fact Whether the City Is Liable Under § 1983**

The City argues that Plaintiff has not produced sufficient evidence to establish a *prima facie* case that a municipal policy or custom caused her injury in order to establish municipal liability under § 1983 pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Def. Mem. at 21-23.  The City argues that she has not established a *prima facie* case because the record does not reflect a pattern of similar incidents of police misconduct or that the City was deliberately indifferent to the rights of hearing-impaired individuals with whom untrained officers may come into contact.  *Id.* at 21 n.3, 22.

In response, Plaintiff argues that the record is sufficient to create a question of fact whether her injury was caused by the City's failure adequately to train officers on how to interact with citizens who are disabled due to hearing impairments.  Pl. Mem. at 23-25.[21]  Plaintiff produced a 2009 settlement agreement between the United States and the City, pursuant to which the City agreed to provide auxiliary aids to persons with hearing disabilities and to take other measures to ensure compliance with the ADA.  Rozynski Decl. Ex. B (the "US Agreement") at 3-4.  Plaintiff argues that the City's failure to take affirmative steps to address policy and training deficiencies highlighted in the US Agreement demonstrates deliberate indifference.  Pl. Mem. at 23-24.  Plaintiff acknowledges that the NYPD has training documents on how to interact with

---

[21]      The City's argument that Plaintiff is precluded from advancing a failure-to-train theory of municipal liability because that theory was not clearly alleged in her complaint is without merit.  In *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014) (*per curiam*), the Supreme Court reversed summary judgment in a municipality's favor that had been granted because the complaint failed to invoke 42 U.S.C. § 1983.  The Court stated that the federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Id.* at 346.  The Court clarified that its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), on which the City relies, were "not on point" because those decisions "concern the *factual* allegations a complaint must contain to survive a motion to dismiss."  *Id.* at 347.  Here, the City does not argue that Plaintiff failed plausibly to allege a § 1983 claim but rather that she is precluded from proving her § 1983 claim on the theory that the officers were inadequately trained.  *City of Shelby* makes clear that Plaintiff was not required to plead a specific theory of liability.  Moreover, the City cannot claim surprise by Plaintiff's theory of liability given that she deposed the person who was in charge of NYPD training as a Rule 30(b)(6) witness and questioned each officer about his training with respect to providing reasonable accommodations to hearing-impaired individuals.

hearing-impaired individuals and procedures in place to provide ASL interpreters, *see* Pl. 56.1

Stmt. ¶¶ 105, 115, but she has adduced evidence from which a jury could conclude that NYPD

fails adequately to translate those training materials into effective training for its officers.  For

example, the Assistant New York City Commissioner of Training for the NYPD, who is

responsible for planning and administering NYPD academy training on interacting with disabled

individuals, Carol Roberson, testified that she made no changes to the training program

following the US Agreement.  Zuckerman Decl. Ex. ("Roberson Dep.") at 13, 35.  Moreover,

five police officers who had some involvement in this case were deposed, and *none* could recall

whether he had ever received *any* ADA-related training.

In reply, the City argued that it had a "policy" in place at the time of Plaintiff's arrest – a

procedure in the NYPD Patrol Guide called "Interaction with the Hearing Impaired"[22] – and

produced a record of Officer Romano's training in the academy regarding the ADA.  Def. Reply

at 10; Zuckerman Decl. Ex. V.  The City disputed the evidentiary value of the US Agreement

because the City did not admit to any wrongdoing.  Def. Reply at 10, 12.  Def. Reply at 12.

Finally, the City argued that the evidence in the record is insufficient to create a question of fact

whether it was "deliberately indifferent" because Plaintiff did not produce evidence that

"establish[es] 'to a moral certainty' that a situation such as plaintiff's would be mishandled."

Def. Reply at 13 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

It is well-established that a municipality may be liable under § 1983 only "if the

governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be

subjected' to such deprivation."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting

*Monell*, 436 U.S. at 692).  Municipalities "are responsible only for 'their *own* illegal acts,'" they

---

[22]     The procedure in the Patrol Guide was adopted pursuant to the US Agreement.

"are not vicariously liable under § 1983 for their employees' actions." *Id.* (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, a "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)). "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged injury." *Id.* (quoting *Connick*, 131 S. Ct. at 1359).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Id.* at 334. A municipality's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983" if the "failure to train its employees in a relevant respect" amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion); *Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers chose to retain that program." *Id.* at 1360. "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the constitution.'" *Id.* (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). "[D]eliberate indifference may [also] be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (citing *Reynolds v.*

*Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)) (internal citations and alterations omitted).

Contrary to the City's assertion, a pattern of similar violations is not absolutely necessary to prove municipal liability for failure to train. The operative inquiry is whether the municipality was on *notice* that "a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 131 S. Ct. at 1359; *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (the Second Circuit has "never required" proof of a pattern of violations to establish deliberate indifference; "plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious.'"). Notice may be proved by evidence of a pattern of similar violations, *Connick*, 131 S. Ct. at 1359, or by evidence of one injury if "the need for more or different training [was] so obvious, and the inadequacy [of the training] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for different training, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "The operative inquiry is whether the[] facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash*, 654 F.3d at 334.

In *Cash*, the Second Circuit concluded that a plaintiff could establish deliberate indifference through evidence that showed: the municipality knew of a particular risk and had a policy in place to address that risk; a single incident alerted the policymaker to deficiencies in the policy; and the policymaker failed to take affirmative steps to cure the deficiencies. *See id.* at 339. *Cash* involved a claim by a woman in pretrial detention who was raped by a prison guard. *Id.* at 327. The plaintiff brought a § 1983 claim against the county, alleging that the county was

liable for her sexual assault due to its failure to supervise or implement procedures to protect inmates from sexual assault by guards. *Id*. Following a jury verdict for the plaintiff, the district court granted the defendant's Rule 50 motion for judgment notwithstanding the verdict; on appeal, the Second Circuit reversed. *Id.*

The Second Circuit found that there was sufficient evidence for the jury to find deliberate indifference to the municipality's affirmative duty to protect female prisoners in their custody from sexual assault even though there had only been one prior reported incident of sexual contact and that was between an allegedly "willing" female prisoner and a male guard. *Id.* at 336. The court reasoned that the policymaker had been alerted of the "moral certainty" that female prisoners were at risk of sexual exploitation because New York law "pronounces prisoners categorically incapable of consenting to any sexual activity with guards." *Id.* at 335. Although the prior incident and "'highly publicized incidents' at other New York correctional facilities'" had alerted the relevant policymaker that "mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation," the only response to the earlier incident had been to circulate a memorandum that reiterated existing law and policy. *Id.* at 337-38. The court concluded that a reasonable jury could have found that, "in these circumstances, the defendants' mere reiteration of the proscriptive policy unaccompanied by any proactive steps to minimize the opportunity for exploitation . . . demonstrated deliberate indifference to defendants' affirmative duty to protect prisoners from sexual exploitation." *Id.* at 339; *see also Connick*, 131 S. Ct. at 1360 ("Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.").

Plaintiff has produced sufficient evidence to create a question of fact whether the City was deliberately indifferent to the need for additional training of officers with respect to their interactions with hearing-impaired individuals. Roberson testified that she has overseen NYPD Academy training regarding interactions with individuals with hearing impairments since 2003. The US Agreement (and the events that triggered that agreement) put the City on notice in 2009 that its procedures and officer training might not satisfy its obligations under the ADA and outlined the affirmative steps that needed to be taken so that the City could reasonably ensure that its officers did not violate the rights of individuals with hearing impairments. *See* US Agreement at 3-4. Moreover, putting aside the agreement with the United States, it would be preposterous to believe that given the diversity of the population in the City of New York, the NYPD did not know full well that its officers would encounter persons with hearing impairments in connection with protecting and defending the City and that some of those people would need accommodation in order to interact with the police.

Although the US Agreement mandated certain changes to the training that officers received as new recruits, *see* US Agreement § 9, Roberson testified that she did not make any changes to the training program following the US Agreement. The only evidence in the record of any officer receiving relevant training is Officer Romano's training in the academy, which occurred prior to 2009. Thus, although Plaintiff, like Cash, can point to only a single prior incident where the NYPD treated a person with a hearing impairment badly, a jury could find that the single prior incident put the NYPD on notice of the need to train its officers on procedures to comply with the ADA. And, the evidence of the NYPD's treatment of the Plaintiff

could be sufficient for a jury to conclude that the City was deliberately indifferent to its ADA obligations.[23]

### E. Plaintiff's Common Law Tort Claims

Plaintiff seeks to hold the City liable for intentional torts allegedly committed by its police officers under theories of agency and *respondeat superior*. Am. Compl. ¶¶ 50, 45, 56, 62. Specifically, she alleges that the City is liable for false arrest because the officers lacked probable cause to believe that she had committed a crime, and for assault and battery based on conduct by an unidentified police officer that was intended to and did cause her apprehension and subjected her to unwanted physical contact. The City claims that it is protected from suit based on state law immunity and that, even if it does not enjoy immunity, it is entitled to summary judgment because her arrest was supported by probable cause rendering any physical contact that occurred after her lawful arrest privileged. Def. Mem. at 13-17.

#### 1. The City Is Not Immune From Suit on Plaintiff's Tort Claims

The City argues that it enjoys state law immunity for the officers' allegedly tortious actions. Def. Mem. at 20-21. Eleventh Amendment sovereign immunity does not apply to municipal actors, *see Monell*, 436 U.S. at 690 n.54, and Plaintiff's claims are based on state law. Thus, the City's immunity, if any, would arise only by operation of state law.

"A long line of cases" from the New York Court of Appeals "has held the State or municipalities liable for the actions of their police officers in the line of duty." *Jones v. State of New York*, 33 N.Y.2d 275, 279 (1973) (citations omitted). Because municipal immunity is an

---

[23]     In addition, as recited in the US Agreement, NYPD had received numerous complaints, including one that resulted in a monetary settlement, prior to the incident that gave rise to the 2009 settlement. Between those incidents and the fact that the City and the United States entered into a settlement agreement, a jury could easily find that the City was fully on notice of the need to have effective policies and procedures for dealing with hearing impaired individuals prior to September 11, 2011.

extension of State immunity, the State's waiver of sovereign immunity makes municipalities "answerable equally with individuals and private corporations for wrongs of officers and employees." *Bernardine v. City of New York*, 294 N.Y. 361, 365 (1945); *accord Thomas v. Consol. Fire Dist. No. 1 of Town of Niskayuna*, 50 N.Y.2d 143, 146-47 (1980) (noting that the dicta in *Bernardine* "has been frequently cited with approval by th[e] court in cases finding municipalities liable for the acts of their agents and is now generally understood to permit municipal liability even in the absence of particular statutory enactments"); *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) ("A New York employer, such as the City, is liable for intentional torts, such as assault and battery, committed by its employees provided that the tort is committed within the scope of the [employees'] employment." (citing *Carnegie v. J.P. Phillips, Inc.*, 28 A.D.3d 599 (2d Dep't 2006))).

Despite this broad waiver of immunity, the City argues that the officers' decision to arrest Plaintiff, as well as any other allegedly tortious conduct that followed, were discretionary acts that cannot form a basis for municipal liability. Def. Mem. at 21. "A public employee's discretionary acts – meaning conduct involving the exercise of reasoned judgment – may not result in the municipality's liability even when the conduct is negligent." *Lauer v. City of New York*, 95 N.Y.2d 95, 99 (2000). Although Plaintiff's claims (false arrest and assault and battery) are intentional torts, the "discretionary act" line of decisions on which the City relies all discuss whether municipalities may be held liable for *negligent* acts of its employees given the State's waiver of immunity.[24] Under New York law, the City, just like any other private entity, is

---

[24]     *See McLean v. City of New York*, 12 N.Y.3d 194, 199 (2009) ("We have long followed the rule that an agency of government is not liable for negligent performance of a governmental function unless there existed 'a special duty to the injured person, in contrast to a general duty owed to the public.'" (citation omitted)); *Kovit v. Estate of Hallums*, 4 N.Y.3d 499, 505 (2005) ("To hold the City liable for the negligent performance of a discretionary act, a plaintiff must establish a special relationship with the municipality."); *Lazan v. Cnty. of Suffolk*, 4 N.Y.3d 499, 507 (2005) (concluding that the plaintiff failed to establish a special relationship to give rise to municipal liability for the negligent performance of a discretionary act); *Mon v. City of New York*, 78 N.Y.2d 309,

"answerable for the conduct of its officers who commit common-law torts, such as assault and false imprisonment," when they are "acting in the course of their employment." *Brown v. State of New York*, 89 N.Y.2d 172, 194 (1996); *see also Jones*, 33 N.Y.2d at 279 (affirming dismissal of plaintiff's first cause of action against the Department of Correctional Services based on negligence, but reversing dismissal of the second claim because it "allege[d] an intentional tort.").

### 2.       Assault and Battery

The City argues that it is entitled to summary judgment on Plaintiff's common law assault and battery claim because she failed to allege facts in her Amended Complaint to put the City on notice that her claim was based on contact other than contact that occurred during her arrest, which was purportedly privileged. Def. Mem. at 17; *cf. Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 404 (S.D.N.Y. 2009) (handcuffing and escorting a person under arrest is privileged physical contact). At her January 27, 2014, deposition, Plaintiff testified that while she was in a holding cell she was "pushed" or "shoved" "very forcefully against the wall when [she] attempted to touch [a] police officer's hand" to get the officer's attention. Pl. Mem. at 16-17; *see* D. Williams Dep. at 106-109, Dkts. 66-5, 78-4; Def. Resp. to Pl. 56.1 Stmt. ¶ 65.

Under New York law, "assault" is the "intentional placing of another person in fear of imminent harmful or offensive contact," and "civil battery" is "an intentional wrongful physical contact with another person without consent." *Green*, 465 F.3d at 86 (quoting *Charkhy v. Altman*, 252 A.D.2d 413 (1st Dep't 1998)). "In the civil context . . . , the common meanings of

---

311 (1991) ("[T]he principal question is whether the City has governmental immunity from liability for negligence in hiring."); *Haddock v. City of New York*, 75 N.Y.2d 478 (1990) ([T]he issue now comes down to whether, as a matter of law, the City can be held liable to plaintiff for negligent retention of Johnson as its employee, or whether it is immune from liability on that basis.").

'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." *Girden*

*v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (quoting *United Nat'l Ins. Co. v. Waterfront*

*N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)).

The City argues that Plaintiff's testimony about the alleged tort that occurred in her cell

should be disregarded because the event described was not alleged in Plaintiff's Amended

Complaint, and the Amended Complaint failed to satisfy the Rule 12(b)(6) pleading standard

under *Twombly* and *Iqbal* for an assault and battery claim. Def. Mem. at 20; Def. Reply Mem. at

9. A Rule 12(b)(6) motion "must be made before pleading if a responsive pleading is allowed."

Fed. R. Civ. P. 12(b)(6). Because the City answered the Amended Complaint on February 19,

2014, it must do more than challenge Plaintiff's factual pleadings. The City must "show[] that

there is no genuine dispute as to any material fact" based on admissible evidence in the record,

and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiff's

testimony is not refuted by any evidence in the record, and her testimony alone is sufficient to

establish a *prima facie* case. Because the City has not presented any evidence to dispute

Plaintiff's testimony – let alone such compelling evidence that establishes there is no genuine

dispute regarding what happened – the City's motion for summary judgment must be denied.

### 3. False Arrest

The City argues that it is entitled to summary judgment on Plaintiff's false arrest claim

because Officer Romano had probable cause to arrest Plaintiff based on White's complaints of

assault, which was corroborated by his observation of injuries on the two women. Def. Mem. at

16.[25] Probable cause is a complete defense to an action for false arrest under New York law.

*Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). "An officer has probable cause to arrest

---

[25] Neither officer described the injuries they observed on White, *see* Romano Oct. 9 Dep. at 17; Costanzo Dep. at 30, but arrest reports for both women noted bruising, *see* Rozynski Decl. Ex. R, T.

when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Id.* (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "[I]t is well-established that a law enforcement official has probable cause to arrest if he received information from some person, normally the putative victim or eyewitness" that the person arrested committed an arrestable offense, unless "the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citing *Martinez v. Simonetti*, 202 F.3d 625, 364 (2d Cir. 2000); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). "[S]ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007).

Plaintiff contends that summary judgment is not appropriate because the facts underlying Officer Romano's probable cause determination are disputed, and because a reasonable jury could conclude that his determination was not objectively reasonable. Pl. Mem. at 13-16. Officer Romano admitted that the woman he interviewed did not specify whether what she called a "fight" was physical or merely a "shouting match" (for lack of a better term), but that he inferred from his observations of injuries on the two women that the fight was physical. Romano Apr. 6 Dep. at 40, 43. Officer Costanzo did not recall either woman accusing the other woman of assault or admitting to an assault. Costanzo Dep. at 36. Plaintiff admits that she had a scratch on her chin, but denies that there were any other signs of a physical altercation. D. Williams Aff. ¶ 1, Rozynski Decl. Ex. I, Dkt. 66-9. The testimonies of Mr. Williams, Rivera, and Sabella all support Plaintiff's testimony that she did not have injuries indicative of a physical altercation. C. Williams Dep. at 98; Rivera Dep. at 87; Sabella Dep. at 66. Moreover, according to all of the

witnesses, Plaintiff and White simply did not have a physical altercation that would have produced injuries.  Because the undisputed facts do not establish that Officer Romano's determination that there was probable cause to arrest Plaintiff for assault was objectively reasonable, the City is not entitled to judgment as a matter of law on Plaintiff's common law false arrest claim.

## III.     CONCLUSION

Because the City may be held liable for discrimination on the basis of disability at the scene of an arrest and is not immune from liability under New York law for Plaintiff's false arrest and assault and battery claims under a theory of *respondeat superior*, the City's motion for summary judgment is DENIED.  The Clerk of Court is respectfully requested to terminate the open motion at Docket Entry 60.


**SO ORDERED.**

**Date:  August 5, 2015**                                      **VALERIE CAPRONI**
      **New York, NY**                                    **United States District Judge**